FILED

Nov 15 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      s/ CharityW      DEPUTY

1 | Kevin T. Kelly
2 | 2669 Hamilton Avenue
   | El Centro, California 92243
3 | ktkelly@me.com
4 | (310) 709-5935

# ORIGINAL

5 | *Pro Se Plaintiff*

6

7

8

9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

10

11

12 | KEVIN T. KELLY,                          Case No: **'18CV2615 JLS  WVG**

13 |                    Plaintiff,

14 |                                          **COMPLAINT FOR DECLARATORY**
   |                                          **AND INJUNCTIVE RELIEF AND**
15 | v.                                       **CIVIL PENALTIES**

16 | CITY OF POWAY, a municipal               (Federal Water Pollution Control Act, 33 U.S.C. §
17 | corporation,                             1251 et seq.)

   |                                          (Endangered Species Act, 16 U.S.C. § 1531 et seq.)
18 |                    Defendant.
                                             *JURY TRIAL REQUESTED*
19

20

21 | **I.     INTRODUCTION**

22 | 1. When the City of Poway incorporated as a general law city in San Diego County

23 |    in December 1980, the former Poway Municipal Water District became part of

24 |

25 |    the City structure, including its earthen dam in Warren Canyon near the base of

26 |    Mount Woodson. The dam, 160 feet high and 1,060 feet wide, created a 62-acre

27 |

28 |    lake over a United States Geological Survey blue-line seasonal stream called

Warren Creek. This reservoir, now known as Lake Poway, serves as a local emergency water supply and is able to store over one billion gallons of water at one time.[1]

2.  While most of the water from Lake Poway is usually imported by the San Diego County Water Authority and piped in and out of the reservoir on a regular basis, natural runoff can fill almost one third of the reservoir's capacity during wetter years.  This natural runoff is funneled into the reservoir from two seasonal streams that merge together, with one coming from the Mount Woodson cornerstone, the other coming from the Rock Haven Cornerstone. From the merged streams, the reservoir has been designed to capture millions of gallons of storm runoff as well as natural spring water emanating from both Mount Woodson and Rock Haven.

3.  Inevitably, with this storm and spring water, sediment along with other pollutants are transported through these streams and into Lake Poway. Unfortunately, over a long period of time and without sustainable management, sediment deposits will gradually displace the volume area that was previously used for water storage until eventually the reservoir becomes completely filled with sediment. As water storage is lost, the beneficial uses that depend on

---

[1] Once in Lake Poway, the water from the reservoir is pulled into the Lester J. Bergland Water Treatment Plant via a public water supply intake structure for further purification into drinking water. Also, some of this purified water is pumped back into the reservoir for storage.

storage – such as water supply and flood control – also will decline and eventually will be lost.

4. The City of Poway has a system of unpaved roads above Lake Poway that serve as hiking trails leading to the famous Mount Woodson peak and the Potato Chip Rock landmark. These trails contain at least four unpermitted and unauthorized culvert-with-dirt-backfill stream crossings over Warren Creek and its tributaries above Lake Poway and one unpermitted wooden footbridge across waters of the state and United States. The unpaved roads also contain at least eight more cross-drainage culverts not placed in waters of the state but that drain directly into Lake Poway.

5. Over the past 30 years, the City of Poway has never obtained the proper Clean Water Act permits and *individual* water quality certifications[2] from the San Diego Water Board for the placement, maintenance, and replacement of dredged and fill materials in the seasonal and ephemeral tributaries above Lake Poway.

6. There are also about 20 private residences in Warren Canyon within the City of

---

[2] Regardless of whether a tributary is Waters of the United States or merely waters of the state, the San Diego Water Board requires a "water quality certification" for all projects done in such waters and use the same form for either situation (the technical term for the water quality certification for waters of the state are "waste discharge requirements.") The fact that the San Diego Water opted to regulate discharges to waters of the state through the 401 program in lieu of or in addition to issuing waste discharge requirements does not preclude the regional boards from issuing WDRs in the absence of a request for 401 certification. Under state law, the duty to file a report of waste discharge is mandatory; if the project site has an ephemeral tributary, the municipality must apply for and obtain waste discharge requirements prior to impacting waters of the state (which also functions as a Section 401 water quality certification when the ephemeral tributary is considered Waters of the U.S.).

Poway and upstream of Lake Poway, and a number of these private residences also contain unpermitted and unauthorized culvert-with-dirt backfill stream crossings and other illicit discharges/connections and *mobile* pollutants intentionally placed within Warren Creek.

7. Many of these culvert crossings in Warren Creek failed during the winter storms of 2017, including at least two unpermitted and unauthorized culvert crossings owned by the City of Poway and at least four unpermitted crossings owned by private landowners, which resulted in an unreasonable amount of sedimentation pollution into Lake Poway from mobile pollutants caused by anthropogenic sources.

8. A significant portion of the polluted water discharged into Lake Poway was non-storm spring water that flowed during periods of dry weather, collecting sedimentation pollution from and through private residences' point sources and the City's point sources before flowing into the reservoir.

9. After the winter storms of 2017, the City of Poway again conducted unauthorized and unpermitted dredging and filling activities in waters of the United States including rebuilding culvert-with-dirt-backfill stream crossings that have not been engineered to withstand storm surges of an expected an 50-year storm event.

10. The City has used a generalized emergency Department of the Army permit to repair its main tributary crossing on April 17-20, 2017; however, the City has

not met the generalized emergency permit conditions because the rebuilding

efforts were not fully described in the emergency permit (other structures, dirt

fill, and dredged materials were placed in the historical stream), the rebuilding

efforts occurred during non-emergency storm conditions (winter rains

practically ceased by the end of February 2017), and the reconstruction occurred

in proximity to the City's public water supply intake within the reservoir (the

emergency permit cannot be used in this type of situation).

11. These 2017 rebuilding efforts in the Lake Poway area took place when Poway's

City Council suspended environmental review of its projects after it declared a

weather "state of emergency" in a year with a near average amount of rainfall.

After the heavy rains of January and February 2017, it hardly rained at all in

March and April 2017. Inexplicably, this "state of emergency" was not lifted

until March of 2018 following one of the longest dry spells in San Diego County

history. Under this shroud, the City of Poway conducted all of its rebuilding

activities in the Lake Poway area and in Waters of the United States and/or state

during non-emergency circumstances and during the dry spring, summer, and

fall months.

12. The City of Poway does not permit private landowners to construct culvert with

earth-fill road crossings over blue-line streams on private property in Warren

Canyon; yet, in hypocritical fashion and without the proper local permits from

the San Diego Water Board, the City has recently built culvert with earth-fill

road crossings in proximity to Lake Poway, a public water supply that impounds storm water and non-storm spring water from the local mountains and that contains a public water supply intake into a drinking water purification plant.

13. Lake Poway impounds Waters of the United States.

14. As there are multiple sources of water flowing through Warren Creek and into Lake Poway – including storm and non-storm perennial spring water from both Mount Woodson and Rock Haven -- Lake Poway and Warren Creek are considered Waters of the United States.

15. Lake Poway has met the definition of Waters of the United States (WOTUS) since the EPA promulgated its WOTUS rules in the 1980s.

16. Lake Poway is not an enclosed conveyance system or a terminal off-stream reservoir with a lockless dam.

17. Lake Poway is not a ditch as the City of Poway contends.

18. Lake Poway was not created in "dry land." It was created by excavating a tributary.

19. Lake Poway was excavated in wetlands.

20. Lake Poway was not built over an ephemeral tributary. It was built over a seasonal stream that funneled storm and non-storm spring water to the San Dieguito River and thence the Pacific Ocean.

21. Lake Poway is not a strictly intrastate body of water: It is composed of navigable-in-fact waters that are hydrologically connected to the Pacific Ocean

which is 17 miles away; moreover, the waters of Lake Poway have been used in interstate commerce.

    a. Foth-CLE Engineering Group, a Wisconsin based company, was paid by the City of Poway, a California municipal corporation, to use its vessel and attached equipment to navigate and survey Lake Poway in 2018.

    b. The reservoir is and could be used by interstate or foreign travelers for recreational or other purposes;

    c. Fish could be taken from the reservoir and sold in interstate commerce; and

    d. The City of Poway is in the commercial business of renting fishing boats to interstate and foreign tourists for use on Lake Poway.

22. The reservoir has a high downstream hazard risk of flooding according to the state of California because of the seasonal streams feeding the reservoir. Water flooded over the dam in 1997, which was naturally funneled into the Pacific Ocean below.

23. The area below the dam was almost inundated in 2017. Had it rained another inch during the first week of March 2017, water would have spilled over the dam (Poway was able to successfully prevent flooding in 2017 by removing some of the water out of the reservoir during the final days of February 2017).

24. Water also naturally seeps underneath the dam, flows out of an outlet pipe for mandatory releases to satisfy downstream prior rights, and spills over a spillway

during times of flooding. All such waters flow down into the San Dieguito River and thence the Pacific Ocean.

25. The City of Poway has a license to use a fixed amount of the water from Warren Creek, which is a tributary to the San Dieguito River and thence the Pacific Ocean. The amount cannot exceed 858 acre-feet per season and it can only be collected by the reservoir between November 1 of each year to May 31 of the succeeding year. The City of Poway must maintain an outlet pipe of adequate capacity in the dam as near as practicable to the bottom of the natural stream channel in order that water entering the reservoir which is not authorized for appropriation under its license may be released.

26. In 2017, the City of Poway was mandated to release some of the water from its reservoir to Warren Creek below the dam as the reservoir collected more than 858 acre-feet of water from natural runoff.

27. The City of Poway also has a water rights agreement with the City of San Diego, signed in 1968, in which the City of San Diego owns half the water rights of Warren Creek above Lake Poway. The City of Poway must pay the City of San Diego back for its fair share of this water annually.

28. The historical record shows that approximately 1000 acre feet of water from Warren Creek has filled Lake Poway in a given season (e.g., the 1979-1980 season) and that well over 100,000 gallons of water a minute can surge through the main tributary during a 50-year storm event.

29. During the last 30 years, the City of Poway has mismanaged its local water supplies by underreporting the amount of natural runoff that flows into Lake Poway during wetter years. This underreporting is due to the fact that the City of San Diego owns half of the water rights coming from the tributary feeding Lake Poway, and the City of Poway does not want to pay the City of San Diego back for its fair share of water annually.

30. Poway's City Engineer did not do his job of overseeing the work of Poway's Public Works Director Mike Obermiller, who did not account for the amount of water that can flow through the main tributary and into Lake Poway and designed a dirt-backfill stream crossing that will not withstand storm surges and the amount of water coming through the main tributary during wetter years.

31. As of August 23, 2018, the City of Poway is currently looking to hire a new City Engineer.

32. By law, the City of Poway should have constructed a concrete water measuring structure / engineered bridge combination at the location of its current dirt-backfill stream crossing over the main tributary to fulfill its contractual obligations under the 1968 Water Rights Agreement between Poway and the City of San Diego and to meet state and federal water quality requirements.

33. The amount of water coming through the main tributary of Warren Canyon upstream of Lake Poway during a 50-year storm event would not fit within the recently built culvert crossing as it is currently placed and would lead to another

blowout.

34. Considerably less water than a 50-year storm event would cause a blowout of the main tributary culvert crossing because the City realigned the stream from its historical placement and placed dirt-fill and dredged materials in the historical part of the stream bed in 2017 and in previous years without the appropriate Clean Water Act and San Diego Water Board permits.

35. The effluent coming off the City of Poway's rebuilt earthen crossings, as well as the placement of mobile pollutants in Warren Creek by private third party landowners in Warren Canyon, have and will cause pollution in Lake Poway seasonally during most rainy seasons, which will lessen its storage and flood-control capacity over time.

36. In 2017, the City of Poway has failed to obtain *individualized* water quality certifications and/or waste discharge requirements from the San Diego Water Board for its stream crossings in at least two locations above Lake Poway.

37. In 2017, Lake Poway had a higher average numeric turbidity level than in 2016 and, unlike other years, had a higher average numeric turbidity level than allowed by state law for drinking water, based on measurements taken from the public water supply intake.

38. The higher turbidity levels in 2017 were caused by excessive sedimentation from the proximal blown-out stream crossings and the resulting polluted storm and non-storm water that flowed into the reservoir.

39. Under the Clean Water Act, the City of Poway is responsible for ensuring that pollution from its point sources do not lead to the loss of the beneficial uses of Lake Poway. However, not only has the City of Poway not obtained the proper Clean Water Act and San Diego Water Board permits for its construction activities in the Lake Poway area, it has also not been adhering to the National Pollutant Discharge Elimination System ("NDPES") permit (the "2013 MS4 Permit") that it has procured for its storm and non-storm water point-source discharges from its main stormwater sewer system (MS4) feeding the reservoir and other downstream areas including the Pacific Ocean.

40. The City of Poway has done nothing to reduce or eliminate past or future storm and non-storm water discharges of pollutants into Lake Poway. As mandated by its 2013 MS4 Permit, it should have implemented effective controls to reduce future pollution.

41. As Lake Poway is Waters of the United States, the City of Poway's 2013 MS4 Permit requires it to reduce pollutants in storm water discharges from its MS4 to the maximum extent practicable.

42. In 2017, a significant amount of non-storm water – i.e. natural spring water flowing from both Mount Woodson and Rock Haven that is funneled into Warren Creek – became contaminated with mobile pollutants including sedimentation from failed culvert with dirt-backfill crossings owned by the City of Poway as well as several private residences of Warren Canyon.

43. This polluted non-storm water was discharged through a major outfall point source and entered Lake Poway – the receiving body of water of the state and waters of the United States – at pollution levels far above the City's 2013 MS4 Permit non-storm water action levels (NALs) for turbidity and other pollutants.

44. The City of Poway's 2013 MS4 Permit requires that non-storm spring water must be effectively prohibited from entering into the City's MS4 through the effective implementation of various provisions of the City's 2013 MS4 Permit. Otherwise, the 2013 MS4 Permit and federal law require the City to obtain a separate NPDES permit for the non-storm water discharges.

45. History will repeat itself because the City of Poway and some private landowners in Warren Canyon have replaced unpermitted fill and dredged materials – mobile pollutants – back in the main tributary feeding Lake Poway.

46. The non-storm spring water flows into Lake Poway from two sources: Rock Haven Spring, which is on City-owned land (APN: 278-210-1100) and Kelly Spring, which is on land that Plaintiff owns (APN: 278-210-1800). Before the water from Kelly Spring discharges into the City of Poway's MS4, through a major outfall point source, and into the receiving water (Lake Poway), the spring water has become and becomes contaminated with sedimentation pollution and other mobile pollutants mainly from different point-source locations in the privately owned portion of Warren Canyon.

47. Unless a non-storm water discharge is identified as a discharge authorized by a

separate NPDES permit, the City's 2013 MS4 Permit requires the City of Poway

to reduce or eliminate non-storm water discharges from springs and rising

ground waters into its MS4 where feasible and priorities and resources allow.

2013 MS4 Permit, Provision E.2.a.(7).

48. This reduction or elimination of a non-storm water discharge from a spring is

required to be implemented not only if the non-storm water discharge is

uncontaminated but even more so when the non-storm water is contaminated

from pollutants before being discharged into the City's MS4. The policy goal of

this requirement is to ensure that the municipality is doing all it can to preserve

and save precious water resources.

49. From 1972 when Poway dam was built to today, over 20,000 tons of sediment

have entered Lake Poway from Warren Creek.

50. MS4 operators like the City of Poway cannot passively receive and discharge

pollutants from third parties, whether in storm water or non-storm water

discharges.

51. The City's discharges and third-party discharges from its MS4 have caused,

have contributed to, and have threatened to cause sedimentation pollution, as

well as excess turbidity and color pollution, in Lake Poway at unreasonable and

actionable levels in violation of its NPDES permit.

52. In addition to reducing future storm water pollution, the City of Poway must

reduce future non-storm water discharges into its MS4 and into Lake Poway

through effective law enforcement and through effective controls and other best management practices (BMPs) to fulfill its current 2013 MS4 Permit; otherwise, it must ensure that separate NPDES permits are obtained for the non-storm water discharges to its MS4 and to Lake Poway that will occur on a seasonal basis.

53. The City of Poway has failed to address and effectively prohibit non-storm water pollution through implementing a required enforcement program designed to bring private landowners in the watershed area feeding Lake Poway – i.e. Warren Canyon – into compliance with the various Clean Water Act and San Diego Water Board permits and requirements.

54. The City of Poway must implement effective controls and BMPs to segregate perennial flows of spring water from non-point source and point-source pollutants before they are discharged into Warren Creek and into the City's MS4.

55. The non-storm spring water emanating from Mount Woodson is first discharged into the City-owned MS4 starting at APN: 278-290-1000 and continuing on into APN: 278-280-2300, which contains the City-owned point-source culvert crossing over Warren Creek. The non-storm spring water is then discharged through a major outfall point source that drains over 1000 acres (a wooden footbridge single conveyance in Warren Creek which straddles APN: 278-280-2300 and APNs: 2782810100 and 7601590500 (14692 and 14656 Lake

Poway Road, Poway, California 92064, Latitude 33.0039, Longitude -117.0069).[3]

56. The wooden footbridge is a major outfall as defined by the federal regulations that discharges into adjacent wetlands and the surface waters of the Boulder Bay area of Lake Poway. The pictures below show the wooden footbridge in 2005, 2009, and 2018.




---

[3] Alternatively, the major outfall may be the 48-inch culvert immediately upstream of the wooden bridge, depending on how the federal courts interpret the Clean Water Act and the term "Waters of the United States" as applied to Lake Poway, its adjacent wetlands, and its upstream watershed.



57. The City has failed to identify the major outfall in its MS4 immediately above Lake Poway as well as the non-storm water discharges through the relevant point source immediately above Lake Poway and, consequently, has failed to fulfill the wet and dry weather monitoring and reporting requirements that must be done on an annual basis and shown to the San Diego Water Board.

58. The City has failed to prepare and implement a storm water pollution prevention plan and water quality improvement plans for the watershed area above Lake Poway and has failed to implement pollution control technologies and other best management practices to prevent past and future impure storm water and non-storm water discharges and sediment plumes into Lake Poway.

59. The City of Poway has failed to report its non-storm water discharges, its lack of best management practices, and the resulting prohibited and uncontrolled pollution into Lake Poway in its Report of Waste Discharge required for its Regional MS4 permit renewal and in other reports as required by its current 2013 MS4 Permit.

60. The City of Poway has identified through the public record the fact that spring water from Rock Haven flows in its MS4 and reaches Lake Poway and that storm water and non-storm water flows from Warren Creek contributed to the sedimentation pollution into the Boulder Bay portion of Lake Poway in 2017.

61. The City of Poway has acknowledged in the public record that MS4 pollution has nearly buried its wooden footbridge in Boulder Bay with course sediment, which only a few years ago was floating above the waters of Lake Poway.

62. To rectify the degradation of beneficial uses of Lake Poway, the 2013 MS4 Permit requires the City of Poway to reduce pollutants in storm water to the maximum extent practicable and to either prohibit the non-storm water discharges or propose controls to be implemented for the category of non-storm water discharges as part of the Water Quality Improvement Plan and then implement those controls to reduce the non-storm water discharges. 2013 MS4 Permit, Provision E.2.a.(6).

63. One of the policy goals of the Clean Water Act is to capture stormwater and non-storm water efficiently and effectively after storm surges to lessen the

City's reliance on imported water. For the portion of the City of Poway that lies within the San Dieguito watershed, the most effective method of accomplishing this goal is through stream rehabilitation projects at the source of the water. The City of Poway refuses to undertake such projects as mitigation for its harms to the environment and public water supply, which are federally and state mandated.

64. Plaintiff has proposed a feasible way to considerably reduce the non-storm water discharges to the City's MS4 and Lake Poway – i.e. the spring water and rising ground waters emanating from both Rock Haven and Mount Woodson – through wetland repairs and stream rehabilitation projects on APN: 278-210-1800 in the City of Poway that have been designed by a qualified surface water engineer. The City of Poway refuses to undertake such projects in the two streams on this parcel, which would fulfill its 2013 MS4 Permit requirement, Provision E.2, by slowing storm water flows, filtering out pollutants from surface water, creating new wetlands, and recharging underground aquifers through increased capture and infiltration of lowflow spring water runoff.

65. Moreover, following the destruction of its trail system into waters of the United States and reconstruction of its new earthen stream crossings, the City of Poway has failed to adhere to its Habitat Conservation Plan's mitigation requirements by properly accounting for its developmental impacts to waters of the state and United States through the actual preservation of additional biological resources

including restoration and preservation of additional stream and wetland acreage of <u>equivalent</u> type and quality at the appropriate mitigation ratio.

66. The City of Poway does not value wetlands with its current policies and procedures; rather, "[t]he City is trying to remove the 'water of the U.S.' classification" for Lake Poway so that it does not have to comply with any part of the Clean Water Act. Foth-CLE Engineering Group, Geophysical Survey of Lake Poway, at 33 n.4, June 7, 2018.

67. On top of all that, the City of Poway has constructed and maintained unauthorized hiking trails on Plaintiff's private property in the watershed area above Lake Poway. Through its construction and maintenance activities on private property, the City has violated state trespassing laws as well as the Clean Water Act and the Endangered Species Act as the unpermitted trails cross a blue-line stream feeding Lake Poway and contain endangered plant and animal species on the trails and in the vicinity.

## II.    JURISDICTION

68. This action involves conduct, injuries, and rights to relief that present federal questions arising under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. Accordingly, this court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 1365, and 28 U.S.C. §1331, and 16 U.S.C. § 1540.

69. Defendant the City of Poway was served with a notice of the Plaintiff's intent to

sue for violations of the CWA and the ESA, via certified and registered mail, return receipt requested, on July 27, 2018.[4] More than sixty days have passed since Defendant received the Notice Letter. Defendant has not remedied the CWA and ESA violations that are the subject of the Notice Letter and this Complaint. No regulatory agency has commenced and is diligently prosecuting any action to address the illegal activity that is the subject of this action. A copy of Plaintiff's combined CWA and ESA "Notice of Intent" letter is attached as Exhibit 1.

70. Plaintiff provided Notice of Defendant's violations of the Clean Water Act and the Endangered Species Act to the Administrator of the United States Environmental Protection Agency (US EPA); the Administrator of the US EPA Region IX; the Attorney General of the United States; the Executive Director of the California State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Diego Region ("San Diego Water Board"); and the Secretary of the Department of the Interior, in full compliance with the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), the regulations adopted thereunder, 40 CFR § 135.1 et seq., and in full compliance with the Endangered Species Act, 16 U.S.C. § 1540(g)(2)(A)(i).

---

[4] Plaintiff has also submitted Notice Letters to the required parties via certified mail on the following dates: August 3, 2018; August 6, 2018; August 7, 2018; August 13, 2018; October 19, 2018; and November 5, 2018.

71. Plaintiff has filed suit before the 120th day since noticing the federal and state agencies of the City of Poway's regulatory violations.

72. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b), 33 U.S.C. § 1365(c)(1), and 16 U.S.C. § 1540(g)(3)(A) because the acts and omissions giving rise to this action – the effluent standard and limitation violations and prohibitions described herein, the endangerment to the public and its water supply arising herefrom, and the illegal takings of endangered species on private property within the same watershed referenced above – all occurred and/or are located in San Diego County, California, in the Southern District of California.

73. The United States District Court for the Southern District of California has jurisdiction to, inter alia, order civil penalties and grant equitable relief, including but not limited to an order to comply with the CWA and ESA and applicable permits thereunder. 33 U.S.C. § 1365(a); 16 U.S.C. § 1540(g).

74. The United States District Court for the Southern District of California also has supplemental jurisdiction over all other claims that are so related to the claims within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution. 28 U.S.C. § 1367.

## III.   PARTIES

### A. Plaintiff

75. Plaintiff is a taxpaying citizen of Poway and owns 43 acres of key watershed

- 21 -

land that contain streams and springs feeding Lake Poway (APNs 278-210-1800, 278-210-3000, 278-210-2900, 278-210-0300, and 278-210-0400).

76. Since November 2016, Plaintiff has enjoyed the waters of Lake Poway.

77. As a recreational user of the City's reservoir and the surrounding natural environment, he, along with his family, has hiked around, boated in, and fished in the Boulder Bay area and other areas of Lake Poway that have and will be affected by the City of Poway's illegal activities in waters of the state and United States. He hopes to continue to recreate in the Lake Poway area with his family in the future without the seasonal intermittent plumes of sedimentation and other pollutants gradually filling in Lake Poway over time and harming wildlife.

78. He has a passion for protecting wetlands including the wetlands in, adjacent to, and above Lake Poway and enhancing the human use and enjoyment of those natural resources.

79. It is Plaintiff's position that Lake Poway is Waters of the United States as defined by federal law and that the City of Poway's regional storm water and non-storm water permit (the 2013 MS4 Permit) is enforceable in the sub-watershed area above Lake Poway, even under Justice Scalia's plurality opinion in Rapanos v. United States, 547 U.S. 715 (2006).

80. As owner of the spring (Kelly Spring near the base of Mount Woodson on APN 278-210-1800) that contributes the largest amount of non-storm spring water

into Lake Poway on a seasonable basis, Plaintiff wants to work with the City of

Poway and the San Diego Water Board to find the best solution to reduce and

segregate the non-storm water from the City's MS4 through stream

rehabilitation projects that will create new wetlands and recharge the

underground aquifers and will improve the water quality of Lake Poway and the

San Dieguito watershed in general.

81. The water from Kelly Spring eventually is discharged into the city-owned MS4

at APN: 278-290-1000, the City of Poway's open space resource management

area, and through a major outfall and into Lake Poway at APN: 278-280-2300.

The water from Kelly Spring has become polluted in the past from various

unpermitted point-source culvert crossings and other illegal connections and

discharges placed in Warren Creek by private landowners before being

discharged as contaminated non-storm water into the City's MS4 and into Lake

Poway.

82. The water from Rock Haven Spring that is discharged into the City's MS4 at

APN: 278-210-1100 then flows onto Plaintiff's property at APN: 278-210-1800

before being discharged into Lake Poway further downstream.

83. Plaintiff also has been surfing in the Pacific Ocean at various spots along the

San Diego County coast since 2007 and has hiked multiple times on the south

side of the San Dieguito River near the point where the storm and non-storm

waters from the Lake Poway area are discharged into the Pacific Ocean (in and

around Torrey Pines Extension uplands). He has identified the ecological connection between Torrey Pines Extension and his property on Mount Woodson by identifying that the federally endangered plant Del Mar Manzanita grows in both locations. Plaintiff has also recreated on the north side of the San Dieguito River where it meets the Pacific Ocean and believes the science that the ecological and aquatic health of the Pacific Ocean at the mouth of the San Dieguito River is highly dependent on the ecological and aquatic health of its headwaters, including Lake Poway and its upstream subwatershed.

84. Plaintiff believes that the City of Poway is also responsible for protecting the mouth of the San Dieguito River and the territorial seas (the Pacific Ocean) because of its jurisdiction over the river's headwaters located on Mount Woodson and Rock Haven.

**B. Defendant**

85. The City of Poway is a California General Law City and municipal corporation, duly organized and existing by virtue of the laws of the State of California and the charter of the City of Poway.

86. The City of Poway operates a modern water collection, treatment, and distribution system.

87. The City of Poway owns Lake Poway, which is one source of the City's drinking water supply, and owns portions of the area upstream of Lake Poway including APNs 278-280-2300; APN 278-281-0100; APN: 278-290-1000; and

APN: 278-210-1100.

88. The City's parcel, APN: 278-210-1100, contains locally known Rock Haven
Spring, a significant source of non-storm spring water that flows first through
the City of Poway's MS4 and then through Plaintiff's private property (APN:
278-210-1800) before reentering the City's MS4 by Lake Poway on APN: 278-
290-1000.

89. The City's parcels contain point sources and non-point sources that have caused
and will cause sedimentation pollution into Lake Poway.

90. By law, the City of Poway also has enforcement authority over the residents of
Warren Canyon and their point sources that are placed within their privately
owned portions of Warren Creek because the creek is interrelated and becomes
part of a municipal conveyance system downstream.

91. City-owned Lake Poway is a year-round navigable-in-fact waterbody and is
considered waters of the United States because it has been used in interstate
commerce and because water from the reservoir has reached and will reach the
Pacific Ocean 17 miles away during a 25-year storm event and/or after
mandated water releases from an outlet pipe.

92. The City of Poway is seeking to devalue the wetlands that Plaintiff owns above
Lake Poway by disingenuously arguing that Warren Creek is merely an
"ephemeral" tributary and that Lake Poway is a "terminal reservoir" and not
Waters of the United States according to Justice Scalia's plurality opinion in

Rapanos v. United States, 547 U.S. 715 (2006).

## IV.   STATUTORY BACKGROUND

93. The federal Clean Water Act (CWA) (33 U.S.C. § 1251 et seq.) of 1972 is the

basic federal law that addresses surface water quality control and protection of

beneficial uses of water. The objective of the CWA is to restore and maintain

the chemical, physical, and biological integrity of the nation's waters through

prevention, reduction, and elimination of pollution. The CWA applies to

discharges of pollutants into waters of the United States.

94. The term waters of the United States means:

> All waters which are currently used, or were used in the past, or may be
> susceptible to use in interstate or foreign commerce, including all waters
> which are subject to the ebb and flow of tide; all interstate waters
> including interstate wetlands; all other waters such as intrastate lakes,
> rivers, streams (including intermittent streams), mudflats, sandflats,
> wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural
> ponds, the use, degradation or destruction of which could affect interstate
> or foreign commerce including any such waters: a. which are could be
> used by interstate or foreign travelers for recreational or other purposes;
> or b. from which fish or shellfish are or could be taken and sold in
> interstate or foreign commerce; or c. which are used or could be used for
> industrial purposes by industries in interstate commerce. 4. All
> impoundments of waters otherwise defined as waters of the United States
> under this definition; 5. Tributaries of waters identified in paragraphs (1)
> through (4) or this section; 6. The territorial sea; 7. Wetlands adjacent to
> waters.

> 40 C.F.R. § 230.3(o) (June 29, 2015).

95. Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any

pollutant in waters of the United States by any person except in compliance with

a National Pollutant Elimination System (NPDES) permit issued under Section 402 of the CWA, 33 U.S.C. § 1342, or a Department of the Army Permit for dredged or fill material at specified sites issued under Section 404 of the CWA, 33 U.S.C. § 1344.

96. Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to mean an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

97. Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to mean dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological material, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

98. Section 502(12)(A) of the CWA, 33 U.S.C. § 1362(12)(A), defines the term "discharge of pollutants" to mean any addition of any pollutant to navigable waters from any point source.

99. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including territorial seas."

100.    The Supreme Court has also opined that a wetland must have an impact on the quality of a downstream navigable-in-fact water to fall under the jurisdiction of the CWA (known as the "significant nexus" test). Rapanos v. U.S., 547 U.S. 715, 759 (2006) (Kennedy, J., concurring); see In re Smith Farm

Enterprises, LLC, CWA Appeal No. 08-02 (EAB, March 16, 2011), slip op. at 28-30.

101.    Justice Scalia in his plurality opinion in Rapanos opined that the wetlands in question must in fact be adjacent to waters of the United States to be considered part of the Army Corps' jurisdiction. Rapanos, 547 U.S. at 740.

102.    Justice Scalia in his plurality opinion in Rapanos opined that the term "navigable waters" under the CWA includes only relatively permanent, standing, or flowing bodies of water, not intermittent or ephemeral flows of water. At the same time, he noted that the CWA's term "navigable waters" includes something more than traditional navigable waters. 547 U.S. at 733.

103.    Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel, or other floating craft, from which pollutants are or may be discharged.

104.    "The stormwater discharges came from point sources, because they flowed out of artificial 'pipe[s],' 'ditche[es],' and 'channel[s],' 33 U.S.C. § 1362(14)." Decker v. Northwest Environmental Defense Center, 568 U.S. 597, 623 (Scalia, J., concurring in part and dissenting in part).

105.    Water from a spring also discharges from a point source by definition in the City of Poway's 2013 MS4 Permit.

106.     A point source also includes the dredged and fill materials placed around the culverts inside a MS4 and/or waters of the United States by machines such as back hoes. "[T]he definition of a point source is to be broadly interpreted," and courts have uniformly held that earth-moving equipment, such as dump trucks, bulldozers, excavators, plowing equipment, back hoes, and related heavy machinery, are all point sources. See, e.g., Peconic Baykeeper, Inc. v. Suffolk County, 600 F.3d 180, 188 (2d Cir. 2010); Concerned Area Residents for the Environment v. Southview Farm, 34 F.3d 114, 118 (2d Cir. 1994); Avoyelles Sportmen's League v. Marsh, 715 F.2d 897, 922 (5th Cir. 1983).

107.     Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires NPDES permits for certain municipal storm water discharges. EPA promulgated regulations at 40 C.F.R. § 122.26 (December 21, 2015) to implement the storm water permit provisions of Section 402(p).

108.     "Storm Water" is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13) (December 21, 2015).

109.     Non-storm water discharge is any discharge into the MS4 or from the MS4 into a receiving water that is not composed entirely of storm water.

110.     NPDES permits are required for discharges of storm water from a "municipal separate storm sewer system (MS4) [which] means a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm

drains)" owned by a city and designed for conveying storm water. 40 C.F.R. §
122.26(b)(8) (December 21, 2015). An MS4 conveys only untreated storm
water. See 40 C.F.R. § 122.26(a)(7) (December 21, 2015).

111.    Generally, the CWA requires point source discharges, including
dischargers of storm water associated with maintenance or construction activity,
to comply strictly with water quality standards. 33 U.S.C. § 1311(b)(1)(C).

112.    CWA section 402(p) requires the EPA or authorized state to issue NPDES
permits for storm water discharges from MS4s to waters of the United States.
CWA section 402(p)(3)(ii) requires that NPDES permits for storm water
discharges from MS4s to "require controls to reduce the discharge of pollutants
[in storm water] to the maximum extent practicable [MEP], including
management practices, control techniques and system, design and engineering
methods, and such other provisions as the Administrator or State determines
appropriate for the control of such pollutants." 33 U.S.C. § 1342(p).

113.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b) authorizes States with
an EPA-approved NPDES program to issue NPDES permits. The State of
California, through its State Water Resources Control Board (SWRCB) and
Regional Water Boards, is a state approved under section 402(b) of the CWA to
administer the NPDES program, including the issuance of storm water permits
within California.

114.     Under 40 CFR § 122.26(b)(2) (December 21, 2015), an illicit discharge is defined as "any discharge to a municipal separate storm sewer that is not composed entirely of storm water except discharges pursuant to a NPDES permit (other than the NDPES permit for discharges from the municipal separate storm sewer). This implementing regulation requires a separate NPDES permit for uncontrolled polluted non-storm water discharged into and from a MS4 other than the MS4 permit for storm water.

115.     As required by Section 402(p)(3)(B)(ii) of the Clean Water Act, cities are required to "effectively prohibit non-storm water discharges into the MS4 and watercourses, except where such discharges" are covered by a separate NPDES permit or fall within one of thirteen categories of flows that are conditionally exempted from the discharge prohibition such as natural flow from springs and rising ground waters. These non-storm water flows may be exempted so long as (i) they are not a source of pollutants to receiving waters and (ii) they do not violate antidegradation policies.

116.     "[M]unicipalities will not be held responsible for prohibiting some specific components of discharges or flows" through their MS4s, even though "such components may be considered non-storm water discharges, unless such discharges are specifically identified on a case-by-case basis as needing to be addressed." 55 Fed. Reg. 47995 (16 November 1990).

117.    "EPA disagrees that [water from springs and rising ground water] will not pose, in every case, significant environmental problems." 55 Fed. Reg. 48037 (16 November 1990).

118.    40 CFR § 122.26(d)(2)(iv)(B)(1) (December 21, 2015) states that the proposed management program required in a MS4 permit shall include: An enforcement program "to prevent illicit discharges to the municipal separate storm sewer system."

119.    The program description shall address the following categories of non-storm water discharges or flows only where such discharges are identified by the municipality as sources of pollutants to waters of the United States: ... rising ground waters, . . . springs . . . ." 55 Fed. Reg. 48037 (16 November 1990).

120.    "The CWA prohibits the point source discharge of non-storm water not subject to an NPDES permit through municipal separate storm sewers to waters of the United States." 55 Fed. Reg. 47996 (16 November 1990).

121.    Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a), establishes an Army Corps-administered permit program for the discharge of dredged or fill material at specified sites into waters of the United States.

122.    Section 404 requirements are distinct from, and in addition to, the NPDES permit framework in Section 402, 33 U.S.C. § 1342.

123. Section 404(a) of the CWA, 33 U.S.C. § 1344(a), prohibits the "discharge of a pollutant" into waters of the United States, except in compliance with a permit issued pursuant to the provisions in the Act.

124. The Act broadly defines the term "pollutant" to include dredged spoil, rock, sand, and waste discharged into water. 33 U.S.C. § 1362(6).

125. The "discharge of fill material" under Section 404 is defined as "the addition of fill material into waters of the United States," including, but not limited to, infrastructure construction fill, causeway or road fills, and "site development fills for recreational, industrial, commercial, residential, or other uses." 33 C.F.R. § 323.2(f) (December 30, 2008).

126. "Fill material" refers to material that replaces aquatic area with dry land or changing the bottom elevation of a waterbody. 33 C.F.R. § 323.2(e)(1) (December 8, 2008).

127. "Dredged material" under Section 404 means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c) (December 8, 2015).

128. Activities in waters of the U.S. that are regulated under the Section 404 program include fills for development, water resource projects, and infrastructure development (such as unpaved roads) that are placed in waters of the United States.

129.     The Army Corps of Engineers has authority to issue individual permits or "general permits on a state, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material" (both known as a "Section 404 Permit"). 33 U.S.C. § 1344(e)(1).

130.     Under CWA Section 404(e), the Army Corps of Engineers (USACE) can issue general permits to authorize activities that have minimal individual and cumulative adverse environmental effects. USACE can issue nationwide permits, which is a general permit that authorizes activities across the country, unless revoked by a district or division commander. Nationwide permits authorize a wide variety of activities such as linear transportation projects, residential development, commercial and industrial developments, utility lines, road crossings, bank stabilization activities, wetland and stream restoration activities, and certain maintenance activities.

131.     Regional permits are a type of general permit issued by a Division or District Engineer that may require case-by-case reporting and acknowledgement. 33 C.F.R. § 325.5(c)(1) (August 30, 2018).

132.     An individual or standard permit is required when a project cannot meet all of the conditions of a general permit and has more than minimal individual or cumulative impacts. These types of projects are evaluated using additional environmental criteria and involve a more comprehensive public interest review. 33 C.F.R. § 325.5(b) (October 25, 2018).

133.    Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1), requires that any application to the Army Corps for a Section 404 permit must include a "certification from the State in which the discharge originated or will originate . . . that any . . . discharge will comply with [other sections of the Clean Water Act]."

134.    Before the Army Corps can issue a Section 404 permit, the state must certify the project is compliant with local Basin Plans and water quality objectives. 33 U.S.C. § 1341(a)(1).

135.    This certification from the state is known as a Section 401 Certification.

136.    Section 404 permits rely upon, and are required to, incorporate any conditions imposed by a state's water quality certification. 33 U.S.C. § 1341(a)(1).

137.    The Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq., was passed in 1973 to provide a legal mechanism for the conservation of endangered and threatened species and the ecosystems upon which they depend. With limited exceptions, the ESA places restrictions on a range of activities involving endangered and threatened animals and plants to help ensure their continued survival. With limited exceptions, the prohibited activities may not be carried out unless authorized by a permit from the U.S. Fish and Wildlife Service. Sections 7 and 9 of the ESA allow "incidental" takes of threatened and

endangered species, but only in accordance with a permit and a corresponding Habitat Conservation Plan.

138.     It is unlawful to commit, to attempt to commit, to cause to be committed or to solicit another to commit the following: Remove, cut, dig up, damage, or destroy a federally listed endangered plant on private property in violation of any law or regulation of any state including a state criminal trespass law. 16 U.S.C. § 1538(a)(2)(B).

139.     With respect to any endangered species of wildlife, it is unlawful to take any such species within the United States without a permit. 16 U.S.C. § 1538(a)(1)(B).

140.     The Clean Water Act allows for citizen enforcement of the Clean Water Act against a municipality which is alleged to be in violation of an effluent standard or limitation under the Act or with an order issued by the Administrator or State with respect to a standard or limitation under the Act.  Civil penalties, declaratory relief, injunctive relief, and litigation costs may be awarded. All violations of separate Clean Water Act requirements or permit conditions are separately subject to penalty assessment on each and every day such violations continue. For the purposes of Section 402 of the CWA, each discharge in excess of an NPDES limitation or each permit condition not implemented constitutes a separate violation. For purposes of Section 404 of the CWA, a day of violation may either be a day that actual discharge or dredged or fill material takes place,

or may also include any day that such dredged or fill material is allowed to remain in waters or wetlands. Civil liability under the CWA is not limited to intentional violations. 33 U.S.C. § 1319; 33 U.S.C. § 1365; 28 U.S.C. § 2201.

141.     A private cause of action is available for citizens under 33 U.S.C. § 1365 to file a civil action against any person "who is alleged to be in violation of … an effluent standard or limitation . . ." Id. at § 1365(a)(1). Section 1365(f) defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311, . . . certification under section 1341, . . . and a permit or condition issued under section 1342 of this title." Id. at § 1365(f).

142.     A term or condition in a permit issued under CWA §§ 401, 402, or 404 is an "effluent standard or limitation" that can be enforced by way of a citizen suit under 33 U.S.C. § 1365.

143.     The Endangered Species Act allows for citizen enforcement of the ESA to enjoin any person who is alleged to be in violation of any provision of the ESA. Injunctive relief and costs of litigation may be ordered by a federal judge. 16 U.S.C. § 1540(g).

## V.     City of Poway's NPDES Permit Requirements

144.     The San Diego Water Board issued to the City of Poway the National Pollutant Discharge Elimination System ("NPDES") Permit and Waste Discharge Requirements, No. R9-2013-0001, as amended by Order No. R9-

2015-0001 and R9-2015-0100, NPDES No. CAS0109266 (the "2013 MS4 Permit").

145.     Permit Provision A prohibits unauthorized discharges from the City of Poway's properties, facilities, activities, MS4s and other rights of way, including:

a. Provision A.1.a provides: "Discharges from MS4s in a manner causing, or threatening to cause, a condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited."

 i. The term "pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: the waters for beneficial uses; or facilities which serve those beneficial uses. "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves.

 ii. The term "receiving waters" includes creeks, streams, rivers, lakes, wetlands, reservoirs, estuaries, bays, and the ocean.

 iii. "Discharges" means addition of pollutants to navigable waters from any point source.

b. Provision A.1.b provides: "Non-storm water discharges into MS4s are to be effectively prohibited, through the implementation of Provision E.2, unless such discharges are authorized by a separate NPDES permit."

c. Provision A.1.c further provides: "Discharges from MS4s are subject to all waste discharge prohibitions in the Basin Plan."

d. Provision A.2.a provides: "Discharges from MS4s must not cause or contribute to the violation of water quality standards in any receiving waters."

   i. Attachment F provides: "The receiving water limitations included in this Order consist of all applicable numeric or narrative water quality objects or criteria, for receiving waters."

e. Provision A.3 provides: "Pollutants in storm water discharges from MS4s must be reduced to the MEP."

f. Provision A.4 provides: "Each Copermittee must achieve compliance with Provisions A.1.a, A.1.c and A.2.a through timely implementation of control measures."

   i. Attachment F provides: "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1a, A.1.c, or A.2.a from an enforcement action."

   ii. Attachment F further provides:

The Ninth Circuit held in <u>Natural Resources Defense Council v. County of Los Angeles</u> (2011) 673 F.3d 880, 886 (revd. on other grounds and remanded by <u>Los Angeles County Flood Control District v. Natural Resources Defense Council</u> (133 S. Ct. 710 (2013))) that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. The Ninth Circuit holding is consistent with the position of the State and Regional Water Boards that exceedances of water quality standards in an MS4 permit constitute violations of permit terms subject to enforcement by the Water Boards or through a citizen suit. While the Water Boards have generally directed discharges to achieve compliance by improving control measures through the iterative process, the San Diego Water Board retains the discretion to take other appropriate enforcement and the iterative process does not shield dischargers from citizen suits under the CWA.

2013 MS4 Permit, Attachment F, at F-45.

iii.   The requirements of Provision A.4, therefore, are required to be implemented until the water quality standards expressed under Provisions A.1.a, A.1.c, and A.2.a are achieved.

iv.   "Part of the "controls" required by the Order is the process described in Provision A.4. Provision A.4 includes the process that is ultimately expected to achieve compliance with the requirement that discharges from the MS4 do not cause or contribute to violations of water quality standards in the receiving waters. The implementation of Provision A.4 is required when the Copermittees or the San Diego Water Board have determined that discharges from the MS4 are causing or contributing to violations of water quality standards in the receiving waters."

2013 MS4 Permit, Attachment F, at F-45.

146.   The San Diego Water Board's Basin Plan implements and incorporates by reference both the State and federal antidegradation policies. The Order requires

- 40 -

the Copermittees to meet water quality standards through best practicable treatment or control measures. As required by 40 CFR 122.44(a) (December 21, 2015), the Copermittees must comply with "maximum extent practicable" technology-based standards set forth in CWA section 402(p) for discharges of pollutants in storm water from the MS4s.

    a.  Pursuant to 40 CFR 122.26(d)(2)(iv) (December 21, 2015), each Copermittee is required to implement a management program to reduce the discharge of pollutants "to the maximum extent practicable using management practices, control techniques and system, design and engineering methods, and other such provisions which are appropriate."

    b.  MS4s regulated to the MEP standard achieve the standard by storm water management plans that implement best management practices in a narrative form, not a numeric form. There are no numeric baseline criteria in the MEP standard. Therefore, water quality standards (WQS) are the only baseline that exists within the MEP standard.

    c.  WQS's are the only way to "control [] such pollutants" from municipal storm water because without a concrete standard, there is no measure of control.

147.    NPDES Permit No. CAS0109266, 2013 MS4 Permit, Attachment F describes:

"Although sediment is naturally occurring in the natural environment, the discharge of sediment under unnatural conditions is problematic to receiving waters. Fine sediment in creeks causes high turbidity that interferes with the functionality of native flora and fauna in local creeks. For example, turbidity interferes with both photosynthesis of water-philic plants, as well as successful foraging and reproduction of benthic macroinvertebrates. Sediment can also make it difficult for fish to breathe because it clogs fish gills. Other pollutants such as heavy metals or pesticides can adhere to sediment and are transported to receiving waters during storm events, where they dissolve in the water column and become bioavailable to aquatic organisms. Sediment is recognized as a major stressor to surface waters . . ."

2013 MS4 Permit, Attachment F, at F-110-111.

a. Attachment F further describes:

"The San Diego Water Board identified, through investigations and complaints, sediment discharges from unpaved roads as a significant source of water quality problems in the San Diego Region. Inspection activities conducted by the San Diego Water Board since the Third Term Permits have found a lack of source control for many unpaved roads within the jurisdiction of the Copermittees. Unpaved roads are a source of sediment that can be discharged in runoff to receiving waters, especially during storm events. Erosion of unpaved roads occurs when soil particles are loosened and carried away from the roadway base, ditch or road bank by water, wind, traffic, or other transport means. Exposed soils, high runoff velocities and volumes, sandy or silty soil types, and poor compaction increase the potential for erosion. Road construction, culvert installation, and other maintenance activities can disturb the soil and drainage patterns to streams in undeveloped areas, causing excess runoff and thereby erosion and the release of sediment. Poorly designed unpaved roads can act as preferential drainage pathways that carry runoff and sediment into natural streams, impacting water quality. In addition, other public works activities along unpaved roads have the potential to significantly affect sediment discharge and transport within streams and other waterways, which can degrade the beneficial uses of those waterways."

2013 MS4 Permit, Attachment F, at F-116.

b. The EPA also recognizes that discharges from unpaved roads pose a significant potential threat to water quality.

148. Non-storm water (dry weather) discharges from the MS4 are not considered storm water (wet weather) discharges and therefore not subject to the MEP standard. Non-storm-water discharges must be reduced and effectively prohibited through effective controls especially when the non-storm water is a source of pollutants to the MS4.

149. The Copermittees are required to reduce or eliminate non-storm water discharges such as water from springs and rising ground waters to the MS4, even when those non-storm water discharges are uncontaminated, to further the San Diego Water Board's policy of enhancing precious local water supplies. 2013 MS4 Permit, Provision E.2.a.(7).

150. Pure spring water discharged into the MS4 is considered a conditionally exempt category of non-stormwater which still must be properly "addressed" under any set of circumstances by each Copermittee under its strict 2013 MS4 Permit. However, spring water that has accumulated excess sedimentation directly from third parties' point sources and/or from a municipality's point sources is considered polluted non-stormwater (anthropogenically caused) and is not subject to the MEP standard but must meet a much more stringent test to effectively address the discharges. Such discharges from the MS4 into receiving waters are to be effectively prohibited and are to be treated as illicit discharges

unless effective controls and other best management practices (BMPs) are put into place to reduce the non-storm water discharges to acceptable levels.

    i.   Provision C includes requirements for the Copermittees to identify and include numeric action levels in the Water Quality Improvement Plan to direct and focus the Copermittees' jurisdictional runoff management program implementation efforts for controlling MS4 discharges to receiving waters.

    ii.   Under Provision C, the numeric action levels required are for non-storm water discharges and storm-water discharges. The non-storm water action levels (NALs) are applicable to non-storm water discharges from the Copermittees' MS4, which can occur year-round. The storm water action levels (SALs) are applicable to storm water discharges from the Copermittees' MS4s, which occur during the rainy season defined as the period between October 1 and April 30.

        1.   The numeric non-storm water action level for turbidity is 20 NTU, which is a maximum daily action level.

        2.   The numeric non-storm water action level for fecal coliform is 200 MPN/100 ml as an average monthly action level and 400 MPN/100 ml as an instantaneous maximum.

3.  The numeric storm-water action level for turbidity is 126 NTU.

iii.  The action levels of Provision C are to be used by the Copermittees to prioritize the actions to be implemented as part of the Water Quality Improvement Plan.

iv.  If there are non-storm water discharges that are not required to be addressed as illicit discharges, those discharges must comply, <u>at a minimum</u>, with the discharge prohibitions and receiving water limitations of Provision A. Thus, the non-storm water discharges from the MS4 must be at levels that will not cause or contribute to a condition of pollution, contamination, or nuisance in waters of the state (Provision A.1.a), and must not cause or contribute to a violation of water quality standards in receiving waters (Provision A2.a) to be consistent with the discharge prohibitions and receiving water limitations of Provisions A.1.a and A.2.a.

v.  Exceedances of NALs would then provide an indication of the relative severity of a pollutant in non-storm water discharges from the MS4 contributing to potential or observed receiving water impacts. The relative severity or significance of a pollutant in non-storm water discharges from the MS4 will provide the Copermittees a valuable source of information that can be used to

identify priority water quality conditions within a Watershed

Management Area and within each Copermittee's jurisdiction.

vi.  Non-storm water discharges are not authorized to enter the MS4

and are considered to be illicit discharges, unless authorized by a

separate NPDES permit.

1.  Consistent with federal law, unless non-storm water

discharges to the MS4 are authorized by a separate NPDES

permit, non-storm water discharges are appropriately subject

to the effective prohibition requirement in the CWA and

Regional Water Boards are not limited by the iterative MEP

approach to storm water regulation in crafting appropriate

regulations for non-storm water discharges.

2.  The federal regulations (40 C.F.R. 122.26(d)(2)(vi)(B)(1)
(December 21, 2015)) require the Copermittees to

> "'implement and enforce an ordinance, order or
> similar means' to address and prevent polluted non-
> storm water discharges to their MS4s. Thus, the Co-
> permittees are required to 'effectively' prohibit
> polluted non-storm water discharges to their MS4s
> through enforcing their legal authority established
> under 'ordinance, order, or similar means' and either
> remove those discharges to their MS4s, put controls in
> place approved by the San Diego Water Board to
> reduce the non-storm water discharges, or else require
> those discharges to obtain coverage under a separate
> NPDES permit."

> 2013 MS4 Permit, Attachment F, at F-40.

3. Non-storm water discharges (dry weather) from the MS4 are not considered storm water (wet weather) discharges and therefore are not subject to the MEP standard.

4. The Copermittees must effectively prohibit non-storm water discharges into the MS4s, reduce the discharge of pollutants in storm water from the MS4s to the MEP, and ensure that their MS4 discharges do not cause or contribute to violations of water quality standards.

5. If the Copermittees have effectively prohibited non-storm water discharges and reduced storm water pollutant discharges to the MEP, but their discharges are still causing or contributing to violations of water quality standards, Provision A.4 provides a clear "iterative process" for the Copermittees to follow. Provision A.4 essentially require the Copermittees to implement additional BMPs until MS4 discharges no longer cause or contribute to a violation of water quality standards.

6. The federal NPDES regulations also reference several categories of "non-storm water discharges or flows [which]

shall be addressed where such discharges are identified . . . as sources of pollutants to waters of the United States."

7. Provision E.2.a of the City's NPDES permit requires each Copermittee to address all types of non-storm water discharges into its MS4 as illicit discharges, unless the discharge is authorized by a separate NPDES permit, or identified as a category of non-storm water discharges or flows that must be addressed pursuant to Provision E.2.a. Only non-NPDES-permitted non-storm water discharges identified as a category of non-storm water discharges under Provisions E.2.a.(1) though E.2.a.(5) AND not identified as a source of pollutants do not have to be addressed as illicit discharges.

8. Each Copermittee must, where feasible and priorities and resources allow, reduce or eliminate non-storm water discharges listed under Provisions E.2.a.(1)-(4) into its MS4, unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit. This provision applies to uncontaminated spring water and rising groundwaters under Provision E.2.a.(3).

9. Under Provision E.2.a.(6), if the Copermittee or the San Diego Water Board identifies any category of non-storm water discharges listed under E.2.a.(1)-(4) as a source of pollutants to receiving waters, the category must be prohibited through ordinance, order, or similar means and addressed as an illicit discharge. Alternatively, the Copermittee may propose controls to be implemented for the category of non-storm water discharges as part of the Water Quality Improvement Plan instead of prohibiting the category of non-storm water discharges, and implement the controls if accepted by the San Diego Water Board as part of the Water Quality Improvement Plan.

10. Consistent with 40 CFR 122.26(d)(2)(iv)(B) and 122.26(d)(2)(iv)(B)(1) (December 21, 2015), each Copermittee must implement a "program . . . to prevent illicit discharges to the municipal storm sewer system" and "detect . . . illicit discharges and improper disposal into the storm sewer," including "other sources of non-storm water." Provision E.2.b requires each Copermittee to identify major outfalls and to implement measures to prevent and detect illicit discharges and connections to its MS4 as part of its

illicit discharge detection and elimination program on public and private property within its jurisdiction.

11. Provision E.2.c requires each Copermittee to conduct field screening of its MS4 within its jurisdiction to <u>detect non-storm water</u> and illicit discharges to the MS4.

    (a) Elimination of illicit discharges to the MS4 is consistent with the requirements of 40 C.F.R. 122.26(d)(2)(iv)(B) "to detect and remove … illicit discharges" that will achieve the CWA requirement for MS4 permits to "effectively prohibit non-storm water discharges into the storm sewers."

    (b) Each Copermittee is responsible for prioritizing its efforts to eliminate non-storm water and illicit discharges or connections to its MS4 based on field screening and monitoring data, NALs, illicit discharge investigation records, and the known or suspected sources. Sources of non-storm water and illicit discharges or connections must be eliminated by enforcing the legal authority

established by each Copermittee pursuant to Provision E.1.

12. Provision E.2.d. requires the Copermittee to categorize a reoccurring non-storm water discharge from springs that exceeds a NAL as either a set of circumstances that will be addressed through its Enforcement Response Plan pursuant to E.6 or the category of discharge must be addressed either through the prohibition of that category of discharge or a reduction of that discharge through effective controls. 2013 MS4 Permit, Provision E.2.a.(6).

13. Provision E.6 requires each Copermittee to develop an Enforcement Response Plan as part of its jurisdictional runoff management program document. Proper implementation of the ERP is necessary to effectively prohibit non-stormwater discharges to the MS4 and reduce the discharge of pollutants in storm water from the MS4 to the MEP.

(a) The ERP will serve as a reference for the Copermittee and the San Diego Water Board to determine if consistent enforcement actions are being implemented to achieve timely and

effective compliance from all public and private entities that are not in compliance with the Copermittee's ordinances, permits, or other requirements.

(b) The ERP must contain clear direction for the Copermittee to take immediate enforcement action, when appropriate and necessary, in their illicit discharge detection and elimination, construction management, and existing development management programs.

(c) Violations must be corrected in a timely manner, with escalated enforcement required for non-compliance.

14. Provision E.7 requires each Copermittee to implement a public education and participation program as part of its jurisdictional runoff management program, which will contribute toward effectively prohibiting non-storm water discharges to the MS4 and toward the reduction of pollutants in storm water from the MS4 to the MEP.

151.    The Copermittees must develop and conduct a program to monitor the discharges from the MS4 outfalls in each Watershed Management Area during dry weather and during wet weather. 2013 MS4 Permit, Provision D.2.

a.  The Copermittees must conduct MS4 outfall discharge monitoring during implementation of the Water Quality Improvement Plan to assess the effectiveness of their jurisdictional runoff management programs toward effectively prohibiting non-storm water discharges into the MS4 and reducing pollutants in storm water discharges from their MS4s to the MEP.

b.  Each Copermittees must identify all major MS4 outfalls that discharge directly to receiving waters.

c.  Each Copermittee must perform dry and wet weather field screening monitoring to determine persistent flows and to identify non-storm water and illicit discharges within its jurisdiction and prioritize the dry weather MS4 discharges that will be investigated and eliminated pursuant to Provision E.2.d.

152.    The MS4 Permit requires that the City "effectively prohibit" non-storm water discharges into the MS4 through the implementation of a Jurisdictional Runoff Management Plan, unless such discharges are authorized by a separate NPDES permit. 2013 MS4 Permit, Provision A.1.b; see also 2013 MS4 Permit, Finding 15.

i. The MS4 Permit requires the City's Jurisdictional Runoff Management Plan to implement "a program to actively detect and eliminate illicit discharges into the MS4, or otherwise require the discharger to apply for and obtain a separate NPDES permit." 2013 MS4 Permit, Provision E.2; see also 40 C.F.R. § 122.26(d)(2)(iv)(b) (Dec. 21, 2015).

ii. An "illicit discharge" is "any discharge to a [MS4] that is not composed entirely of storm water and is not covered by an NPDES permit." 2013 MS4 Permit, Attachment F-39; see also 40 C.F.R. § 122.26(b)(2) (Dec. 21, 2015).

iii. The Illicit Discharge Detection and Elimination program must be implemented in accordance with previously adopted strategies (a water quality improvement plan) and include certain detailed requirements to achieve compliance with non-storm water discharge prohibitions and receiving water limitations. 2013 MS4 Permit, Provision E.2., Provision A.4.

iv. The City's Illicit Discharge Program must include specific measures to prevent and detect illicit discharges to the MS4. These measures include:

   1. Including and maintaining an accurate and updated geographic informational system ("GIS") map of its MS4

that, among other requirements, identifies all segments of the

MS4 including major outfalls. 2013 MS4 Permit, Provision

E.2.b.(1).

2. Using the City's "personnel and contractors to assist in

identifying and reporting illicit discharges and connections

during their daily employment activities." 2013 MS4 Permit,

Provision E.2.b (2).

3. Conducting field screening, including visual observations, of

portions of its MS4 to detect non-stormwater and illicit

discharges and connections to the MS4. 2013 MS4 Permit,

Provision E.2.c; and

4. Including enumerated measures to investigate and eliminate

illicit discharges to the MS4. 2013 MS4 Permit, Provision

E.2.d.

v.  The City is required to prioritize an investigation into non-storm

water or illicit discharges when, as here, pollutants identified with

those discharges are causing or contributing to receiving water

impairments or impacting environmentally sensitive areas within

the City. 2013 MS4 Permit, Provision E.2.d(1)(a-b).

      vi.  When illicit discharges and connections are known to the City, it must use its legal authority to eliminate them. 2013 MS4 Permit, Provision E.2.d (3)(a).

153.     In addition to its discharge prohibitions and controls on the City's own activities, the MS4 Permit requires the City to "establish, maintain, and enforce adequate legal authority within its jurisdiction to control pollutant discharges into and from its MS4 through statute, ordinance, permit, contract, order or similar means." 2013 MS4 Permit, Provision E.1.a; see also 40 C.F.R. § 122.26(d)(2)(vi)(B)(1) (Dec. 21, 2015).

154.     As noted above, the MS4 Permit demands that the City maintain adequate legal authority to, at a minimum, "prohibit and eliminate all illicit discharges and illicit connections to the MS4." 2013 MS4 Permit, Provision E.1.a.(1); see also 40 C.F.R. § 122.26(d)(2)(i)(B) (Dec. 21, 2015).

155.     The San Diego Water Board requires permits (waste discharge requirements) for all projects constructed within waters of the state. Not obtaining a required permit can be enforced by the City Attorney.

156.     The City's legal authority must also control the discharge of spills, dumping, or disposal of materials and other unpermitted fills and mobile pollutants into its MS4 as well as the interconnected privately owned storm water conveyance system within its jurisdiction. 2013 MS4 Permit, Provision E.1.a. (3).

157.    The City's authority must require the use of effective controls and best management practices ("BMPs") to prevent or reduce the discharge of pollutants in storm water from its MS4 to the maximum extent practicable. 2013 MS4 Permit, Provision E.1.a.(7).

158.    In addition, the City must have the authority to, at a minimum, ensure compliance with its own regulatory efforts to effectively prohibit non-storm water discharges to its MS4 and either eliminate (or effectively reduce) those discharges to its MS4 or require those non-storm water discharges to its MS4 to have their own separate NPDES permits. 2013 MS4 Permit, Provision E.1.a (9); see also 2013 MS4 Permit, Attachment F at F-40.

159.    The 2013 MS4 Permit requires that the City submit a statement certifying that it has "taken the necessary steps to obtain and maintain full legal authority within its jurisdiction to implement and enforce each of the requirements in the [MS4 Permit]." 2013 MS4 Permit, Provision E.1.b.

160.    The City of Poway has prepared its own Jurisdictional Runoff Management Plan (JRMP) in accordance with its NPDES permit for its MS4.

161.    Under 8.2.2 of Poway's JRMP, the City has agreed to maintain unpaved roads and implement BMPs to prevent the transportation of sediment into the storm water conveyance system.

162.    In its JRMP, the City also stated that it will take action in accordance with its Enforcement Response Plan to eliminate illicit connections and illicit

discharges into, from, and through its MS4 that lead to non-storm water pollution in receiving waters.

163.    Provision F includes the requirements for the documents and reports that the Copermittees must prepare and provide to the San Diego Water Board, including Water Quality Improvement Plans, a Jurisdictional Runoff Management Plan, Waste Discharge Reports, and reports of non-storm water discharges as well as illicit discharges and connections.

    a.  The Copermittee must confirm whether or not a program was implemented during the fiscal year to <u>actively</u> detect and eliminate illicit discharges and connections in accordance with the requirements under Provision E.2.

    b.  The City is also required to file a Waste Discharge Report containing any illicit discharges to receiving waters and any exceedances of numeric or narrative water quality standards.

    c.  Illicit connections and illicit discharges and all known non-storm water discharges must be reported to the San Diego Water Board.

164.    According to 2013 MS4 Permit Provision E.3., BMPs are required for <u>all</u> development projects of each Copermittee. Each Copermittee must prescribe the following BMP requirements during the planning process for all development projects in waters of the state regardless of size or type, where local permits are issued (i.e. waste discharge requirements from the San Diego Water Board),

including unpaved road repairs and flood management projects within waters of the state:

    a.  Onsite BMPs;

    b.  Structural BMPs;

    c.  Source Control BMPs (prevention of illicit discharges into MS4); and

    d.  Low Impact Development (LID) BMPs, including for maintenance or restoration of storage reservoirs and drainage corridors including ephemeral and intermittent streams (waters of the state).

        i.  Development projects proposing to dredge or fill materials in waters of the U.S. must obtain a CWA Section 401 Water Quality Certification from the San Diego Water Board.

        ii.  Projects proposing to dredge or fill waters of the state must obtain waste discharge requirements from the San Diego Water Board.

## VI.   CWA Section 404 Department of the Army Permits & CWA Section 401 Water Quality Certifications

165.    Department of the Army Regional General Permit (RGP) Number 63 for Repair and Protection Activities in Emergency Situations authorizes discharges of dredged or fill material into Waters of the United States, including adjacent wetlands, and/or work or structures in and adjacent to navigable waters of the United States for necessary repair and protection measures associated with an emergency situation.

166.    An "emergency situation" is present where there is clear, sudden, unexpected, and imminent threat to life or property demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services (i.e., a situation that could potentially result in an unacceptable hazard to life or significant loss of property if corrective action requiring a permit is not undertaken immediately).

167.    RGP 63 applies to all of San Diego County.

168.    Under RGP 63, discharges of dredged or fill material into Waters of the United States must be avoided or minimized to the maximum extent practicable at the project site. Compensation for unavoidable discharge of fill materials may require appropriate mitigation measures.

169.    Under the terms of RGP 63, any work authorized must be the minimum necessary to alleviate the immediate emergency, unless complete reconstruction only results in very minor additional impact to aquatic resources and logistical concerns indicate such reconstruction is as expedient considering the condition of the project site and is limited to in-kind replacement or refurbishment. The RGP may NOT be used to upgrade an existing structure to current standards when that activity would result in additional adverse effects on aquatic resources. Such upgrade projects shall be considered separate activities for which other forms of authorization will be required.

170.    Work not described in permit application documentation but deemed necessary after a field assessment is not authorized unless coordinated with the Regulatory project manager and acknowledged by appropriate means. These coordinated permit modifications must also be described in sufficient detail in the post-project report.

171.    Any projects authorized under RGP 63 must be initiated within 14 days of receiving authorization. If the project start time can be delayed for more than two weeks, the imminent threat of impending loss may have diminished in magnitude, as well as immediacy, and generally would not meet the definition of an "emergency."

172.    California's State Water Resources Control Board issued a conditional Section 401 water quality certification for RGP 63 dated November 25, 2013.

173.    The 401 Certification for RGP 63 is subject to modification or revocation upon administrative or judicial review.

174.    The 401 Certification for RGP 63 is limited to emergency situations that meet the California Environmental Quality Act definition of an "emergency."

175.    For actions that do not quality for enrollment under 401 Certification for RGP 63 because the situation does not meet the definition of "emergency," the discharger must contact either the State Water Board or the applicable Regional Water Board to apply for an individual water quality certification.

176.     Under RGP 63, all necessary BMPs to control erosion and runoff from

areas associated with the emergency actions shall be implemented.

177.     Under RGP 63, restoration must include revegetation with native species.

The revegetation palette must not contain any plants listed on the California

Invasive Plant Council Invasive Plant Inventory.

178.     Under RGP 63, every effort must be made to ensure any material dredged

or excavated from Waters of the United States is not likely to be washed back

into any Waters of the United States.

179.     Under RGP 63, no discharge of dredged or fill material may occur in the

proximity of a public water supply intake except where the discharge is for the

repair of the public water supply intake structures or adjacent bank stabilization.

180.     Under RGP 63, discharges must not permanently restrict or impede the

passage of normal or expected high flows or cause the relocation of the water

except within the existing river plain unless the primary purpose of the fill is to

impound waters.

181.     Under RGP 63, any structure or fill authorized shall be maintained, unless

it is later determined that the structure is further contributing to other adverse

conditions to public property. In such situations, corrective measures will be

taken to rectify these adverse conditions, including removal and/or redesign of

the original emergency corrective action, or appropriate mitigation as

determined through coordination with the permittee and the appropriate Federal and State agencies.

## VII.  City of Poway's Habitat Conservation Plan Required by the ESA

182.     Preparation and implementation of the citywide Poway Subarea Habitat Conservation Plan/Natural Community Conservation Plan (HCP) is necessary to allow for the incidental take of listed species by public projects and private projects which rely upon the City's incidental take/management authorization permit. This subarea HCP fulfills requirements pursuant to Section 10(a) of the federal Endangered Species Act (ESA), 16 U.S.C. § 1539.

183.     Poway's HCP plays a number of legal roles as an environmental planning document, and the implementing agreement for the HCP, properly signed by the City of Poway and the wildlife agencies, assures that the HCP will be fully implemented.

184.     Collectively, the laws and planning efforts require protection and management of sufficient, interconnected habitat areas to support listed species – or "target" species that serve as indicators of ecosystem health – in exchange for allowing limited "take" of the species or its habitat.

185.     Section 1.0 of the HCP points out that Incidental take may occur during otherwise lawful endeavors, such as development allowed under the community's adopted General Plan.

186.    The issuance of an ITP authorizes "take" by any entity under "direct control of the permittee." 50 CFR 13.25(d) (January 8, 2014).

187.    The Poway Subarea HCP serves as a multispecies HCP as called for under Section 10(a)(1)(B) of the federal ESA. Listed species covered under the plan include: Encinitas Baccharis (*Baccharis vanessae*), Southwestern willow flycatcher (*Empidonax traillii*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*).

188.    Section 7.4 states: "Impacts to vegetation communities and wildlife habitats in the City of Poway shall require compensating mitigation, restoration, or revegetation, or a combination thereof. Compensating mitigation can consist of 1) outright purchase or dedication of lands inside the Mitigation Area as biological open space or 2) payment of in-lieu fees into a mitigation bank administered by the City of Poway or a land trust acting as an agent of the City of Poway."

189.    Section 7.4 states: "The compensation strategy applies to planned public and private development projects within the City or within other jurisdictions that choose to mitigate within Poway."

190.    Section 7.4 further states: "The specific mitigation strategy for a project will be based on the results of a biological resource survey technical report prepared by a qualified biologist."

191.    Section 7.4.3: The following mitigation ratios shall apply to all projects resulting in removal of natural vegetation or wildlife habitat within the City of Poway and that are subject to the HCP, whether inside or outside of the Mitigation Area.

    a.  Any unavoidable impacts to wetland habitat will be mitigated by replacement or enhancement at a minimum ratio of 3:1 for woodland types and 2:1 for shrub-dominated types. Mitigation ratios for disturbed wetlands will generally be mitigated in-kind at no less than 1:1 ratio as determined on a case-by-case basis.

    b.  Impacts to oak-dominated habitats shall require mitigation by in-kind habitat creation, restoration, or enhancement. Impacts shall require a minimum of a 3:1 replacement ratio.

    c.  Direct impacts to coastal sage scrub or mixed coastal sage scrub/chaparral shall be compensated at a minimum 2:1 ratio.

## VIII. FACTUAL ALLEGATIONS

192.    The City of Poway is a municipality of the State of California and, therefore, a "person" as defined by Section 502(5) of the CWA, 33 U.S.C. 1362(5), and Section 3 of the ESA, 16 U.S. § 1532(13) and subject to both Acts' requirements.

193.    The City of Poway is primarily responsible for the design, construction, management, and maintenance of the trails surrounding Lake Poway, including

- 65 -

the dirt roads, stream crossings, and maintenance facilities in the vicinity. These operations include roads with drainage systems, catch basins, ditches, man-made channels, and storm drains.

194.   The City of Poway owns (or partly leases) Lake Poway and the surrounding areas including the following parcels: APNs: 278-280-2300; APN: 278-290-1000; APN: 278-281-0100; APN: 7601590500; and APN: 278-210-1100.

195.   The City of Poway maintains trails above Lake Poway that are on City-owned/controlled land as well as Plaintiff's privately owned land, including APN: 278-210-2900 and 278-210-3000.

196.   The trails cross waters of the United States and/or State of California in at least six places, including on City-owned land and on Plaintiff's privately owned land (APN: 278-210-3000).

197.   Trail construction and maintenance involve dredging and filling activities in waters of the United States and/or state.

198.   Trail construction and maintenance involve cutting wood and living plants, including state and federally protected threatened and endangered species such as Encinitas Baccharis (*Baccharis vanessae*) and Del Mar Manzanita (*Arctostaphylos glandulosa ssp. Crassifolia*).

199.   Trail maintenance also involves disturbing the habitat of threatened and endangered species including the Southwestern willow flycatcher (*Empidonax*

*traillii*), Golden eagle (*Aquila chrysaetos canadensis*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*).

200.　The City of Poway owns and operates a MS4 and its components, including on APNs: 278-280-2300; APN: 278-290-1000; APN: 278-281-0100; APN: 7601590500; and APN: 278-210-1100.

201.　The City of Poway's access road and trails cross its MS4 system in several locations above Lake Poway.

202.　The City of Poway's MS4 system encompasses streams and creeks from Poway's city limits off of State Highway 67 and all the way downstream into Lake Poway. The subwatershed area feeding Lake Poway is small (around 1000 acres) and only extends to Mount Woodson and the eastern city limits of Poway.

203.　The MS4 owned by the City of Poway includes portions of Warren Creek and the City-owned culverts and a wooden footbridge in Warren Creek and its tributaries.

204.　Poway's MS4 also includes the cross-drainage culverts along the City's unpaved roads above Lake Poway, which drain directly into Lake Poway.

205.　Poway's MS4 also includes a wooden footbridge over Warren Creek that is by definition a major outfall point source where storm and non-storm water

directly discharges into the surface waters of Lake Poway (Boulder Bay) and its adjacent wetlands through a single conveyance draining more than 50 acres.[5]

206.  Poway's MS4 is a collection of point sources, including outfalls, that discharge into the navigable waters of the United States. See NRDC v. CNTY. of Los Angeles, 725 F.3d 1194, 1198 n.6 (9th Cir. 2013).

207.  "[S]tream crossings for roads may involve point source discharges of dredged or fill material." See 40 C.F.R. § 122.27(b)(1) (August 30, 2018).

208.  The Army Corps has asserted jurisdiction over portions of Warren Creek and all of Lake Poway as Waters of the United States.

209.  Lake Poway is considered a receiving body of water of the state and "waters of the United States." It is a navigable body of water in the traditional sense of the term as used in the CWA and its implementing regulations.

210.  Lake Poway and Warren Creek are within the San Dieguito watershed.

211.  The City of Poway conducts and/or controls construction activities, including clearing, grading, and excavation, and other land disturbance activities at various locations around Lake Poway and other locations within the San Dieguito watershed. ("Construction activities").

---

[5] In the alternative (depending on how the federal courts define Waters of the United States as applied to the watershed area above Lake Poway including its adjacent wetlands, the major outfall may be the 48-inch culvert immediately upstream from the wooden footbridge. Either way, the City of Poway is required to monitor and control the discharges into Lake Poway under the 2013 MS4 Permit.

212.     The City of Poway conducts maintenance activities, including road maintenance (such as slope stabilization, vegetation control, and drain inlet cleaning) and road surveillance, throughout the City of Poway. The City of Poway also owns and/or operates maintenance facilities, including vehicle maintenance facilities, sand storage facilities, material and equipment storage facilities in the City of Poway. The City of Poway maintains the dirt roads and trails in and around Lake Poway, including clearing them of debris and runoff damage after storms and regularly trimming tree and plant growth along its trails. ("Maintenance activities.")

213.     The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain the City's trails, including those on Plaintiff's privately owned land (APN: 278-210-2900 and 278-210-3000).

214.     The City of Poway also has staff under the direction of Mike Obermiller, P.E., and the City Engineer, Steve Crosby, P.E., who both oversee construction and maintenance activities of the City's trails and access roads above Lake Poway.

215.     The City of Poway's discharges consist of storm water and non-storm water runoff generated from its operations and properties, including its Construction Activities, Maintenance Activities, and Maintenance Facilities.

216.    Mobile components of the City of Poway's point-source earthen culvert crossings have been discharged as effluent into its downstream MS4, through a major outfall point source, and into Lake Poway, a navigable receiving water of the state and of the United States.

217.    The City of Poway's discharges of pollutants into stormwater and non-stormwater have caused and have threatened to cause pollution in waters of the United States. Pollutant sources from the City of Poway's operations include motor vehicles, road maintenance, construction site runoff, maintenance facility runoff, dumping, spills, landscape care, vegetation removal, dredging and filling activities upstream of Lake Poway, sediment runoff coming from dirt bridges placed in streams above Lake Poway, and road reconstruction activities in and near tributaries and other receiving waters, including Lake Poway. Pollutant categories include metals, synthetic organics, sediment, nutrients, debris, oxygen demanding substances (decaying vegetation, animal waste, and other organic matter), and other pollutants which may cause aquatic toxicity and harm to aquatic species in the receiving waters.

218.    Losing the flood control capacity of Lake Poway will inevitably lead to water pollution into the Pacific Ocean 17 miles away.

219.    There are at least four locations immediately above Lake Poway in which culverts with dirt backfill have been placed in waters of the state on City-owned land, including both seasonal and ephemeral tributaries.

220.    There are at least two additional locations about a mile above Lake Poway in which the City of Poway has dredged, placed dirt backfill or some other type of crossing in waters of the state that connect to Lake Poway.

221.    There are at least eight additional cross-draining culverts under the trails above Lake Poway draining storm water and effluent into waters of the United States, i.e. Lake Poway.

222.    There are at least four unpermitted culvert with dirt-backfill crossings over Warren Creek on private property upstream of Lake Poway, all of which were washed out during the winter storms of 2017. Since then, some of these crossings have been rebuilt without the proper permits and authorizations.

223.    The beneficial uses of the streams in Warren Canyon and in Lake Poway itself include municipal and domestic supply, agricultural supply, industrial service supply, industrial process supply, wildlife habitat, cold freshwater habitat, preservation of biological habitats of special significance, and non-contact water recreation. See State Water Resources Control Board, Beneficial Use Designation under the Porter-Cologne Water Quality Control Act.

224.    The City of Poway's Jurisdictional Runoff Management Plan has identified the following pollutants coming from its MS4 in Warren Canyon: Indicator Bacteria, Color, Manganese, Mercury, Nitrogen, pH, Phosphorus, Viruses, Turbidity, and Nutrients.

225.     The City of Poway's discharges consist of storm water and non-storm water flows, including flows that are contaminated with pollution from point-sources and non-point sources before being discharged to the City-owned MS4.

226.     The non-storm water spring water and rising ground water flows are considered "discharges" for purposes of the Clean Water Act and the City's 2013 MS4 Permit when the discharges first enter "into" the City-owned MS4.

227.     The non-storm water spring water and rising ground waters are also considered discharges when those flows pass through a culvert, an outfall, or other type of point source.

228.     There are two prominent sets of springs in the watershed area that feeds Lake Poway: Kelly Spring located near the base of Mount Woodson on Plaintiff's private property at APN: 278-210-1800 in the City of Poway and Rock Haven Spring located near Highway 67 in the City of Poway on City-owned/maintained property (APN: 278-210-1100).

229.     The picture below, taken in 1968 after a fire, depicts the spring water flows from Mount Woodson on APN: 278-210-1800 and the spring water discharges from Rock Haven that first flow through a culvert underneath Highway 67 and into the City of Poway's MS4 before entering Plaintiff's private property at APN: 278-210-1800 as shown below.



230.    Both the spring water discharges from Mount Woodson and from Rock

Haven flow into a merged Warren Creek that eventually are deposited

downstream through a major outfall (a wooden footbridge single conveyance)

on City-owned APNs: 278-280-2300 and APN: 2782810100 and directly into

Lake Poway, the receiving waters.  The photograph below depicts Plaintiff's

parcel APN: 278-210-1800 in yellow; the City's parcel APN: 278-210-1100

which contains Rock Haven Spring discharges is in pink; Lake Poway is colored

blue; and Warren Creek as well as the stream coming off of Mount Woodson on

Plaintiff's parcel are outlined in blue.



231.   The spring water discharges from Rock Haven regularly become

contaminated with pollutants from Highway 67 before being deposited into the

City-owned MS4, then onto Plaintiff's property at APN: 278-210-1800, and

then pick up more pollutants at various locations on private property in Warren

Canyon before eventually emptying into City-owned property, through a major

outfall point source, and into Lake Poway.

232.   The spring water discharges from both Rock Haven and Mount Woodson

also become polluted with contaminants from various illicit connections and

unpermitted discharges and mobile pollutants at various locations on private

property in Warren Canyon before eventually emptying into City-owned

property and its MS4, through a major outfall, and into Lake Poway.

233.     Naturally, the storm and non-storm spring waters from Mount Woodson and Rock Haven are discharged into the Pacific Ocean. The picture below was taken from Plaintiff's property APN: 278-210-1800, the location of Kelly Spring. The Pacific Ocean can be seen in the distance.



234.     The Poway dam, built in 1972, has impounded most of these waters.

235.     The City of Poway's unauthorized point-source earthen culvert crossings have discharged pollutants as effluent into its MS4 and into Lake Poway, a navigable water of the state and the United States.

236.     The illicit discharges into Lake Poway include non-storm spring waters which becomes polluted from the illicit connections/discharges in and from the privately owned storm water conveyance system – the many unauthorized culverts with dirt-backfill stream crossings installed within Warren Creek in Warren Canyon on private property – that eventually get discharged into the City-owned portion of Warren Creek (its MS4), through a major outfall/point source, and into Lake Poway.

237.     The City of Poway's discharges of pollutants into storm water and non-storm water have caused and have threatened to cause pollution in waters of the United States, including the Pacific Ocean (through overtopping of the dam/ dam inundation).

          **1. The City of Poway is liable for the point source storm water pollution coming from its unpaved road culvert crossings, from other illicit connections/discharges and the unpermitted placement of mobile pollutants in Warren Creek on private property, and from non-storm water dry weather polluted discharges into Lake Poway following the winter storms of 2017.**

238.    The City of Poway owns and operates a MS4 immediately above Lake

Poway. This portion of the MS4 comprises Warren Creek – a seasonal stream

funneling storm and spring water from Mount Woodson and Rock Haven – and

its ephemeral tributaries, all of which flow into Lake Poway.

239.    The City of Poway owns Rock Haven Spring on Rock Haven mountain

about one-mile plus upstream from Lake Poway. The water from this spring is

directly discharged into Warren Creek, the City's MS4, on City-owned property

at APN: 278-210-1100 before entering private property.

240.    Storm water and non-storm water from Rock Haven then flows through

one-mile plus length of Warren Creek on private property, including through

Plaintiff's property at APN: 278-210-1800, and then into Lake Poway.

241.    Plaintiff's property contains a separate perennial spring on Mount

Woodson (Kelly Spring) that flows through private property for one mile plus

before entering the City's MS4 at APN: 278-280-2300 by Lake Poway.

242.    In 2017, a small lake formed on Plaintiff's property from the water

flowing out of Kelly Spring. According to Plaintiff's eyewitness-neighbors, it

took over two weeks – the first part of March 2017 – for the small lake to finally

dissipate on Plaintiff's property back to a small creek.

243.    Plaintiff has another eyewitness-neighbor who has lived in Warren

Canyon since the 1980s at the point where Warren Creek merges into one

stream, and he has verified that water flows in Warren Creek on a seasonal basis from "January to about Easter" most years.

244.     Illegal third-party actions on private property in Warren Canyon have resulted in illicit connections/discharges and other unpermitted materials being placed in Warren Creek. The pollutants are carried by storm and non-storm water flows downstream into the City's MS4 and into the receiving waters of Lake Poway.

245.     The City of Poway has several culvert crossings composed of dredge and fill material over Warren Creek and its tributaries, as well as a wooden footbridge over Warren Creek, and the City regularly maintains them on at least a yearly basis with machinery such as tractors and other machinery, which add new fill materials to the Waters of the United States and/or state.

246.     The City of Poway-owned wooden footbridge over Warren Creek meets the legal definition of a major outfall that discharges storm and non-storm water directly into the surface waters of Lake Poway and its adjacent wetlands.

247.     Alternatively, and depending on how the federal courts interpret the Waters of the United States definition as applied to Lake Poway, its adjacent wetlands and upstream watershed, the major outfall could be located at the 48-inch culvert immediately upstream of the wooden bridge over Boulder Bay.

248.    The City of Poway has failed to obtain any valid Clean Water Act and/or San Diego Water Board permit for the maintenance/replacement of its culvert crossings or its footbridge over the last 30 years.

249.    The photograph below depicts the hiking trails above Lake Poway in 2012 (the red arrow shows the approximate location of the main Warren Creek culvert crossing. The wooden footbridge can be seen at the end of Warren Creek in the then dry portion of the lakebed of the reservoir.).



250.    Beginning on January 20, 2017, the culvert crossings over Warren Creek and its tributaries, including those owned by private third parties and those owned by the City of Poway, began to wash away when heavy rains commenced.

251.    On February 27, 2017, the largest portions of these culvert crossings were washed out when the heaviest rains produced destructive flows that damaged or destroyed at least two City-owned crossings over Warren Creek and its

tributaries upstream of Lake Poway and at least four privately owned culvert

crossings.

252.     The photograph below, taken on March 16, 2017 and during dry weather

(it hadn't rained in Poway in over two weeks), depicts the City's hiking trails

above Lake Poway. Two red pins point to the approximate location of the

culvert crossings within streams that were damaged or destroyed. The red pin on

the right depicts the main tributary crossing within Warren Creek located at Lat.

33.003° N; 117.0054° W in Section 32, Township 13 S, Range 1W, in the

eastern portion of the city of Poway. There are two additional culvert crossings

over ephemeral tributaries and at least eight additional cross-drainage culverts

placed under the trails above Lake Poway (not identified in the picture below),

all installed/maintained without CWA and/or San Diego Water Board permits.



- 80 -

253.     With the addition of pollution from the City's point sources as well as
polluted discharges from private third parties, the non-storm water flowing
through the City's MS4 and into Lake Poway was composed of highly
concentrated amounts of sediment, debris, waste, herbicides, pesticides, metals,
asbestos, and other illicit substances before the water hit the major outfall and
into the Boulder Bay area of Lake Poway.

254.     The polluted storm water and subsequent non-storm water was discharged
into Lake Poway on a daily basis from January 20, 2017 to April 17, 2017 and
caused high turbidity levels in the reservoir for 87 days straight. The high
turbidity levels also decreased the oxygen levels in the stream and reservoir
which harmed aquatic species. The effluent also destroyed adjacent wetland
habitat in the area above Boulder Bay.

255.     The photograph below, taken on March 16, 2017 <u>during dry weather</u> (it
hadn't rained in Poway in over two weeks), depicts the long-running plume of
pollution migrating from Warren Creek and into Lake Poway, the receiving
body of water. The excess sediment now sits at the bottom of the reservoir. This
picture depicts polluted non-storm spring water flowing into Lake Poway on
March 16, 2017, carrying the City's damaged point-source dirt stream crossings
as well as third-party illicit discharges into the reservoir bottom.



256.    Turbidity can be measured relative to water clarity, and the turbidity

measurement of the non-storm water discharges into Lake Poway was way

above 200 NTUs on March 16, 2017. This measurement is above the NAL for

non-storm water discharges (20 NTUs). This measurement was taken on a dry

weather day as it hadn't rained in Poway in over two weeks (the capture date of

the photo above is March 16, 2017.)

257.    The cloriform measurement as measured at the public water supply intake

in Lake Poway was also above the permitted NAL for non-storm water during

the period of January 20, 2017 and April 17, 2017, including on or around

March 16, 2017.

258.    The City of Poway failed to prevent the high turbidity levels in violation

of its NPDES Permit, Order No. R9-2013-0001, as amended by Order No. R9-

2015-0001 and R9-2015-0100, NPDES No. CAS0109266 (2013 MS4 Permit).

259.    The City of Poway should have instituted controls like a turbidity curtain

to reduce the discharge of pollutants to the maximum extent practicable (MEP),

but the City did nothing to prevent the long-running sediment plume from

reducing the beneficial uses of Lake Poway as a water storage facility between

January 20, 2017 and April 17, 2017. The lost capacity of Lake Poway remains

to this day.

260.    Having known that polluted storm water and non-storm water discharges

have polluted Lake Poway in 2017, the City of Poway should have developed,

implemented, and installed effective controls to reduce future sedimentation and

other types of pollution into Lake Poway in the future.

261.    Instead, the City of Poway placed more unpermitted dredged dirt and fill

materials into Warren Creek and its tributaries.

262.    The City's current "BMPs," if any, would not control future storm water

pollution to the maximum extent practicable.

263.    The City's current "BMPs" would not effectively reduce or effectively

prohibit non-storm water discharges into Lake Poway in the future.

264.    The City of Poway is required to go above and beyond the MEP standard

and is required by federal law and its 2013 MS4 Permit to effectively prohibit

future non-storm water plumes into Lake Poway by removing its own illicit connections and discharges, remove mobile pollutants intentionally installed in Warren Creek, install effective controls to reduce non-storm water discharges, and enforce the Clean Water Act regulations and state water quality requirements as to private landowners who have installed unpermitted culvert with dirt-backfill crossings and other mobile pollutants into Warren Creek within the City of Poway's jurisdiction.

265. The City of Poway must effectively segregate non-storm water discharges into its MS4 because they are causing a condition of pollution in Lake Poway and because the City's NPDES permit require that it do so regardless of pollution conditions in Lake Poway or any other receiving waterbody.

266. The City of Poway's only way around the strict standard to "effectively prohibit" polluted non-storm water discharges into Lake Poway is to require the procurement of separate NPDES permits for the non-storm water discharges from Rock Haven on City-owned property and for the non-storm water flows that originates from Plaintiff's property but are passively discharged into the City's MS4 at APN: 278-290-1000.

267. On each and every day between January 20, 2017 and April 17, 2017, the City of Poway violated NPDES Permit No. CAS0109266 (2013 MS4 Permit) and the Clean Water Act, 33 U.S.C. § 1311(a) and 33 U.S.C. § 1342(p) as follows:

a. NPDES Permit No. CAS0109266, Provision A.1.a provides that

"Discharges from MS4s in manner causing, or threatening to cause, a

condition of pollution, contamination, or nuisance in receiving waters of

the state are prohibited." The City of Poway violated this provision at

least 87 times during the winter and early spring months of 2017 as

storm and non-storm water flowed continuously during that time frame.

Here, the "MS4" encompasses the portion of unpaved access road with

drainage systems (culverts) above Lake Poway; the MS4 also comprises

Warren Creek and its tributaries on City-owned land; the "discharges"

encompass the effluent made up of the dirt, gravel, fill, and chemical and

biological pollutants attached to the sediment that comprised the earthen

crossings which disintegrated and were mobilized after the winter storms

of 2017; the discharges encompass the polluted storm water; the

discharges also encompass the polluted non-storm water spring water;

the "pollution" comprises the *unreasonable* amounts of dirt, gravel, fill,

and chemical and biological pollutants attached to the sediment that were

transported into the wetlands adjacent to Lake Poway and into Lake

Poway that resulted in the significant losses of many of the beneficial

uses of the wetlands and the reservoir; the receiving waters include the

downstream wetlands and Lake Poway; and the point sources encompass

the springs, culverts, backfill placed within streams, the machinery used

to place the backfill in the streams, and the wooden footbridge (major

outfall) from which all pollutants were discharged into the surface waters

of Lake Poway, which are waters of the state.

b.   The storm water and non-storm water pollution reduced the beneficial

uses of the wetlands by burying the vegetation, reducing the storage

capacity of the reservoir, and harming aquatic life. Because the City of

Poway violated the water quality standards as articulated in narrative

form in Provision A.1.a, the City has violated its NPDES permit.

268.    The City of Poway has also violated NPDES Permit No. CAS0109266,

Provision A.1.c: "Discharges from MS4s are subject to all waste discharge

prohibitions in the Basin Plan" for the reasons given above on each and every

day between January 20, 2017 and April 17, 2017. The Basin Plan states: "The

discharge of waste to **waters of the state** in a manner causing, or threatening to

cause a condition of pollution, contamination, or nuisance as defined in

California Water Code Section 13050, is prohibited." Lake Poway is waters of

the state in addition to Waters of the United States.

269.    The City of Poway has also violated NPDES Permit No. CAS0109266,

Provision A.2.a: "Discharges from MS4s must not cause or contribute to the

violation of water quality standards in any receiving waters" for the reasons

given above on each and every day between January 20, 2017 and April 17,

2017. "The receiving water limitations included in this Order consist of all

applicable numeric or narrative water quality objects or criteria, for receiving

waters as contained in the Basin Plan … or in federal regulations." Narrative

water quality standards include protecting particular designated uses such as for

recreation or public water supply (Lake Poway serves both of these purposes).

When pollutants cannot be precisely measured, narrative criteria are used to

express a parameter in a qualitative form.

    a. The term "pollution" means an alteration of the quality of the waters of

       the state by waste to a degree which unreasonably affects either of the

       following: the waters for beneficial uses; or facilities which serve those

       beneficial uses.

    b. "Beneficial uses" of the waters of the state that may be protected against

       quality degradation include, but are not limited to, domestic, municipal,

       agricultural and industrial supply; power generation; recreation; aesthetic

       enjoyment; navigation; and preservation and enhancement of fish,

       wildlife, and other aquatic resources or preserves.

    c. Lake Poway, as Waters of the United States, is considered "receiving

       waters."

270.    The City of Poway has violated Provisions A.1.a, A.1.c and A.2.a of its

NPDES Permit because its discharges of pollutants from its point sources and

third-party point sources caused a condition of pollution in the wetlands of

Warren Canyon and in Lake Poway that has resulted in the loss of the beneficial

uses of these aquatic resources. The reservoir has lost some of its water storage

capacity because of Poway's pollution from its point sources – i.e. earthen

stream crossings and other mobile pollutants flowing in the storm and non-storm

water through its MS4.  Also the beneficial uses of the wetlands immediately

above Boulder Bay at the entrance into Lake Poway has been lost because of

increased sedimentation that has changed the nature of the wetlands there from

forested wetlands into herbaceous wetlands.

    i.  Sediment-laden runoff results in increased turbidity and decreased

oxygen in a stream and the receiving reservoir, which in turn

results in loss of in-stream habitat for fish and other aquatic

species.

    ii.  Sediment-laden runoff kills fish directly, destroy spawning beds,

and suffocate fish eggs and bottom dwelling organisms.

    iii.  Sediment-laden runoff increases difficulty in filtering drinking

water, resulting in higher treatment costs, and results in the loss of

drinking water reservoir storage capacity and decreases the

navigational capacity of waterways.

    iv.  Sediment-laden runoff blocks light and reduces growth of

beneficial aquatic grasses.

271.    While exiting the stream crossings, the rush of storm water and

subsequent lowflow non-storm spring water traveling through the City of

Poway's MS4 during winter and spring months of 2017 mobilized the stream crossing one piece of sediment at a time until the polluted storm water traveled toward Lake Poway and most of the dredge and fill materials from the crossings were deposited either in the wetlands above Boulder Bay or in the lake bottom. The City of Poway is liable under the CWA because (1) the City "discharged pollutants from a point source, (2) the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water, and (3) the pollutant levels reaching navigable water are more than de minimis." Hawai'i Wildlife Fund v. County of Maui, 886 F.3d 737, 749 (9th Cir. 2018).

    a. From 1972 to 2018, over 20,000 tons of sediment have entered the Boulder Bay area of Lake Poway.

    b. In 2017, several of those tons of sediment filled in Boulder Bay to the point that half of its wooden footbridge at the inlet (which used to be over water) is now buried with sediment.

    c. According to Poway's Public Works Director, the buildup of silt has blocked the natural flow of the tributary to the surface waters of Lake Poway.

272.     The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.1.b: "Non-storm water discharges into MS4s are to be effectively prohibited, through implementation of Provision E.2, unless such discharges are

authorized by a separate NPDES permit." The City of Poway has not properly

applied the requirements of Provision E.2 to the non-storm spring water

discharges into its MS4 and into Lake Poway, and the City of Poway does not

have a separate NPDES permit for the non-storm water discharges from Rock

Haven Spring or a NPDES permit authorizing the Mount Woodson spring water

discharges into its MS4. Polluted non-storm spring water discharges into Lake

Poway have been and will be a future problem because of the reoccurring,

seasonal nature of the springs (i.e. with surface water flows typically 3 months

of the year in non-drought years).

273.    The City of Poway has also violated its 2013 MS4 Permit effluent

limitations, Provision A.3, which require the City to reduce pollutants in storm

water from the MS4 to the maximum extent practicable. The City has not even

done the bare minimum to reduce future storm water pollution as the City has

not installed the proper BMPs in its MS4 above Lake Poway during rebuilding

efforts in 2017 and has not unblocked the natural flow of its main tributary into

Lake Poway.

274.    On February 1, 2018, the City of Poway entered into a contract with Foth-

CLE Engineering Inc., a Wisconsin company, to perform a bathymetric survey

of Lake Poway in order to characterize the thickness of the terrestrial sediment

that has deposited in the reservoir from its MS4 system following the Winter

Storm Events of 2017. The City of Poway has stated in the public record that the

need for this survey "became apparent" after the winter storms of 2017. City

staff acknowledged that the course sediment pollution has buried part of its

wooden bridge that only a few years ago was suspended over Lake Poway and

that silt buildup has blocked the natural flow of the tributary. To supply City

engineers with options for the removal of terrestrial sediment from Boulder Bay

and other identified areas of Lake Poway, CLE compiled a dredge report. The

stated goal of the project was to assess the siltation and storage capacity of Lake

Poway and to evaluate the removal of silt from Boulder Bay and adjacent areas.

   a. The report found that over 20,000 tons of course sediment has

      accumulated in Boulder Bay since 1972.

   b. The maps complied by CLE show that the course sediment has built up

      over the years (i.e. shoaling) along the route of the historical stream

      (Warren Creek) within Lake Poway all the way to its spillway.

   c. The report also noted that the City of Poway is trying to remove the

      Waters of the United States designation for Lake Poway so that it would

      not have to abide by the Clean Water Act and the permits associated with

      the Act (i.e. Department of the Army Permits and the 2013 MS4 Permit).

275.    A permittee violates the CWA when it violates any term of its NPDES

permit. See Russian River Watershed Prot. Comm. V. City of Santa Rosa, 142

F.3d 1136, 1138 (9th Cir. 1998); see also 40 C.F.R. § 122.41(a) ("Any permit

noncompliance constitutes a violation of the Clean Water Act and is grounds for

[an] enforcement action"); <u>Nw. Envtl. Advocates v. City of Portland</u>, 56 F.3d 979, 986 (9th Cir. 1995) (noting that "[t]he plain language of [the CWA citizen suit provision] authorizes citizens to enforce all permit conditions"); Environmental Law Handbook 327 ("The primary purpose of NPDES permits is to establish enforceable effluent limitations.").

276.     The City of Poway has failed to fulfill Provision A.4 of its NPDES permit, which provides: "Each Copermittee must achieve compliance with A.1.a, A.1.c, and A.2.a through timely implementation of control measures. . . . Upon a determination by either the Copermittees or the San Diego Water Board that discharges from the MS4 are causing or contributing to a new exceedance of an applicable water quality standard not addressed by the Water Quality Improvement Plan, the Copermittees must submit the following updates to the Water Quality Improvement Plan . . .: Water quality improvement strategies (i.e. BMPs, retrofitting projects, stream and/or habitat rehabilitation projects, adjustments to jurisdictional runoff management programs, etc.) that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards."

a. "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1.a, A.1.c or A.2.a from an enforcement action" including a citizen suit. The engagement in the iterative process does not provide a safe harbor from liability for violations of permit

terms prohibiting exceedances of water quality standards. The NPDES

permit is designed to allow the iterative process to continue as many

times as necessary to fulfill strict water quality standards.

b. The City of Poway is required to go above and beyond the iterative

approach as it is required to effectively prohibit non-storm water

pollution in its receiving waters (including waters of the state) through

effective controls that reduce the amount of lowflow spring water into its

MS4 and into Lake Poway. The City of Poway has done nothing to

effectively control non-storm water discharges into Lake Poway that will

occur on a seasonal basis (with the possible exception of extreme

drought years like 2018.)

**2. The City of Poway has failed to engage in best management
practices in violation of its NPDES Permit by failing to maintain
its cross-drainage culverts lining the unpaved road immediately
above Lake Poway in 2017 to the present.**

277.     In addition to the culverts placed in waters of the state and Waters of the

United States as discussed above, the City of Poway has at least eight cross-

drain culverts along the unpaved road immediately above Lake Poway.

278.     These cross-drain culverts discharge directly into Lake Poway.

279.     These cross-drain culverts are considered a part of the City of Poway's

MS4 even though they are not placed in Waters of the United States and/or

waters of the state. They are considered part of the City's MS4 because they drain directly into Waters of the United States, i.e. Lake Poway and thence the Pacific Ocean.

280.    The City of Poway has not engaged in best management practices with regard to maintaining these cross-drain culverts. The pictures below, taken in the summer of 2018, show that the culverts are half-buried in dirt, leaves, and other debris, making the culverts ineffective in properly draining the unpaved road.









281.     The inhibited culverts caused an unreasonable amount of pollution to

drain off its dirt roads rather than through the cross-draining culverts. This

pollution entered Lake Poway between January 20, 2017 and April 17, 2017, on

January 9 and February 27 of 2018, and will occur again on a seasonal basis.

282.     The City of Poway has admitted that at least two of its storm drains

became clogged during the 2017 raining season and caused surface cracks in its

trail system above Lake Poway.

283.     Due to the City of Poway's lack of maintenance of these cross-drain culverts from 2017 to today, the City of Poway has violated its Jurisdictional Runoff Management Plan and its 2013 MS4 permit.

**3. In 2017, the City of Poway rebuilt the destroyed earthen crossings in its MS4 right above Lake Poway in violation of sections 301, 401, 402, and 404 of the Clean Water Act and the 2013 MS4 Permit.**

a.   Warren Creek Crossing

284.     On January 24, 2017, the Poway City Council adopted Resolution No. 17-004 which declared an emergency within the City of Poway and suspended environmental review and the notice and bidding requirements in connection with emergency repairs due to significant winter storms that occurred on January 20 and February 26-27 of 2017.

285.     In its July 18, 2017 Report of Emergency Repair Expenditures Pertaining to Resolution No. 17-004, the City listed $4,500 as a current expenditure on storm drain/CMP (corrugated metal pipe) repairs at Lake Poway.

286.     There are at least twelve locations in the vicinity of Lake Poway where City-owned storm drain culverts are used to drain water into Lake Poway from the trails including from various streams and tributaries and runoff coming off the nearby hills and mountains. At least two of these culverts within Waters of the United States and/or state were repaired in 2017.

287.    On April 17, 2017, the City of Poway started a project in Warren Creek, a blue-line stream as depicted on a USGS topographic map that flows into Lake Poway, which has been designated as "Waters of the United States" by the state of California and by the EPA.

288.    The City described the Warren Creek Crossing project in its Army Corps of Engineers' Regional General Permit 63 as follows: "Place 48" tall x 72" wide x 20' long oval corrugated metal pipe (CMP) into 0.007 acre of non-wetland waters of the U.S. No excavation, pushing, shoving or contouring of the soil occurred while placing the pipe." After placement of the CMP, staff hand placed rocks and boulders with the assistance of a back hoe and backfilled/compacted the remaining area with soil and class II base material."

   a.   The City described the purpose of the activity as follows: "Provide vehicular access around the lake for the maintenance of trash receptacles, trails, and other related assets, and the pumping of spoiled porta pots to eliminate the potential for human waste in proximity of drinking water. Provide emergency access for the City of Poway Fire Department in response to reports of traumatic injury, dehydration, acute medical emergencies such as heart attacks and strokes. Many of these emergencies require a rapid delivery of paramedic services and transport to a hospital for continued patient care. The activity was the minimum necessary to alleviate the immediate emergency."

b. The City described the following erosion and sediment control measures implemented: "Straw wattles and booms were placed downstream. Staff performed all work from the adjacent access control road, and no upstream and downstream material in the tributary was pushed, shoved, or contoured."

c. The City described the following pollution prevention measured implemented: "Spill containment materials were onsite; no equipment or vehicle fueling, lubrication, or maintenance were performed onsite; no equipment was placed in the tributary."

289.    To the Army Corp of Engineers and to the San Diego Water Board, the City incorrectly labeled Warren Creek as "an ephemeral tributary to Lake Poway." (It is not ephemeral but a seasonal creek fed by perennial springs with flowing water at least three months out of the year typically.)

290.    The City finished the project within Warren Creek on April 20, 2017.

291.    Although the City of Poway described the project as occurring under "emergency" conditions, "emergency" conditions (as defined by state and federal law) ended by the beginning of March 2017 when the winter rains ended in the City of Poway. In fact, in hardly rained at all in March and April 2017 in the City of Poway following the heavy rains of January and February 2017.

292.    Thus, the City of Poway violated the timing and situational requirements of its RGP 63 general permit because the threat of stormy weather had ended by

March 1, 2017.  The pictures below were taken on April 17, 2017, the day that

construction of the Warren Creek Crossing began.



   a.  The pictures above show the natural spring water that emanated from

       Mount Woodson before being drained into Lake Poway. It hardly rained

       at all in Poway in March or April 2017, including around the time that

       the above photographs were taken, and yet spring water still remained in

       Warren Creek.

   b.  The City of Poway submitted the pictures above and the pictures below to

       the Department of the Army and to the San Diego Water Board in its

       "Final Report for Regional General Permit 63 for Repair and Protection

activities in Emergency Situations (RGP 63)."



293.     However, the City of Poway completed unauthorized work in addition to this rebuilt culvert crossing pictured above and violated the RGP 63 condition that the work authorized be fully described in the permit application and that the minimum necessary be done to alleviate the immediate emergency. The City of Poway failed to disclose to the federal and state authorities the device placed adjacent to the crossing on a dirt-fill platform within the location of the historical stream and the pipe dredged into the ground and attached to the culvert. The pictures below were taken in April 2018 at this same location.







294.    The placement of the above inlet flow meter in 2017 involved dredging within Warren Creek for the placement of the pipe attached to the culvert and filling more dirt and other materials into Warren Creek for the platform.

295.     The RGP 63 permit states that work not described in the permit

application documentation but deemed necessary after a field assessment is not

authorized unless acknowledged by appropriate means. Permit modifications

must also be described in sufficient detail in the post-project report. The City of

Poway failed to mention the device and the pipe, its location within the

historical stream, the dredging and filling activities involved in their placement,

and the resulting effects on downstream wetlands for their placement, in its

post-project report.

296.     The device and the attached pipe have additional adverse effects on

aquatic resources including wetlands in the immediate vicinity.  The City of

Poway has not engaged in a mitigation project to compensate for these effects as

required by its Habitat Conservation Plan and/or Clean Water Act permits.

297.     Although the City of Poway obtained a generalized Section 401 Water

Quality Certification by submitting its Final Report to the State Water Board,

the certification that the City received violated the RGP 63 condition that

situations that do not meet the definition of "emergency" require the

municipality to seek out a subsequent individual water quality certification from

the San Diego Water Board. Also the emergency water quality certification

failed to mention and to gain approval for the inlet flow meter and its placement

within Warren Creek that involved additional dredging and filling activities.

298.     The City of Poway never obtained an individual water quality certification (and/or waste discharge requirements) for neither its crossing nor its device/pipe and the dirt platform on which they sit in Warren Creek. An individualized Section 401 certification would have addressed the local basin plan and water quality standards as they pertain to this project and would have required the City to do much more to mitigate future environmental effects. Waste discharge requirements would have done the same.

299.     The culvert crossing, along with the inlet flow meter, are not best management practices and do not fulfill the City's NPDES requirement to control storm water and non-storm water pollution to the maximum extent practicable (MEP). Only a fully engineered bridge capable of withstanding a 50-year storm would fulfill the MEP standard.

300.     The City of Poway failed to engage in all necessary BMPs to control erosion and runoff from areas associated with the aforementioned actions in violation of its CWA permits and/or San Diego Water Board permits.

301.     The City tried to justify its emergency permit by arguing that there were porta potties in the vicinity that needed to be emptied. It is not a best management practice to have porta potties in their current location close to Warren Creek at a location that is difficult to reach after storms and close to the Lake in general. The City of Poway could have locked the porta potties,

especially the ones located near to Warren Creek, instead of leaving them open

for hikers to use after the February 26-27, 2017 storm.

302.     The City of Poway could have closed the trail at Warren Creek

indefinitely until the proper repairs were done (the City does not have a problem

closing its trails during heat waves and enforcing the closure. Also, there are

other ways to get to the top of Mount Woodson (using the aforementioned

Warren Creek crossing is not necessary but only a more convenient way to get

to the top of the mountain.) The public water supply should take precedence

over recreational activities.

303.     Most importantly, the City of Poway has not adhered to the requirements

of RGP 63 because no discharge of dredge or fill material may occur in the

proximity of a public water supply intake. The City of Poway cannot use RGP

63 or any other general permit to repair its trail crossings above Lake Poway

because the crossings occur in proximity of a public water supply intake.

    a. In 2017, Lake Poway had a higher numeric turbidity level than in 2016

       and, unlike previous years, a higher level than allowed by state law for

       drinking water (0.314 NTUs).

    b. These higher levels were caused by the failed culvert crossings within

       the City's MS4 as the pollution made its way to the City's public water

       supply intake area through diffusion.

    c.  The City must apply for an individualized permit to undertake any access road repair projects above Lake Poway because this generalized permit condition (or any of the other general permits that could have been potentially been used) can never be satisfied.

304.    The City of Poway did not adhere to the RGP 63 permit condition mandating that the structure not impede the normal or expected high flows or cause the relocation of the water. A future heavy storm would destroy the earthen crossing in its "new" location and mobilize the dredged and fill material as effluent into the wetlands and reservoir below.

305.    The City of Poway cannot justify placing the device and the pipe into its Warren Creek crossing under Nationwide Permit 5 because of their proximity to a public water supply intake. Also, no pre-construction notification was given to the appropriate authorities and no individual 401 water quality certification was obtained for the device or the pipe, all of which would have been required by NWP 5 or any generalized permit.

306.    The City of Poway is likely to repair/replace this stream crossing and the attached device without future Department of the Army authorization and without the proper permits from the San Diego Water Board.

    a.  The City of Poway has no intention of removing the pipe or the device. These fixtures are not for temporary scientific research.

b. The City has wrongly taken the position that Warren Creek is an ephemeral stream and/or that Lake Poway was constructed in a "dry canyon" that is not subject to the Clean Water Act.

307. As Warren Creek at the location of the Crossing is a seasonal stream with adjacent wetlands that continuously follow the creek down the short way into Lake Poway, Department of the Army jurisdiction exists for this Warren Creek Crossing even under Justice Scalia's Rapanos decision.

308. As the law currently stands in California, this Warren Creek crossing and inlet flow meter device must be regulated under the 2015 Clean Water Rule notwithstanding presumptions about how a future Supreme Court will alter that rule.

309. This Warren Creek crossing and inlet flow meter device also fall within the scope of the EPA's pre-2015 regulations and guidelines on Department of the Army jurisdiction.

310. Even if the Warren Creek Crossing and inlet flow meter are judged to be outside of the jurisdiction of the Department of the Army, these "structures" should be then treated as an illicit connection/discharge because the City of Poway failed to obtain valid waste discharge requirements from the San Diego Water Board for the entire project and failed to abide by the 2013 MS4 Permit and its mandated requirements that effective BMPs be installed at this location.

311.     Waste discharge requirements would have ensured that the proper BMPs be installed and that any construction fulfill the City's MS4 Permit requirements as listed in Provision E.3, which are required for all development projects, including those constructed by City staff.

312.     The Warren Creek crossing project was not a "maintenance" project.

313.     Failure to obtain state waste discharge requirements is enforceable via a citizen's suit under the CWA because the City's 2013 MS4 Permit federalizes these requirements and their associated mandates requiring the installation of effective BMPs to manage storm and non-storm water. 2013 MS4 Permit, Provision E.3.a.(3)(a) n.25.

314.     The City of Poway should have restored the natural drainage corridors into Lake Poway, which are still currently blocked with sediment, as part of its development projects in the Lake Poway area in 2017.

315.     Even if Lake Poway were determined not to be Waters of the United States, Warren Creek is still part of the City's MS4, and as such, the City would be required to obtain waste discharge requirements before construction which would have required the City to implement its 2013 MS4 Permit requirements including fulfilling Low Impact development BMP requirements and/or onsite/source control BMPs at this site and in the vicinity, which the City failed to do. See 2013 MS4 Permit, Provision E.3.a.

b. Ephemeral tributary crossing

316.     On July 17, 2017, the City of Poway entered into a contract for the Lake Poway Trail Slope Repair project with the Piperin Corporation.

317.     This project was constructed under the January 24, 2017 Proclamation of Local Emergency, which was the City's justification for waiving environmental review and the formal bidding procedures normally associated with this type of project.

318.     After the heavy rains in January and February of 2017, City staff discovered cracks in the soil slope adjacent to the Lake Poway access road. The City utilized its on-call geotechnical consultant to perform a limited geotechnical evaluation of the dirt road surrounding Lake Poway. The limited geotechnical evaluation specifically focused on an area where a large crack had formed parallel to the road. During the investigation, it was discovered that the tension crack had formed due to surficial instability of the slope at this location.

319.     The project repaired the slope by replacing a section of clogged storm drain pipe and reconstructing the slope by benching the exposed slope face into competent material, and rebuilding the slope with compacted fill. The final cost of the project was $38,976.70. The picture below depicts work done by the Piperin Corporation.



320.    The Piperin Crossing project was done within an ephemeral tributary to Warren Creek that flows into Lake Poway. This ephemeral tributary is considered Waters of the United States under the 2015 Clean Water Rule, which is applicable in California.

321.    The location of the project is 14556 Lake Poway Road at Latitude 33.0046, Longitude -117.0100.

322.    The Piperin Crossing project was not executed in "emergency" conditions as the work was done in the dry summer months. The City of Poway abused its

emergency powers by suspending environmental review and state bidding laws

to repair this earthen stream crossing above Lake Poway.

323.    Under state law, the Piperin Corporation would be required to pay the

City back for the payment made to them for its work as the work was done in

violation of state bidding laws.

324.    The City of Poway and the Piperin Corporation failed to procure a valid

permit from the San Diego Water Board for any of the storm drain/crossing

repairs within the tributaries feeding Lake Poway.

325.    Although the City of Poway budgeted money for permits/water quality

certification for the Piperin Crossing Project, the City of Poway did not follow

through in procuring these required authorizations.

326.    The City of Poway cannot use a generalized Department of the Army

permit to justify any of its culvert crossing repairs above Lake Poway because

of the crossings' proximity to a public water supply intake.

327.    The City failed to engage in compensatory mitigation of additional

riparian areas as would have been required by the San Diego Water Board.

328.    The City of Poway is likely to repair this crossing without Department of

the Army authorization and without a water quality certification and/or waste

discharge requirements from the San Diego Water Board in the future.

329.    The City of Poway failed to implement Best Management Practices and

Effective Controls for future storm water pollution as required by the City's

NPDES permit, including the restoration of drainage corridors including the area immediately downstream of the Piperin Crossing project, because all of the work done by the Piperin Corporation is considered a "development project" and not a maintenance project. See 2013 MS4 Permit, Provision E.3.

330.    The combined ecological loss to wetlands has exceeded 0.1 acres when one accounts for the two crossings above Lake Poway (the Warren Creek Crossing and the Piperin Crossing) in toto and the sensitive wetlands that exists near the exit point of the tributaries which all have been harmed by the sediment deposits coming from the dredged and fill materials becoming effluent with the addition of storm and non-storm water. These wetlands contain Pacific shining willows and other obligate wetland species that are home to endangered and threated species such as California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*). Any valid Army Corp permit and/or San Diego Water Board permit would require ESA § 7 consultation, and that consultation for the loss of wetlands was not accomplished.

a.  The City of Poway failed to conserve similar habitat as compensatory mitigation for its crossings and the destructive impact that the crossings have had and will have in the future.

b. Alternatively, the regulations require § 7 consultation to be re-initiated when the action of the City causes effects to listed species or critical habitat that were not previously considered. 50 C.F.R. § 402.16.

331.    Even if the Piperin Crossing is deemed outside the jurisdiction of the Department of the Army, it would fall under the City's NPDES permit, which federally obligates the City to obtain Waste Discharge Requirements from the San Diego Water Board, which would have required that best management practices and other effective controls such as the use of bioengineering and other control structures be used to prevent future pollution into Lake Poway. These waste discharge requirements would have fulfilled the City's obligations under its 2013 MS4 Permit, Provision E.3, which are enforceable permit terms in a CWA citizen's suit.

332.    If the City had obtained proper permits and had undergone the normal environmental review process, it would have showed that steps were taken to avoid impacts to wetlands, streams and other aquatic resources; that potential impacts were minimized; and that compensation will be provided for all remaining unavoidable impacts. These impacts have harmed sensitive habitat for endangered and threatened species.

333.    To fulfill its NPDES permit, the City of Poway should have installed source control BMPs/low impact development BMPs that will minimize the generation of pollutants at the location of the Piperin Project and the area

immediately downstream (i.e. Lake Poway). A properly permitted project under

the 2013 MS4 Permit would have involved maintenance and restoration of

drainage corridors directly into a public water supply reservoir.

> **4. The City of Poway rebuilt a destroyed earthen crossing in its MS4**
>
> **on APN: 278-210-1100 about a mile upstream from Lake Poway**
>
> **and has not effectively controlled its non-storm water pollution**
>
> **from Rock Haven Spring on this parcel in violation of sections**
>
> **301, 401, 402, and 404 of the Clean Water Act and the City's 2013**
>
> **MS4 Permit.**

334.    The City of Poway owns APN: 278-210-1100. The parcel is zoned open-

space resource management. According to the City's Habitat Conservation Plan,

the parcel contains a listed species, Encinitas baccharis (*Baccharis Vanessae*).

The species extends to Mount Woodson and Poway where it is associated with

dense southern mixed chaparral. 61 Fed. Reg. 195 (October 7, 1996). The parcel

also contains a portion of Warren Creek and Rock Haven Spring.

335.    The City of Poway maintains a hiking trail on APN: 278-210-1100 called

the Warren Canyon Trail. A portion of the trail meets Highway 67 in an

extremely steep portion of Caltrans' right of way. The Warren Canyon Trail

meanders through the lower reaches of Mount Woodson and leads to Lake

Poway.

336.     The Warren Canyon Trail crosses over Warren Creek on APN: 278-210-
1100. The approximate location of the point of crossing is depicted by a red
arrow on the photograph below:



337.     Over the years, the crossing has been destroyed after heavy rains and the
effluent deposited in the wetlands of Warren Canyon and into Lake Poway
below.

338.     Rock Haven Spring is located on the parcel and on the adjacent Caltrans
right of way. Water from this spring flows under Highway 67 and into the blue-
line stream draining Rock Haven.

339.     Plaintiff own the five parcels surrounding the City's open-space parcel:
APNs 278-210-1800, 278-210-0300, 278-210-0400, 278-210-2900, and 278-
210-3000. All of this surrounding land is zoned rural residential.

340.     The City's trail crossing on APN: 278-210-1100 over Warren Creek has resulted in dredged and fill material and other mobile pollutants being intentionally placed in Waters of the United States and/or state.  The City of Poway has never obtained a permit from the San Diego Water Board for this crossing.

341.     During the heavy storms of 2017 and for weeks thereafter, effluent from the City's unpermitted crossing resulted in pollution traveling onto Plaintiff's property at APN: 278-210-1800. This pollution harmed the wetlands located on the City's property and Plaintiff's property between January 20, 2017 and April 17, 2017. This pollution violated the City's NPDES permit, Provisions A.1.a, A.1.b, A.1.c, and A.2.a for many of the same reasons as mentioned above (Plaintiff's wetlands are considered waters of the state and, under the 2015 Clean Water Rule, waters of the United States). Some of this pollution traveled all the way into Lake Poway on those dates.

342.     Since the trail has been blazed, the City constructed/repaired this crossing without proper CWA § 404 permits and/or waste discharge requirements because the City failed to obtain the proper permits from the San Diego Water Board for this crossing.

343.     The City's actions caused mobile pollutants to be placed within Warren Creek on APN: 278-210-1100.

344.     Non-storm water from Rock Haven picks up pollution from Highway 67 and then flows into the City's MS4 and onto Plaintiff's property below. The City of Poway does not have a separate NPDES permit for this non-storm water discharge as required by its 2013 MS4 Permit.

345.     The City of Poway failed to install effective controls and other LID best management practices to reduce storm and non-storm water pollution coming from APN: 278-210-1100, onto Plaintiff's property APN: 278-210-1800, and into Lake Poway below in violation of its 2013 MS4 Permit.

**5. The City of Poway has constructed and maintained an unauthorized hiking trail on Plaintiff's parcels, APN: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000, in violation of state trespassing laws and in violation of the ESA and the CWA.**

346.     Plaintiff's four other parcels (described in two separate deeds) are also located adjacent to the City of Poway's parcel APN: 278-210-1100.

347.     The property line of Plaintiff's parcels reaches to Poway's northern and northeastern city limit. These four parcels, like the City's parcel, are in Warren Canyon and contain a portion of Warren Creek, the blue-line stream draining Rock Haven.

348.     The photograph below depicts four of Plaintiff's parcels that are zoned rural residential (Plaintiff's downstream parcel containing Kelly Spring is not pictured below). The well-maintained hiking trails as shown cross over a portion

of Warren Creek. The historical stream on this parcel is considered jurisdictional

waters of the United States under the 2015 Clean Water Rule. It is also

considered waters of the state.

349.    The City of Poway regularly clears the stream and upland areas of

wooded vegetation in violation of state trespassing laws and without a valid §

404 permit and/or permit from the San Diego Water Board, which is needed to

clear the remnants of the stream bed. The City of Poway has been doing so since

the trails were blazed by government officials in 2007 (previous owners of these

four parcels did <u>not</u> blaze these trails on Plaintiff's property).



Map Provided by the City of Poway

350.    In the picture above, the X marks in lime green are the approximate

locations of the endangered species that the City of Poway has cut or destroyed

in the process of constructing and maintaining its trails on Plaintiff's parcels.

351.     The City of Poway's discharges of pollutants by maintaining this point

source stream crossing has resulted in violations of the City's NPDES permit.

352.     Since the trails were built/maintained by the City of Poway in 2007, the

City of Poway failed to obtain a CWA § 401 water certification and/or waste

discharge requirements for this crossing and has failed to install proper

controls/LID BMPs for this trail crossing.

353.     Neither Plaintiff nor previous property owners of these four parcels

constructed or maintained these trails on APN: 278-210-3000 and APN: 278-

210-2900.

354.     Under Cal. Penal Code § 601 and 602, it is unlawful to cut down, destroy,

or injure any kind of wood growing upon the lands of another.

355.     Two federally listed threatened and endangered species have been harmed

by the City of Poway: *Arctostaphylos glandulosa ssp. Crassifolia* (Del Mar or

Costa Baja manzanita, pictured below) and *Baccharis vanessae* (a California

endangered plant), which has been documented to grow in Poway and on Mount

Woodson by the federal government at 61 Fed. Reg. 195 (October 7, 1996).



356.    Because the City has violated a state criminal trespass law and other state

laws (e.g., cutting a state endangered plant), the City is liable under Section

9(a)(2) of Endangered Species Act, 16 U.S.C. § 1538(a)(2)(B), which makes it

unlawful to remove, cut, dig up, or damage or destroy any endangered plant in

knowing violation of any state law or regulation or in the course of a violation

of a state criminal trespass law. The "violation of any law . . . of any State"

language of Section 9(a)(2)(B) federalizes the City's violation of state law.

357.    The City is also in violation of 16 U.S.C. § 1538(a)(1) because Plaintiff's

parcels contain critical habitat for the California gnatcatcher, the least bell's

vireo, and the golden eagle (currently de-listed but protected by another statute),

and the City's activities on Plaintiff's parcels have harmed these species and

their habitat.

358.    The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain/restore the City's trails, including those on Plaintiff's parcels. Plaintiff has spoken with Mr. Hahn, and he has confirmed that the City maintains/restores the trails on Plaintiff's property on a regular basis. Plaintiff observed the City's maintenance activities on Plaintiff's property during the first week of May of 2018.

359.    Although the issuance of an Incidental Take Permit authorizes "take" by any entity under "direct control," Poway's Habitat Conservation Plan is not applicable to Plaintiff's parcels of land unless Plaintiff agrees to be a participant and abide by its terms.

360.    According to the City's HCP, if a parcel contiguous to the existing Mitigation Area is found to support high quality habitat or covered species, the property owner may voluntarily request that the property be added to the Mitigation Area. According to Poway's City Planner Joseph Lim, the California Department of Fish and Wildlife had previously urged the City of Poway to purchase APNs: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000 because of the high habitat values and because of the hiking trails through the properties, but the City of Poway decided to pursue other projects instead of obtaining a legal right to use the trails.

361.    The fire department uses the trails on Plaintiff's property as an auxiliary route in wildfire situations, and City maintenance crews and volunteers use Plaintiff's trails instead of the City's official access point further south for safety reasons. Several people park their cars on Plaintiff's property to access the Warren Canyon trail rather than parking on the opposite side of Highway 67 and running through the plethora of speeding cars to get to the side where the trailhead is located.

362.    Even googlemaps has the trailhead for the Warren Canyon trail on Plaintiff's parcel, APN: 278-210-3000, because it is a better maintained and safer trail with easier access than the alternative.

363.    For the most part, the City stopped maintaining its official trailhead and has used Plaintiff's trailhead and properties instead without proper authorizations.

364.    Caltrans has essentially built a crossing over Warren Creek on Plaintiff's property by culverting some of the water from the stream and diverting it further south into the Caltrans right of way. However a portion of the trail crossing is not culverted and does not have the proper BMPs which should have been installed by the City since it is a City-maintained trail.

365.    The City uses Plaintiff's property because the alternative route is steep and dangerous, especially during the winter and spring months.

366.    The City of Poway, its citizens, and its agents likely will continue to use these trails in the future without authorization.

**6. The City of Poway is liable for not implementing Provisions D.2, E.2.a, E.2.b, E.2.c, and E.2.d of its 2013 MS4 Permit in the subwatershed area above and including Lake Poway.**

367.    The City of Poway has not maintained an accurate map of its entire MS4 and the corresponding drainage areas within its jurisdiction including the location of Rock Haven Spring and Kelly Spring on Plaintiff's property.

368.    The City of Poway has not mapped the major outfall immediately above Lake Poway.

369.    The City of Poway is required to track, identify, and eliminate illicit discharges and connections to its MS4 from third parties in Warren Canyon because non-storm water flows through Warren Canyon. It has not done so.

370.    Provision E.2.c requires each Copermittee to conduct field screening and monitoring of MS4 outfalls and other portions of its MS4 within its jurisdiction to detect non-storm water and illicit discharges and connections to the MS4. The field screening requirement is required to be implemented through the dry weather MS4 outfall discharge monitoring required under Provisions D.2.a.(2) and D.2.b(1). The City of Poway has failed to monitor the MS4 discharges entering Lake Poway including the polluted spring water from Mount Woodson and Rock Haven that flows into and through its MS4 and into its reservoir.

371. The City of Poway has failed to properly report its non-storm water discharges and other illicit discharges and connections to the San Diego Water Board.

372. Each Copermittee is responsible for <u>prioritizing</u> its efforts to eliminate non-storm water and illicit discharges or connections to its MS4 based on field screening and monitoring data, NALs, illicit discharge investigation records, and the known and suspected sources.

373. Sources of non-storm water and illicit discharges or connections must be eliminated by enforcing the legal authority established by each Copermittee pursuant to Provision E.1. The City of Poway has not accomplished this as to the contaminated non-storm water discharges to its MS4 vis a vis Rock Haven Spring and Kelly Spring.

374. The City of Poway has been discharging non-storm water pollution coming from Rock Haven onto Plaintiff's property and into Lake Poway from at least January 20, 2017 to the present day without a separate NPDES permit authorizing non-storm water polluted discharges.

375. Now that the non-storm water discharges have been identified in the City of Poway, the City of Poway <u>must</u> reduce or eliminate the non-storm discharges coming from Rock Haven Spring and Kelly Spring on Mount Woodson with effective controls to fulfill 2013 MS4 Permit, Provision E.2.a.(7):

"Provision E.2.a.(7) has been included in the requirements for non-storm water discharges to clarify that any non-storm water discharges to the Copermittees MS4, even those identified pursuant to Provision E.2.a.(1) through E.2.a.(4) [i.e. spring water], must be reduced or eliminated, unless a non-storm water discharge is identified as a discharge authorized by a separate NPDES permit."

2013 MS4 Permit, Attachment F-96.

## IX. CAUSES OF ACTION

### A. Discharges from the City of Poway's MS4s Causing, Contributing to, and Threatening to Cause Pollution in waters of the state in Violation of the 2013 MS4 Permit and CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p)

376.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

377.    The City's NPDES Permit prohibits discharges that cause or contribute to or threatened to cause a condition of pollution, contamination or nuisance in waters of the state.

378.    The City of Poway's satellite images from the second half of March 2017 visually show the discharges of storm water pollutants from the City's destroyed point-source stream crossing as well as the non-storm spring water pollution flowing into the reservoir as it had not rained in Poway in over two weeks when the aerial photographs were taken.

379.     Eyewitness testimony establishes the fact that several culvert crossings in the privately owned portion of Warren Canyon failed in the winter of 2017, sending polluted storm and non-storm water pollution into Lake Poway.

380.     The numeric non-storm water action level for turbidity is 20 NTU, which is a maximum daily action level. On March 16, 2017, the turbidity measurement of the non-storm water discharges into the surface waters of Lake Poway was way above 200 NTUs.

381.     The numeric non-storm water action level for fecal coliform is 200 MPN/100 ml as an average monthly action level and 400 MPN/100 ml as an instantaneous maximum. In March 2017, the measurement of fecal coliform was way above the average monthly action level in Lake Poway.

382.     The City of Poway failed to prohibit the high turbidity levels and high fecal coliform levels in violation of its 2013 MS4 permit.

383.     The City of Poway has acknowledged in the public record that sediment pollution from the storms of 2017 have lessened the water storage capacity of Lake Poway and have blocked the natural course of the main tributary feeding the reservoir.

384.     The City of Poway was rightly concerned about the lost storage capacity of Lake Poway because the State of California considers Poway dam as having a high risk of overtopping and inundation to the Pacific Ocean below.

385.    Both Lake Poway and the Pacific Ocean are navigable waters of the
United States affected or threatened to be affected by the City of Poway's MS4
discharges.

386.    The City ordered a bathymetric survey of the bottom surface of Lake
Poway after it "became apparent with the repair work from the 2017 winter
storm events." City of Poway, Agenda Item 1.12, pg. 3, November 7, 2017.

387.    These admissions demonstrate that exceedances of water quality
standards in Warren Canyon and Lake Poway have occurred since early 2017.

388.    Since 1972, over 20,000 tons of dirt and course sediment have buried the
Boulder Bay area of Lake Poway and infiltrated the reservoir along the path of
the historical stream within the reservoir.

389.    In 2017, enough course sediment entered the Boulder Bay portion of Lake
Poway to bury most of its wooden footbridge that only a few years ago was
floating above water.

390.    City-owned parcels containing the City's point sources that discharge
pollutants into Lake Poway include the following: APN: 278-290-1000; APN
278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

391.    The City of Poway has also maintained two point-source crossings
without permits/authorization that discharge pollution into Warren Canyon and
Lake Poway on APN: 278-210-3000 and APN: 278-210-1100.

392.    The City of Poway also contains two point source springs (Rock Haven Spring and Kelly Spring) that discharge into the City's MS4 in a contaminated state because of unpermitted fill materials and mobile pollutants placed in Warren Creek by private property owners which are picked up by the flowing spring water before being discharged into Lake Poway.

393.    The City of Poway must comply with the discharge prohibitions in its 2013 MS4 Permit, Provision A.1.a at a minimum because the polluted water contained a large amount of non-storm spring water that is traceable to Rock Haven Spring and the seasonal springs on Mount Woodson including Kelly Spring.

394.    In the winter and spring of 2017, the seasonal springs on Mount Woodson continually fed Lake Poway through Easter.

395.    As a result of its control of land areas that are generating polluted stormwater and non-stormwater, the City of Poway has caused and contributed to, and is causing, contributing to, and threatening to cause, pollution in the wetlands of Warren Canyon and in Lake Poway, which are all considered waters of the state.

396.    Between January 20, 2017 and April 17, 2017, and on January 9 and February 27 of 2018, each day that the City of Poway has caused, contributed to, threatened to cause, or failed to mitigate pollution is a separate and distinct violation of the 2013 MS4 Permit and 33 U.S.C. §§ 1311(a) and 1342(p).

397.    During every rain event, stormwater water flows freely over exposed materials of the stream crossings, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and nutrients at levels above applicable water quality standards. The polluted water then flows untreated into Lake Poway.

398.    For weeks after larger rain events, non-storm spring water flows freely over exposed materials of the stream crossings, becoming contaminated with bacteria, color, manganese, mercury, nitrogen, pH, phosphorus, viruses, turbidity, and nutrients at levels above applicable water quality standards. The contaminated non-storm then flows untreated into the City's MS4 and into Lake Poway.

399.    These violations are ongoing and continuous in light of the City of Poway's history of failing to abide by the Clean Water Act and its 2013 MS4 Permit in the area above and including Lake Poway.

400.    The Basin Plan states that "waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." The beneficial uses of Lake Poway are being lost by the City of Poway's actions and inactions.

401.    These violations are ongoing and continuous because the City's Warren Creek crossing has not been engineered to withstand storm surges and will eventually blow out into Lake Poway and its adjacent wetlands during the next series of heavy winter storm events.

402.    The City has not put into place best management practices and effective controls that will reduce pollutants in storm water discharges from its MS4 above Lake Poway to the maximum extent practicable.

403.    These violations are ongoing and continuous because the City of Poway has not enforced the law against private property owners in Warren Canyon who have their own unpermitted discharges of dredge and fill materials in Warren Creek, including newly replaced culverts in 2017 and 2018.

404.    The City of Poway will continue to violate the Clean Water Act in the future unless and until the City is instructed by a federal judge that the Clean Water Act is applicable to Lake Poway and the watershed area that feeds it.

405.    Unless the City of Poway desists in its violations of the NPDES Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff will suffer irreparable harm.

406.    Plaintiff has no adequate remedy at law.

**B. Uncontrolled Non-Storm Water Discharges into and/or from the City's MS4 Without the Use of Effective Controls to Reduce the Discharges in the Future and/or the Procurement of a Separate NPDES Permit in Violation of the 2013 MS4 Permit and CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p)**

407.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

408.    Discharges of contaminated non-storm spring water from Rock Haven and from Mount Woodson into the City of Poway's MS4 and into Lake Poway have caused a condition of pollution and the loss of the beneficial uses of Lake Poway each and every day from January 20, 2017 to April 17, 2017, which are each separate and distinct violations of the City's 2013 MS4 Permit as stated in Cause of Action A.

409.    The MEP standard does not apply to non-storm water discharges into the MS4 and/or receiving waters. The standard to be applied to non-storm water discharges is much stricter.

410.    Non-storm water discharges must be addressed by the City of Poway. The City of Poway has failed to do so.

411.    The City of Poway has not effectively prohibited the contaminated non-stormwater discharges coming from springs into its MS4 in the watershed area above Lake Poway.

412.    Unless the City desists in its violations of the 2013 MS4 Permit, 33 U.S.C. §§ 1311(a) and 1342(p), or obtains a separate NPDES permit for non-storm water discharges of polluted spring water, Plaintiff and the public will suffer irreparable harm.

413.    Although the 2013 MS4 Permit offers the City of Poway a somewhat flexible approach to address the non-storm water spring water discharges into its MS4 and into Lake Poway, the City of Poway has not effectively enforced the

Clean Water Act and state law in the streams feeding Lake Poway with regard to its own projects in waters of the state and has not effectively enforced the Clean Water Act and state law as to the discharges of fill and dredged materials in Warren Creek on private property upstream of Lake Poway.

414.    The City has been presented with a feasible plan to reduce the non-storm water discharges into its MS4 through wetland repair projects on APN: 278-210-1800 that will reduce non-storm water spring flows into the City's MS4 and into Lake Poway.

415.    The City's 2013 MS4 permit requires that the spring water emanating from Mount Woodson and Rock Haven be addressed as a <u>priority</u> concern because of the traceable pollution that has resulted in Lake Poway in 2017.

416.    The City of Poway has the resources to purchase APN: 278-210-1800 for its ecological and water resource values and to construct the rock weirs that will control and reduce storm and non-storm water flows before they enter Lake Poway.

417.    The City of Poway has not come up with an alternative <u>effective</u> and <u>feasible</u> plan to segregate the non-storm water spring water discharges <u>into</u> its MS4 before they are discharged onto private property and into Lake Poway.

418.    The City of Poway has no intention of obtaining separate NPDES permits for the spring water flows from Mount Woodson and from Rock Haven.

419.    Plaintiff has no adequate remedy at law.

C. **Failing to Report and Monitor Wet and Dry Weather Discharges and**
**Identify Non-Storm Water Discharges in Violation of the 2013 MS4**
**Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a)**
**and 1342(p)**

420.    Plaintiff realleges, as set forth fully herein, each and every allegation
contained in the preceding paragraphs.

421.    The City of Poway is required to conduct wet and dry weather monitoring
of the natural runoff including non-storm water flows coming into Lake Poway
and it has failed to do so.

422.    The City of Poway is required to identify the major outfall immediately
upstream of Lake Poway and to conduct wet and dry weather monitoring at this
location on a regular basis. It has failed to do so.

423.    The City of Poway is required to identify non-storm water discharges
coming from its MS4. The City of Poway has not properly identified Rock
Haven Spring and Kelly Spring which are sources of non-storm water pollutants
in its MS4 and into Lake Poway.

424.    The City of Poway is required to monitor the non-storm water discharges
coming from its MS4 and into Lake Poway. It has failed to do so.

425.    The City is required to report its illegal discharges and update the Water
Quality Improvement Plan and identify water quality improvement strategies
such as stream rehabilitation projects that will be implemented to reduce or

eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards and/or waste discharge requirements.

426.     Because contaminated non-storm spring water has been discharged into the City's MS4, the City of Poway is required to report it to the San Diego Water Board. It has failed to do so.

427.     The City has failed to complete the Waste Discharge Report for all discharges from its MS4 that cause or contribute to exceedances of Water Quality Standards in Lake Poway and its upstream MS4.

428.     The City has violated and continues to violate the 2013 MS4 Permit, Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), by failing to update its Water Quality Improvement Plan and identify water quality improvement strategies such as stream rehabilitation projects in the subwatershed area above Lake Poway that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards from storm and non-storm water, including those in the Basin Plan.

429.     The City has violated and continues to violate the 2013 MS4 Permit by failing to submit an adequate Waste Discharge Report, which is required for NPDES Permit renewal, for all discharges from the MS4 that have caused or contributed to exceedances of water quality standards.

430.    On December 27, 2017, the Report of Waste Discharge-Regional Monitoring and Assessment Report 2017 was delivered to the San Diego Regional Water Board. This document is required for the Copermittees to obtain NPDES Permit renewal. This report failed to document the City of Poway's discharges into Lake Poway exceeding Water Quality Standards, including those non-storm water discharges into Lake Poway in March 2017.

431.    This violation is ongoing and continuous. In light of the City's history of violations and the nature of violations, the City will continue to violate these requirements to monitor and report discharges in the future unless and until enjoined from doing so.

432.    Unless the City desists in its violations of the 2013 MS4 Permit, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff and the public will suffer irreparable harm.

433.    Plaintiff has no adequate remedy at law.

**D. Failing to Reduce Pollutants in Storm Water Discharges from MS4s to the MEP in Violation of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)**

434.    Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

435.     The City of Poway's satellite images from 2017 visually show the discharge of pollutants from the City's point-source stream crossings and the contaminated non-storm water discharges from the local mountains causing a condition of pollution in Lake Poway.

436.     The City of Poway has acknowledged in the public record that sediment pollution from the storms of 2017 have lessen the water storage capacity of Lake Poway and has nearly buried its wooden footbridge in the Boulder Bay portion of Lake Poway. The City ordered a bathymetric survey of the bottom surface of Lake Poway after it "became apparent with the repair work from the 2017 winter storm events." City of Poway, Agenda Item 1.12, pg. 3, November 7, 2017. These admissions demonstrate that exceedances of water quality standards in Warren Canyon and Lake Poway have occurred since early 2017.

437.     The City of Poway's parcels containing its point sources that discharge pollutants into and from its MS4 include the following: APN 278-280-2300; APN 278-281-0100; and APN: 278-210-1100.

438.     The City of Poway has also maintained a point source without authorization that discharges pollution into Warren Canyon and Lake Poway on private property: APN: 278-210-3000. Plaintiff is the legal owner of this parcel.

439.     Although the City controls land areas that are generating polluted stormwater and non-stormwater, the City of Poway has failed to reduce pollutants in storm water from its MS4 to the maximum extent practicable.

440.    Poway failed to engage in best management practices by installing a turbidity curtain or other BMPs to limit the amount of pollution from entering Lake Poway between January 20, 2017 and April 17, 2017.

441.    The City of Poway has failed to clean out its culverts within streams above Lake Poway and its cross-draining culverts along its hiking trails above Lake Poway before the 2017, 2018, and 2019 storm seasons to lessen pollution from its MS4 and into Lake Poway during the rainy season.

442.    The City of Poway failed to engage in best management practices to reduce pollutants in storm water discharges from the City's MS4 to the maximum extent practicable with its construction projects completed in 2017.

443.    The Warren Creek Crossing installed by the City of Poway using dirt backfill would not reduce pollutants from its MS4 and into Lake Poway to the maximum extent practicable.

444.    To reduce pollutants in storm water discharges at the location of the Warren Creek Crossing to the maximum extent practicable, the City of Poway should have installed a bridge with abutments instead of a culvert that will not withstand storm surges of an expected 50-year storm event.

445.    The City of Poway has not installed best management practices/source controls/LID BMPs in the vicinity of the Warren Creek Crossing in the Lake Poway area in 2017 to fully protect its downstream water supply to the maximum extent practicable.

446.   The Piperin Crossing project also was constructed without the proper BMPs/source controls/LID BMPs to reduce pollutants in storm water from the City's MS4 to the maximum extent practicable.

447.   These violations are ongoing and continuous. The City of Poway will continue to violate the Clean Water Act in the future unless and until it is enjoined from doing so.

448.   Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff and the public will suffer irreparable harm.

449.   Plaintiff has no adequate remedy at law.

**E. Dredging and Filling Waters of the United States in Violation of Section 301, 401, and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1341, 1344.**

450.   Plaintiff re-alleges and incorporates herein by this reference the preceding paragraphs of this Complaint.

451.   Warren Creek and its tributaries and Lake Poway are all Waters of the United States as defined in the Clean Water Act and the EPA's 2015 Clean Water Rule.

452.   Warren Creek is Waters of the United States under both Justice Scalia's Rapanos plurality decision (because of the adjacent wetlands that are contiguous

with the surface waters of Lake Poway) and under pre-2015 EPA regulations promulgated in the 1980s (because it is a seasonal stream).

453.    Lake Poway is Waters of the United States under Justice Scalia's <u>Rapanos</u> decision and under pre-2015 EPA regulations promulgated in the 1980s because Lake Poway is navigable-in-fact Waters of the United States.

454.    In rebuilding its earthen stream crossings beginning in the spring of 2017, the City of Poway dredged vegetation and sediment from Warren Creek without seeking or obtaining individualized Section 404 permits from the Army Corp of Engineers or individualized Section 401 certifications from the San Diego Water Board. This activity caused unauthorized discharges of dredged and fill materials into waters of the United States in violation of the Clean Water Act Sections 301, 401, and 404.

455.    The City of Poway does not have, has never had, and has never applied for an *individualized* Section 401 certification for any of its stream crossings or other structures in Waters of the United States located in the watershed area above Lake Poway.

456.    The City of Poway does not have, has never had, and has never applied for an *individualized* Section 404 permit for any of its stream crossings or other structures in Waters of the United States located in the watershed area above Lake Poway.

457.     The City of Poway failed to undertake ESA § 7 consultation with the wildlife agencies to ensure that its work in Waters of the United States conforms to its Habitat Conservation Plan.

458.     The generalized emergency permit/certification that the City of Poway obtained in 2017 cannot be used in non-emergency situations and cannot be used for dredging and filling activities above a public water supply intake area.

459.     The City of Poway's unauthorized work occurred in a non-emergency situation and involved dredging and filling activities immediately above a public water supply intake area.

460.     The generalized permit that the City of Poway tried to obtain did not contain a full description of all the work done in Waters of the United States including the dredging and filling activities involved in constructing the inlet flow meter installed in 2017.

461.     The City of Poway has undertaken unauthorized work in Waters of the United States as defined by the Clean Water Act and the permitting authorities.

462.     The Army Corp has asserted jurisdiction over all portions of the Warren Creek crossing in 2017.

463.     In 2017, the City of Poway also failed to obtain a Section 404 permit and Section 401 certification for the work done by the Piperin Corporation in an ephemeral tributary above Lake Poway, which is covered by the EPA's 2015 Clean Water Rule and gives jurisdiction to the Army Corp over this project.

464.     The City of Poway's ongoing and threatened future discharges of dredge and fill material and other pollutants from its activities in the Lake Poway area and upstream watershed constitute violations of the Clean Water Act Section 301, 401, and 404, 33 U.S.C. § 1311, 1341, and 1344. The City of Poway has violated and continues to violate Sections 404 and 401 of the CWA. There is a reasonable likelihood that the City of Poway will conduct future dredge and fill operations in the Lake Poway area and upstream watershed without obtaining Section 404 permits from the Army Corps of Engineers or Section 401 certifications from the San Diego Water Board.

465.     Plaintiff has provided the City of Poway and other state and federal officials with a sixty-day notice of the Clean Water Act violations alleged in this Complaint, pursuant to the Clean Water Act's requirements and all applicable law. Clean Water Act § 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A). More than 60 days have elapsed since Plaintiff provided notice to Defendant of the Clean Water Act violations alleged in this Complaint and the violations remain unabated.

466.     Upon information and belief, neither the U.S. Environmental Protection Agency nor a State has commenced and is diligently prosecuting an action for the Clean Water Act violations asserted in this Complaint.

467.     Unless the City of Poway desists in its violations of the CWA, Plaintiff will suffer irreparable harm.

- 140 -

468. Plaintiff has no adequate remedy at law.

**E. Failing to Implement/Install BMPs including Onsite Structural BMP Performance Requirements and LID BMPs as described in Provisions E.3.a. of the 2013 MS4 Permit for the City of Poway's Development Projects in 2017 in Violation of its 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p)**

469. Plaintiff incorporates by reference each and every allegation contained above, as though set forth fully herein.

470. The City of Poway has failed to prescribe onsite BMPs to its development projects at the Warren Creek Crossing and the Piperin Crossing during the planning process so as to control pollutant discharges into Lake Poway.

471. The City of Poway has failed to implement source control BMPs at the Warren Creek Crossing and the Piperin Crossing development projects in 2017.

472. The City of Poway failed to install a source control BMP to prevent illicit discharges into the MS4 at the Warren Creek Crossing.

473. The City of Poway failed to implement the restoration of the natural storage reservoir and drainage corridors downstream of the Warren Creek crossing project in 2017. The natural flow of the main tributary into Lake Poway is still blocked by excess sediment, preventing the free flow of water into the reservoir. The City of Poway's 2013 MS4 Permit required the City to implement

this low impact development (LID) BMP downstream of the Warren Creek

Crossing as it is a feasible way to reduce pollutants in storm water to the MEP.

474.    The City of Poway failed to implement the maintenance and restoration of

the natural storage reservoir and drainage corridors downstream of the Piperin

Crossing project in 2017. The City of Poway's 2013 MS4 Permit required the

City to implement this low impact development (LID) BMP downstream of the

Warren Creek Crossing as it is a feasible way to reduce pollutants in storm

water to the MEP.

475.    Had the City obtained the proper local permits (i.e. 401 certification

and/or waste discharge requirements from the San Diego Water Board) the City

would had been required to implement the aforementioned source control,

onsite, and LID BMPs at both the Warren Creek Crossing and at the Piperin

Corp. Crossing.

476.    These violations are ongoing and continuous. The City of Poway will

continue to violate the Clean Water Act in the future unless and until it is

enjoined from doing so.

477.    The BMPs, if any, that the City of Poway did prescribe for its

development projects at the Warren Creek Crossing do not fulfill the

requirements of its 2013 MS4 Permit, Provision E.3.a.

478.     The BMPs, if any, that the City of Poway did prescribe for its development projects at the Piperin Corp. Crossing do not fulfill the requirements of its 2013 MS4 Permit, Provision E.3.a.

479.     Unless the City of Poway desists in its violations of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the CWA, 33 U.S.C. §§ 1311(a) and 1342(p), Plaintiff and the public will suffer irreparable harm.

480.     Plaintiff has no adequate remedy at law.

**G. Taking of Endangered and Threatened Species Protected by the Endangered Species Act on Private Property (ESA § 9, 16 U.S.C. § 1538)**

481.     Plaintiff incorporates the allegations set forth above as though fully set forth herein, and alleges as follows:

482.     The City of Poway has violated ESA § 9 and its implementing regulations by causing a direct and/or indirect "take" of protected species by substantially modifying, degrading and/or destroying critical habitat of endangered and threatened species and/or by killing and/or harming endangered and threatened species when conducting trail construction and maintenance activities on private property, APNs: 278-210-2900 and 278-210-3000.

483.     The City of Poway has cut endangered and threatened plants without private property owners' permission.

484.     The City has harmed endangered and threatened animal species and their critical habitat, including the California gnatcatcher and the least bell's vireo.

485.   The City of Poway has violated California state laws in the process of its

trail construction and maintenance activities including state trespassing laws.

486.   Due to the failure to mitigate the "take," as well as the City of Poway's

continued management practices and the public's use of the trail system on

private property, Plaintiff alleges that the City of Poway's violations of the ESA

as set forth in this Complaint are ongoing and will continue after the filing of

this Complaint.

487.   Plaintiff is informed and believes, and on such information and belief

alleges, that without the imposition of the appropriate equitable relief, the City

of Poway will continue to violate the ESA with respect to the endangered and

threatened species. Plaintiff is further informed and believes, and on such

information and belief alleges, that the relief requested in this Complaint will

redress the injury to Plaintiff including the endangered and threatened species,

prevent future injury without just compensation and protect the interests of

Plaintiff, the public at large, and preserve additional acreage containing

endangered and threatened species to account for the Defendant's "take" in

violation of the ESA as set forth in this Complaint.

488.   Plaintiff has provided adequate notice.

489.   Upon information and belief, neither the federal government nor the state

has commenced or is diligently prosecuting an action for the Endangered

Species Act violations asserted in this Complaint.

## X.   REMEDIES

WHEREFORE, Plaintiff requests this Court to enter a judgment:

490.     Declaring Lake Poway as Waters of the United States under 28 U.S.C. § 2201.

491.     Declaring Warren Creek as Waters of the United States at the location of the Warren Creek Crossing.

492.     Declaring that the Clean Water Act is enforceable as to Lake Poway and the subwatershed area above Lake Poway.

493.     Declaring that the 2013 MS4 Permit is enforceable as to Lake Poway and the subwatershed area above Lake Poway.

494.     Declaring the City of Poway to have violated and to be in violation of the 2013 MS4 Permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(p), for discharges causing and contributing to and threatening to cause a condition of pollution in waters of the state and exceedances of water quality standards in Lake Poway.

495.     Declaring the City of Poway to have violated the 2013 MS4 Permit for not reducing pollutants in its MS4 to the maximum extent practicable through best management practices and other water quality improvement projects. 33 U.S.C. § 1342(p).

496.    Declaring the City of Poway to have violated the 2013 MS4 Permit for

not reducing non-storm water spring water discharges into its MS4 and into

Lake Poway.

497.    Declaring the City of Poway to have violated the 2013 MS4 Permit for

failing to obtain the proper state and/or federal permits for its construction

activities in 2017 in the Lake Poway subwatershed area.

498.    Declaring the City of Poway to have violated the 2013 MS4 Permit for

not installing controls and other Best Management Practices when constructing

its trail/access road repairs in the various tributaries above Lake Poway.

499.    Declaring the City of Poway to have violated and to be in violation of

Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for engaging in dredge and fill

activities without a valid permit upstream of Lake Poway.

500.    Declaring the City of Poway to have violated and to be in violation of

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for engaging in

dredge and fill activities without a proper 401 Certification pursuant to the Act

in various locations above Lake Poway.

501.    Enjoining the City of Poway from discharging or causing the discharge of

dredged or fill materials or other pollutants into any waters of the United States

or waters of the state except in compliance with a San Diego Water Board

permit and the 2013 MS4 Permit.

502.    Declaring the City of Poway to have violated and to be in violation of its

NPDES permit and Sections 301(a) and 402(p) of the CWA for discharging

non-storm water without a separate NPDES permit.

503.    Declaring that the City of Poway to have violated and to be in violation of

the Endangered Species Act for its activities on public land and on private land,

APN: 278-210-2900 and APN: 278-210-3000.

504.    Ordering Lake Poway to be added to the section 303(d) of the CWA list

of impaired water bodies.

505.    Ordering the City of Poway to submit an updated Waste Discharge Report

containing its stormwater exceedances into Lake Poway following the winter

storms of 2017 to the San Diego Water Board.

506.    Ordering the City of Poway to replace the Warren Creek Crossing with a

properly engineered bridge.

507.    Ordering the City of Poway to remove the porta potties by Warren Creek

in proximity to Lake Poway.

508.    Directing the City of Poway to undertake measures, at the City's own

expense and at the direction of the San Diego Water Board and/or Army Corps,

to effect complete restoration of waters of the United States within Warren

Creek and its tributaries, to restore the capacity of Lake Poway through

sediment removal, to remove the sediment in Boulder Bay to allow the free flow

of waters from Warren Creek into Lake Poway, and to conduct on-site and off-

site mitigation for unauthorized and/or unavoidable impacts to Waters of the United States, as appropriate.

509.    Ordering for the City to undertake a Supplemental Environmental Project as defined by the EPA. Purchasing land that protects sources of drinking water and enhancing that land to capture more stormwater and non-storm water as groundwater are the types of projects that this Court can order the City of Poway to undertake according to EPA guidelines.

510.    Ordering the City to undertake wetland repairs on APN: 278-210-1800 in the two separate streams on this parcel to slow down storm water flows and to capture non-storm water flows before they enter the City's MS4 by Lake Poway.

511.    Directing the City of Poway to cease illegal activities on Plaintiff's parcels and to justly compensate him for the taking of private property, which is part of a proposed mitigation bank containing streams and springs that has been evaluated by the California Department of Fish and Wildlife.

512.    Ordering the City of Poway to purchase Plaintiff's five parcels in the subwatershed area above Lake Poway for their ecological/water resource values so that the City of Poway can properly regulate these properties as public utilities.

513.   Ordering the City of Poway to purchase Plaintiff's five parcels in the subwatershed area above Lake Poway as injunctive relief for the City's trespassing and illegal takings of endangered species on Plaintiff's property.

514.   Assessing civil monetary penalties for <u>each</u> violation of the CWA and the 2013 MS4 Permit as described herein on each and every day that violations of the Act and the 2013 MS4 Permit have occurred. The maximum civil penalty for noncompliance with the Clean Water Act is currently $51,750 per day per violation.

515.   Awarding Plaintiff's reasonable costs of suit, including attorney, witness, expert and consultant fees, as permitted by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); Section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4); and Section 2412(d) of the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

516.   All other relief deemed appropriate by this Court.

## XI.   JURY DEMAND

517.   Plaintiff requests a jury trial on the issue of liability and any other issue cognizable by a jury.

DATED: November 15, 2018

Respectfully submitted,

Kevin T. Kelly

Pro se Plaintiff