1

2

3

4

5

6

7

8

9                                    Exhibit 1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

July 27, 2018

Andrew Wheeler
Acting Administrator of the Environmental Protection Agency
Environmental Protection Agency
Mail Code: 1101A
Office of the Administrator
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460
Wheeler.Andrew@epa.gov

Ryan Zinke
Secretary of the Interior
U.S. Department of the Interior
1840 C Street, N.W.
Washington, D.C. 20240
Secretary_of_the_interior@ios.doi.gov

Mike Stoker
Regional Administrator of the Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, California 94105
r9.info@epa.gov

Eileen Sobeck, Executive Director
California State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812
Eileen.Sobeck@waterboards.ca.gov

Tina White
City Manager
City of Poway
13325 Civic Center Drive
Poway, California 92064

**Sent via certified mail**

Exhibit 1
Page | 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

**Re: Notice of Violations of the Clean Water Act and Endangered Species Act by the City of Poway in San Diego County, California; 60-day notice of intent to sue**

To whom it may concern:

When the City of Poway incorporated as a general law city in San Diego County in December 1980, Poway Municipal Water District became part of the City structure, including its earthen dam in Warren Canyon near the base of Mount Woodson. The dam, 160 feet high and 1,060 feet wide, created a 72-acre lake over a blue-line stream called Warren Creek. This reservoir, now known as Lake Poway, serves as a local emergency water supply and is able to store over one billion gallons of water at one time.[1] While 99.5% of the water from Lake Poway is imported by the San Diego County Water Authority, the remaining half of percent of water originates almost exclusively from two blue-line streams, one coming from the Mount Woodson cornerstone, the other coming from the Rock Haven Cornerstone. From these streams, the reservoir has been designed to capture millions of gallons of water every year originating as water runoff after storms as well as natural spring water emanating from both Mount Woodson and Rock Haven. Inevitably, with this storm and spring water, sediment along with other pollutants are transported through these streams and into Lake Poway. Unfortunately, over a period of years and without sustainable management, sediment deposits will gradually displace the volume area that was previously used for water storage, until eventually the reservoir becomes completely filled with sediment. As water storage is lost, the beneficial uses that depend on storage – such as water supply and flood control – also will decline and eventually will be lost.

Under the Clean Water Act, the City of Poway is responsible for ensuring that pollution from its point sources does not lead to the loss of the beneficial uses of Lake Poway. However, the City has not been adhering to the various permits that it has procured under the Clean Water Act for its maintenance and construction activities in the Lake Poway area and its upstream storm sewer system (MS4) feeding the reservoir. The City's discharges from its point sources within its MS4, including recently rebuilt earthen crossings over tributaries above Lake Poway, have caused and have threatened to cause pollution into Lake Poway. The City has also conducted unauthorized dredging and filling activities in waters of the United States and has added an unpermitted non-stormwater discharge pipe into its MS4 above Lake Poway. The City has failed to prepare a storm water pollution prevention plan and has failed to implement pollution control technologies and other best management practices to prevent past and

---

[1] Once in Lake Poway, the water from the reservoir is occasionally pulled into the Lester J. Bergland Water Treatment Plant via a pipe for transformation into drinking water. Poway's water treatment works plant is at a separate location from Lake Poway. On average, Poway's drinking water system moves 8.65 million gallons of water each day through 269 miles of pipe, and the vast majority of this water is never placed in Lake Poway. Most of the untreated water that Poway purchases is diverted from the Water Authority's aqueduct directly into Poway's water treatment plant. On the other hand, some of the water in Lake Poway never becomes drinking water as water from the reservoir is occasionally released from the dam via a spillway into the downstream portion of Warren Creek.

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

future impure storm water discharges and sediment plumes into Lake Poway. Moreover, the City of Poway has failed to adhere to its Habitat Conservation Plan's mitigation requirements by properly accounting for its impacts to waters of the United States through preservation of additional biological resources including restoration of additional stream and wetland acreage following the destruction of its trail system into waters of the United States and reconstruction of its new earthen stream crossings.

As a taxpaying citizen of Poway and its water district, as a recreational user of Lake Poway, and as a landowner of a proposed 43-acre mitigation bank upstream of Lake Poway, I urge the United States Environmental Protection Agency, the Department of the Interior, the Department of the Army, and the State Water Board to address the City of Poway's violations of its various permits issued under the Clean Water Act and the Endangered Species Act as further described in this letter. I also urge the aforementioned agencies to address the unauthorized hiking trails on my parcels of land that have been constructed and maintained by the City of Poway in violation of state trespassing laws and in violations of the Clean Water Act and Endangered Species Act as the unpermitted trails on my property cross a blue-line stream feeding Lake Poway and contain endangered plant and animal species on the trails and in the vicinity.

Furthermore, the Clean Water Act (CWA) and the Endangered Species Act (ESA) allow citizens to bring suit in federal court against a municipality alleged to be in violation of these Acts. Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), and Section 11(g) of the Endangered Species Act, 16 U.S.C. § 1540(g), both require that 60 days prior to the initiation of a civil lawsuit, citizens must give notice of their intentions to sue. For alleged violations of both Acts, notice must be given to the alleged violator, the Secretary of the Interior, the Administrator of the United States Environmental Protection Agency (EPA), the Regional Administrator of the EPA, and the Executive Officer of the water pollution control agency in the state in which the violations are occurring. By this letter, Poway citizen Kevin T. Kelly hereby puts the City of Poway on notice that unless the City of Poway demonstrates that all requirements of the Clean Water Act and Endangered Species Act were followed in the Lake Poway area including the adjacent upstream and upland areas from January 20, 2017 to the present day, Kevin T. Kelly intends to file suit in the United States District Court immediately following the expiration of the required 60-day notice period, seeking declaratory and injunctive relief and civil penalties up to the statutory amount of $52,414 for each violation per day of the Clean Water Act[2] and civil penalties of up to $49,467 for each violation of the Endangered Species Act as discussed below and for any additional similar violations that I may discover subsequently. In terms of injunctive relief, I will request that the City of Poway excavate the sediment that has accumulated behind the dam within Lake Poway as a result of its activities, replace the culvert dirt crossings with properly engineered bridges that will not disintegrate as effluent during a heavy storm,[3] and undertake a stream restoration and wetland

[2] 40 CFR § 19.4, Table 2.
[3] Bridges usually cause fewer environmental impacts than culverts because they may not alter the natural channel form or require placement of fill in the channel. University of California Division of Agriculture and Natural Resources, 2007. Rural Roads: A Construction and Maintenance Guide of California Landowners. Publication 8262.

Exhibit 1
Page | 3

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

enhancement and enlargement project upstream of Lake Poway on parcel APN: 278-210-1800 to
compensate for the loss of wetlands and aquatic resources from Poway's activities and to reduce
sediment pollution into Lake Poway as a water quality improvement strategy. The proposed project,
which is attached to this letter, includes stabilizing two reaches of intermittent waterways within the
property, using bioengineering techniques to reduce erosion and sediment transport to receiving waters
and to control peak flows, and establishing native wetland vegetation within the floodplain of the
waterways to enhance water absorption.[4] The goals of the stream restoration/wetland enhancement
project are to create habitat and water quality mitigation credits that the City would be required to
purchase to fulfill the requirements of the City's NPDES permits and to fulfill the requirements of the
Department of the Army permits needed for the City's dredging and filling activities In U.S. waters
including the future Lake Poway Sediment Removal and Management Project.[5] I will also seek to enjoin
the City to fulfill its obligation to purchase conservation lands with endangered species and wetlands
habitat for its violations of the ESA.

If the City of Poway has any information suggesting that one or more of the violations outlined
below did not occur or is stated incorrectly, please provide that information to myself and to the
agencies, specifying the alleged violation in question.

A. **Statutory and Regulatory Framework**

1. The federal Clean Water Act (CWA) (33 U.S.C. § 1251 et seq.) of 1972 is the basic federal law
   that addresses surface water quality control and protection of beneficial uses of water. The
   objective of the CWA is to restore and maintain the chemical, physical, and biological integrity of
   the nation's waters through prevention, reduction, and elimination of pollution. The CWA
   applies to discharges of pollutants into waters of the United States.

2. Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant in waters
   of the United States by any person except in compliance with a National Pollutant Elimination
   System (NPDES) permit issued under Section 402 of the CWA, 33 U.S.C. § 1342, or a Department
   of the Army Permit for dredged or fill material issued under Section 404 of the CWA, 33 U.S.C. §
   1344.

3. Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to mean an individual,
   corporation, partnership, association, State, municipality, commission, or political subdivision of
   a State, or any interstate body.

---

[4] See Exhibit A: Report by Tory Walker, Professional Engineer.

[5] Cf. Devil's Gate Reservoir Sediment Removal and Management Project, Public Notice/Application No.: SPL-2014-
00591, U.S. Army Corps of Engineers, Los Angeles District.

Exhibit 1
Page | 4

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

4. Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to mean dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological material, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

5. Section 502(12)(A) of the CWA, 33 U.S.C. § 1362(12)(A), defines the term "discharge of pollutants" to mean any addition of any pollutant to navigable waters from any point source.

6. Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including territorial seas." EPA's implementing regulations at 40 C.F.R. § 122.2 further define "waters of the United States" to include, inter alia, adjacent lakes and tributaries adjacent to navigable waters. "A water that otherwise qualifies as a tributary under this definition does not lose its status as a tributary if, for any length, there are one or more constructed breaks (such as bridges, culverts, pipes, or dams), or one or more natural breaks (such as wetlands along the run of a stream, debris piles, boulder fields, or a stream that flows underground) so long as a bed and banks and an ordinary high water make can be identified upstream of the break." The Supreme Court has also opined that a wetland must have an impact on the quality of a downstream navigable-in-fact water to fall under the jurisdiction of the CWA (known as the "significant nexus" test). Rapanos v. U.S., 547 U.S. 715, 759 (2006) (Kennedy, J., concurring); see In re Smith Farm Enterprises, LLC, CWA Appeal No. 08-02 (EAB, March 16, 2011), slip op. at 28-30.

7. Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel, or other floating craft, from which pollutants are or may be discharged.

8. Section 402(p) of the CWA, 33 U.S.C. § 1342(p), requires NPDES permits for certain municipal storm water discharges. EPA promulgated regulations at 40 C.F.R. § 122.26 to implement the storm water permit provisions of Section 402(p).

9. "Storm Water" is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13).

10. NPDES permits are required for discharges of storm water from a "municipal separate storm sewer system (MS4) [which] means a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains)" owned by a city and designed for conveying storm water. 40 C.F.R. § 122.26(b)(8). An MS4 conveys only untreated storm water. See 40 C.F.R. § 122.26(a)(7).

Exhibit 1
Page | 5

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

11. Generally, the CWA requires point source discharges, including dischargers of storm water associated with maintenance or construction activity, to comply strictly with water quality standards. 33 U.S.C. § 1311(b)(1)(C).

12. CWA section 402(p) requires the EPA or authorized state to issue NPDES permits for storm water discharges from MS4s to waters of the U.S. CWA section 402(p)(3)(ii) requires that NPDES permits for storm water discharges from MS4s to "require controls to reduce the discharge of pollutants [in storm water] to the maximum extent practicable [MEP], including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or State determines appropriate for the control of such pollutants."

13. Section 402(b) of the CWA, 33 U.S.C. § 1342(b) authorizes States with an EPA-approved NPDES program to issue NPDES permits. The State of California, through its State Water Resources Control Board (SWRCB), is a state approved under section 402(b) of the CWA to administer the NPDES program, including the issuance of storm water permits within California.

14. Section 309(a)(3) of the CWA, 33 U.S.C. § 1319(a), provides, inter alia, that whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any permit condition or limitation implementing certain CWA sections in a permit issued under Section 402 of the CWA, he shall issue an order requiring such person to comply with such section or requirement.

15. Any person may petition the Director to require a NPDES permit for a discharge which contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States. 40 CFR § 122.26(f).

16. Section 404(a) of the Clean Water Act, 33 U.S.C. § 1344(a), establishes an Army Corps-administered permit program for the discharge of dredged or fill material into waters of the United States.

17. Section 404 requirements are distinct from, and in addition to, the NPDES permit framework in Section 402, 33 U.S.C. § 1342.

18. Section 404(a) of the CWA, 33 U.S.C. § 1344(a), prohibits the "discharge of a pollutant" into waters of the United States, except in compliance with a permit issued pursuant to the provisions in the Act.

19. The Act broadly defines the term "pollutant" to include dredged spoil, rock, sand, and waste discharged into water. 33 U.S.C. § 1362(6).

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

20. The "discharge of fill material" is defined as "the addition of fill material into waters of the United States," including, but not limited to, infrastructure construction fill, causeway or road fills, and "site development fills for recreational, industrial, commercial, residential, or other uses." 33 C.F.R. § 323.2(f) (Dec. 30, 2008).

21. "Fill material" refers to material that replaces aquatic area with dry land or changing the bottom elevation of a waterbody. 33 U.S.C. § 323.2(e)(1).

22. "Dredged material" means "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c).

23. Activities in waters of the U.S. that are regulated under the Section 404 program include fills for development, water resource projects (such as dams or levees), and infrastructure development (such as highways and roads) that are placed in waters of the United States.

24. The Army Corps of Engineers has authority to issue individual permits or "general permits on a state, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material" (both known as a "Section 404 Permit"). 33 U.S.C. § 1344(e)(1).

25. Under CWA Section 404(e), the Army Corps of Engineers (USACE) can issue general permits to authorize activities that have minimal individual and cumulative adverse environmental effects. General permits can be issued for a period of no more than 5 years. USACE can issue nationwide permits, which is a general permit that authorizes activities across the country, unless revoked by a district or division commander. Nationwide permits authorize a wide variety of activities such as linear transportation projects, residential development, commercial and industrial developments, utility lines, road crossings, bank stabilization activities, wetland and stream restoration activities, and certain maintenance activities.

26. Regional permits are a type of general permit issued by a Division or District Engineer that may require case-by-case reporting and acknowledgement. 33 C.F.R. § 325.5(c)(1).

27. An individual or standard permit is required when a project cannot meet all of the conditions of a general permit and has more than minimal individual or cumulative impacts. These types of projects are evaluated using additional environmental criteria and involve a more comprehensive public interest review.

28. Section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1), requires that any application to the Army Corps for a Section 404 permit must include a "certification from the State in which the discharge originated or will originate . . . that any . . . discharge will comply with [other sections of the Clean Water Act]."

Exhibit 1
Page | 7

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

29. Before the Army Corps can issue a Section 404 permit, the state must certify the project is compliant with local Basin Plans and water quality objectives. 33 U.S.C. § 1341(a)(1).

30. This certification from the state is known as a Section 401 Certification.

31. Section 404 permits rely upon, and are required to, incorporate any conditions imposed by a state's water quality certification. 33 U.S.C. § 1341(a)(1).

32. The Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.) was passed in 1973 to provide a legal mechanism for the conservation of endangered and threatened species and the ecosystems upon which they depend. With limited exceptions, the ESA places restrictions on a range of activities involving endangered and threatened animals and plants to help ensure their continued survival. With limited exceptions, the prohibited activities may not be carried out unless authorized by a permit from the U.S. Fish and Wildlife Service. Sections 7 and 9 of the ESA allow "incidental" takes of threatened and endangered species, but only in accordance with a permit and a corresponding Habitat Conservation Plan. Moreover, it is unlawful to commit, to attempt to commit, to cause to be committed or to solicit another to commit the following: Remove, cut, dig up, damage, or destroy a federally listed threatened or endangered plant on private property in violation of any law or regulation of any state including a state criminal trespass law. 16 U.S.C. § 1538.

33. The Bald and Golden Eagle Protection Act prohibits anyone, without a permit issued by the Secretary of the Interior, from taking or disturbing a golden eagle (*Aquila chrysaetos*).

34. The Clean Water Act allows for citizen enforcement of the Clean Water Act against a city which is alleged to be in violation of an effluent standard or limitation under the Act or with an order issued by the Administrator or State with respect to a standard or limitation. Civil penalties, declaratory relief, injunctive relief, and litigation costs may be awarded. All violations of separate Clean Water Act requirements or permit conditions are separately subject to penalty assessment on each and every day such violations continue. For the purposes of Section 402 of the CWA, each discharge in excess of an NPDES limitation constitutes a separate violation. For purposes of Section 404 of the CWA, a day of violation may either be a day that actual discharge or dredged or fill material takes place, or may also include any day that such dredged or fill material is allowed to remain in waters or wetlands. Civil liability under the CWA is not limited to intentional violations. Section 505 of the CWA; 33 U.S.C. § 1319; 33 U.S.C. § 1365.

   a. A private cause of action is available for citizens under 33 U.S.C. § 1365 to file a civil action against any person "who is alleged to be in violation of ... an effluent standard or limitation . . . " Id. at § 1365(a)(1). A term or condition in a permit issued under CWA § 404 or a water quality certification issued under CWA § 401 is an "effluent standard or limitation" that can be enforced by way of a citizen suit under § 1365. Section 1365(f)

*Exhibit 1*
Page | 8

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

defines "effluent standard or limitation" as "an unlawful act under subsection (a) of section 1311, . . . certification under section 1341, . . . and a permit or condition issued under section 1342 of this title." Id. at § 1365(f). Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich, 820 F. Supp. 2d 859, 873-74 (N.D. Indiana 2011); see also Atlantic States Legal Foundation v. Salt River Pima-Maricopa Indian Community, 827 F. Supp. 608, 611 (D. Arizona July 12, 1993); Benham v. Oark Materials River Rock, LLC, 885 F.3d 1267, 1277 (10th Cir. 2018); Center for Biological Diversity v. Marina Point Development Associates, 434 F. Supp. 2d 789, 797-798 (C.D. Cal. 2006) (permitting a citizens suit for enforcing § 404 of the CWA).

b. But see Atchafalaya Basinkeeper v. Chustz, 682 F.3d 356 (5th Cir. 2012) (holding that the CWA does not provide citizens the right to sue to enforce the conditions of permits for the discharge of dredged or fill material which does not involve effluent). There seems to be a split in authority amongst the circuits on the extent to which a citizen suit can be brought to enforce the conditions of a § 404 permit. Still, even if the Ninth Circuit were to see limits set forth in the citizen-suit provision of Clean Water Act (CWA) with regard to § 404 permits, courts have not barred citizen suit claims against the Environmental Protection Agency (EPA) under the Administrative Procedure Act (APA) for EPA's failure to veto a permit issued by United States Army Corps of Engineers (USACE) for discharges that have unacceptable adverse effects. Alliance to Save Mattaponi v. U.S. Army Corps of Engineers, 515 F. Supp. 2d 1, 8 (D.D.C. 2007); 5 U.S.C §§ 701(a)(1), 702, 706; Clean Water Act, § 505(a)(2), 33 U.S.C.A. § 1365(a)(2). Also, to the extent that a § 404 claim alleges a violation of an effluent standard or limitation as a result of unauthorized work in waters of the United States, 33 U.S.C. § 1365 is clear that a citizen suit can be brought for a violation pertaining to § 1311(a), which incorporates § 1344.

35. The Endangered Species Act allows for citizen enforcement of the ESA to enjoin any person who is alleged to be in violation of any provision of the ESA and to compel the Secretary to apply its protective regulations for the conservation of such species. Civil penalties, injunctive relief and costs of litigation may be ordered by a federal judge. 16 U.S.C. § 1540.

a. In South Yuba River Citizens League v. National Marine Fisheries Services, 629 F. Supp. 2d 1123, 1135 (E.D. Cal. 2009), the Court indicated that the ESA's citizen suit provision implicitly does not encompass suits alleging violations of an Incidental Take Permit. "In contrast with the other enforcement provisions of the ESA, and with the citizen suit provisions of numerous other environmental statutes [including the Clean Water Act], the ESA's citizen suit provision does not refer to alleged violations of permits issued under the Act. The court must presume that this omission represents a deliberate exclusion of some claims from the scope of the citizen suit provision." Id. at 1129. "Section 11 of the ESA, in addition to providing for citizen suits, provides for the imposition of civil penalties by NMFS and FWS, for criminal penalties, and for

Exhibit I
Page | 9

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

administrative enforcement by various agencies. ESA §§ 11(a), (b), (e). These three enforcement provisions explicitly refer to violations of permits." Id.

b.  Even if an Incidental Take Permit cannot be enforced directly by a citizen suit, I can compel the Secretary to apply its protective regulations for the conservation of endangered and threatened species. I can also sue under the Administrative Procedure Act to compel the EPA to fulfill a non-discretionary duty under the ESA.

c.  Furthermore, I will use the citizen suit provision to seek a judgment that the City of Poway is in violation of 16 U.S.C. § 1538 for unlawfully taking endangered and threatened plants from my private property in violation of a state criminal trespass law.

**B.  City of Poway's NPDES Permit Requirements**

36. On May 8, 2013, the SWRCB issued to the City of Poway the National Pollutant Discharge Elimination System ("NPDES") Permit Statewide Storm Water Permit and Waste Discharge Requirements ("WDRs"), State Water Resources Control Board, Order No. R9-2013-0001, as amended by Order No. R9-2015-0001, NPDES No. CAS0109266 (the "Permit").

   **1.  Discharge Prohibitions**

37. Permit Provision A prohibits unauthorized discharges from the City of Poway's properties, facilities, activities, MS4s and other rights of way, including:

   a.  Provision A.1.a provides: "Discharges from MS4s in a manner causing, or threatening to cause, a condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited."

      i.  The term "pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: the waters for beneficial uses; or facilities which serve those beneficial uses. "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves.

      ii. The term "receiving waters" includes creeks, streams, rivers, lakes, wetlands, reservoirs, estuaries, bays, and the ocean.

Exhibit 1
Page | 10

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

    iii.  "Discharges" means addition of pollutants to navigable waters from any point source.

b.  Provision A.1.b provides: "Non-storm water discharges into MS4s are to be effectively prohibited . . . unless such discharges are authorized by a separate NPDES permit."

c.  Provision A.1.c further provides: "Discharges from MS4s are subject to all waste discharge prohibitions in the Basin Plan."

    i.  Attachment A.1 provides: "The following waste discharge prohibitions in the Water Quality Control Plan for the San Diego Basin (Basin Plan) are applicable to any person, as defined by Section 13050(c) of the California Water Code, who is a citizen, domiciliary, or political agency or entity of California whose activities in California could affect the quality of waters of the state within the boundaries of the San Diego Region."

        1.  "The discharge of waste to waters of the state in a manner causing, or threatening to cause a condition of pollution, contamination, or nuisance as defined in California Water Code Section 13050, is prohibited."

        2.  "The discharge of pollutants or dredged or fill material to waters of the United States except as authorized by a National Pollutant Discharge Elimination System (NPDES) permit or a dredged or fill material permit (subject to the exemption described in California Water Code Section 13376) is prohibited."

        3.  "The dumping, deposition, or discharge of waste directly into waters of the state, or adjacent to such waters in any manner which may permit its being transported into the waters, is prohibited unless authorized by the San Diego Water Board."

        4.  "Any discharge to a storm water conveyance system that is not composed entirely of "storm water" is prohibited unless authorized by the San Diego Water Board."

        5.  "The discharge of sand, silt, clay, or other earthen materials from any activity, including land grading and construction, in quantities which cause deleterious bottom deposits, turbidity, or discoloration in waters of the state or which unreasonably affect, or threaten to affect, beneficial uses of such waters is prohibited."

Exhibit 1
Page | 11

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

d.  Provision A.2.a provides: "Discharges from MS4s must not cause or contribute to the violation of water quality standards in any receiving waters."

   i.  Attachment F provides: "The receiving water limitations included in this Order consist of all applicable numeric or narrative water quality objects or criteria, for receiving waters as contained in the Basin Plan . . . or in federal regulations."

e.  Provision A.4 provides: "Each Copermittee must achieve compliance with Provisions A.1.a, A.1.c and A.2.a through timely implementation of control measures." Provision A.4.a further explains: "If exceedance(s) of water quality standards persist in receiving waters notwithstanding implementation of this Order, the Copermittees must comply with the following procedures: . . . (2) Upon a determination by either the Copermittees or the San Diego Water Board that discharges from the MS4 are causing or contributing to a new exceedance of an applicable water quality standard not addressed by the Water Quality Improvement Plan, the Copermittees must submit the following updates to the Water Quality Improvement Plan . . . : Water quality improvement strategies (i.e. BMPs, retrofitting projects, stream and/or habitat rehabilitation projects, adjustments to jurisdictional runoff management programs, etc.) that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards."

   i.  Attachment F provides: "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1a, A.1.c, or A.2.a from an enforcement action."

   ii.  Attachment F further provides: "The Ninth Circuit held in <u>Natural Resources Defense Council v. County of Los Angeles</u> (2011) 673 F.3d 880, 886 (revd. On other grounds and remanded by <u>Los Angeles County Flood Control District v. Natural Resources Defense Council</u> (133 S. Ct. 710 (2013))) that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. The Ninth Circuit holding is consistent with the position of the State and Regional Water Boards that exceedances of water quality standards in an MS4 permit constitute violations of permit terms subject to enforcement by the Water Boards or through a citizen suit. While the Water Boards have generally directed discharges to achieve compliance by improving control measures through the iterative process, the San Diego Water Board retains the discretion to take other appropriate enforcement and the iterative process does not shield dischargers from citizen suits under the CWA.

Exhibit 1
Page | 12

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

iii.   The requirements of Provision A.4, therefore, are required to be implemented until the water quality standards expressed under Provisions A.1.a, A.1.c, and A.2.a are achieved.

iv.   Part of the "controls" required by the Order is the process described in Provision A.4. Provision A.4 includes the process that is ultimately expected to achieve compliance with the requirement that discharges from the MS4 do not cause or contribute to violations of water quality standards in the receiving waters. The implementation of Provision A.4 is required when the Copermittees or the San Diego Water Board have determined that discharges from the MS4 are causing or contributing to violations of water quality standards in the receiving waters."

f.   Provision E.4.c requires that "[e]ach Copermittee must implement, or require the implementation of effective BMPs to reduce discharges of pollutants in storm water from construction sites to the MEP . . . . These BMPs must be site specific, seasonally appropriate, and construction phase appropriate. . . . Copermittees must implement . . . sediment control . . . and active/passive sediment treatment systems, where applicable."

g.   Provision E.5.b requires each Copermittee to "designate a minimum set of BMPs required for all inventoried existing development" . . . "and implement designated BMPs at municipal facilities in its inventoried existing development."

38.   The San Diego Water Board's Basin Plan implements and incorporates by reference both the State and federal antidegradation policies. The Order requires the Copermittees to meet best practicable treatment or control to meet water quality standards. As required by 40 CFR 122.44(a), the Copermittees must comply with "maximum extent practicable" technology-based standards set forth in CWA section 402(p) for discharges of pollutants in storm water from the MS4s.

a.   Pursuant to 40 CFR 122.26(d)(2)(iv), each Copermittee is required to implement a "management program . . . to reduce the discharge of pollutants to the maximum extent practicable using management practices, control techniques and system, design and engineering methods, and other such provisions which are appropriate."

b.   MS4s regulated to the MEP standard achieve the standard by storm water management plans that implement best management practices in a narrative form, not a numeric form. There are no numeric baseline criteria in the MEP standard like there are in the TBELs in §1311. Therefore, the MS4 permitting process has no numeric mandates. Therefore, water quality standards (WQS) are the only baseline that exists within the MEP standard.

Exhibit 1
Page | 13

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

    c.   WQS's are the only way to "control [] such pollutants" from municipal storm water because without a concrete standard, there is no measure of control.

39. NPDES Permit No. CAS0109266, Attachment F describes: "Although sediment is naturally occurring in the natural environment, the discharge of sediment under unnatural conditions is problematic to receiving waters. Fine sediment in creeks causes high turbidity that interferes with the functionality of native flora and fauna in local creeks. For example, turbidity interferes with both photosynthesis of water-philic plants, as well as successful foraging and reproduction of benthic macroinvertebrates. Sediment can also make it difficult for fish to breathe because it clogs fish gills. Other pollutants such as heavy metals or pesticides can adhere to sediment and are transported to receiving waters during storm events, where they dissolve in the water column and become bioavailable to aquatic organisms. Sediment is recognized as a major stressor to surface waters . . . "

    a.   Attachment F further describes: "The San Diego Water Board identified, through investigations and complaints, sediment discharges from unpaved roads as a significant source of water quality problems in the San Diego Region. Inspection activities conducted by the San Diego Water Board since the Third Term Permits have found a lack of source control for many unpaved roads within the jurisdiction of the Copermittees. Unpaved roads are a source of sediment that can be discharged in runoff to receiving waters, especially during storm events. Erosion of unpaved roads occurs when soil particles are loosened and carried away from the roadway base, ditch or road bank by water, wind, traffic, or other transport means. Exposed soils, high runoff velocities and volumes, sandy or silty soil types, and poor compaction increase the potential for erosion. Road construction, culvert installation, and other maintenance activities can disturb the soil and drainage patterns to streams in undeveloped areas, causing excess runoff and thereby erosion and the release of sediment. Poorly designed unpaved roads can act as preferential drainage pathways that carry runoff and sediment into natural streams, impacting water quality. In addition other public works activities along unpaved roads have the potential to significantly affect sediment discharge and transport within streams and other waterways, which can degrade the beneficial uses of those waterways.

    b.   USEPA also recognizes that discharges from unpaved roads pose a significant potential threat to water quality. USEPA guidance emphasizes the threat of unpaved roads to water quality: "Dirt and gravel roads are a major potential source of these pollutants [sediment] and pollutants that bind to sediment such as oils, nutrients, pesticides, herbicides, and other toxic substances. Many roads have unstable surfaces and bases. Roads act like dams, concentrating flows that accelerate erosion of road materials and roadsides. Both unstable surfaces and accelerated erosion then lead to sediment and dust."

Exhibit 1
Page | 14

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

    c.  With regard to solutions to reduce sediment pollution to the MEP, Attachment F of the City's NPDES Permit explains: "Rehabilitation of channels, streams, and/or habitat will require more significant planning and resources to implement. There are, however, also abundant opportunities to rehabilitate channels, streams, and/or habitats in or adjacent to areas of existing development. Each Watershed Management area likely has several creeks and stream reaches that have been undergrounded, artificially hardened, or hydromodified that could be rehabilitated to be more sustainably configured, which would slow down storm water flows and potentially have more assimilative capacity for pollutants while still being supportive of designated beneficial uses."

**2.  Duty to Comply [40 CFR 122.41(a)]**

40. Attachment B of Order No. R9-2013-0001 provides: "The CWA provides that any person who violates Section 301, 302, 306, 307, 308, 318, or 405 of the CWA, or any permit condition or limitation implementing any such sections in a permit issued under Section 402 . . . is subject to a civil penalty not to exceed $25,000 per day for each violation."

**3.  Duty of Mitigate [40 CFR 122.41(d)]**

41. Attachment B of Order No. R9-2013-0001 provides: "The Copermittee must take all reasonable steps to minimize or prevent any discharge or prevent any discharge or sludge use or disposal in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment."

**4.  City of Poway's Jurisdictional Runoff Management Plan**

42. The City of Poway has prepared its own Jurisdictional Runoff Management Plan (JRMP) in accordance with its NPDES permit for its MS4.

43. Under 8.2.2 of Poway's JRMP, the City has agreed to maintain unpaved roads and implement BMPs to prevent the transportation of sediment into the storm water conveyance system. "Unpaved roads are stabilized utilizing vegetation, gravel, structural containment such as curbs, or other equivalent measures. In the event that any pervious areas are disturbed or otherwise become destabilized, temporary erosion measures will be installed. Erosion control BMPs will be maintained until the area can be more permanently stabilized. If negative impacts to receiving waters associated with runoff from roads and streets are noted, the City will take measures necessary to mitigate the negative impacts. In accordance with the Los Penasquitos and San Dieguito Water Quality Improvement Plans (WQIPs), the City plans to increase maintenance on access roads and trails by proactively monitoring for erosion and completing minor repair and slope stabilization."

Exhibit 1
Page | 15

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

44. The City of Poway also maintains a number of treatment control BMPs, such as detention basins, filter inserts, and curb inlet protection. The City currently maintains 12 active flood control detention basins for the purpose of reducing the peak flow in various areas of the City and minimizing pollutant loads to receiving waters.

C.  **City of Poway's Army Corps of Engineers' Permit Requirements**

45. Department of the Army Regional General Permit (RGP) Number 63 for Repair and Protection Activities in Emergency Situations authorizes discharges of dredged or fill material into Waters of the United States, including wetlands, and/or work or structures in navigable waters of the United States for necessary repair and protection measures associated with an emergency situation.

46. An "emergency situation" is present where there is clear, sudden, unexpected, and imminent threat to life or property demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services (i.e., a situation that could potentially result in an unacceptable hazard to life or significant loss of property if corrective action requiring a permit is not undertaken immediately).

47. RGP 63 applies to all of San Diego County.

48. Under RGP 63, discharges of dredged or fill material into Waters of the United States must be avoided or minimized to the maximum extent practicable at the project site. Compensation for unavoidable discharge of fill materials may require appropriate mitigation measures.

49. Under the terms of RGP 63, any work authorized must be the minimum necessary to alleviate the immediate emergency, unless complete reconstruction only results in very minor additional impact to aquatic resources and logistical concerns indicate such reconstruction is as expedient considering the condition of the project site and is limited to in-kind replacement or refurbishment. The RGP may NOT be used to upgrade an existing structure to current standards when that activity would result in additional adverse effects on aquatic resources. Such upgrade projects shall be considered separate activities for which other forms of authorization will be required.

50. Work not described in permit application documentation but deemed necessary after a field assessment is not authorized unless coordinated with the Regulatory project manager and acknowledged by appropriate means. These coordinated permit modifications must also be described in sufficient detail in the post-project report.

51. Any projects authorized under RGP 63 must be initiated within 14 days of receiving authorization. If the project start time can be delayed for more than two weeks, the imminent

Exhibit 1
Page | 16

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

threat of impending loss may have diminished in magnitude, as well as immediacy, and generally would not meet the definition of an "emergency."

52. California's State Water Resources Control Board issued a conditional Section 401 water quality certification for RGP 63 dated November 25, 2013.

53. The 401 Certification for RGP 63 is subject to modification or revocation upon administrative or judicial review.

54. The 401 Certification for RGP 63 is limited to emergency situations that meet the California Environmental Quality Act definition of an "emergency."

55. For actions that do not quality for enrollment under 401 Certification for RGP 63 because the situation does not meet the definition of "emergency," the discharger must contact either the State Water Board or the applicable Regional Water Board to apply for an individual water quality certification.

56. Under RGP 63, all necessary BMPs to control erosion and runoff from areas associated with the emergency actions shall be implemented.

57. Under RGP 63, restoration must include revegetation with native species. The revegetation palette must not contain any plants listed on the California Invasive Plant Council Invasive Plant Inventory.

58. Under RGP 63, every effort must be made to ensure any material dredged or excavated from Waters of the United States is not likely to be washed back into any Waters of the United States.

59. Under RGP 63, no discharge of dredged or fill material may occur in the proximity of a public water supply intake except where the discharge is for the repair of the public water supply intake structures or adjacent bank stabilization.

60. Under RGP 63, discharges must not permanently restrict or impede the passage of normal or expected high flows or cause the relocation of the water except within the existing river plain unless the primary purpose of the fill is to impound waters.

61. Under RGP 63, any structure or fill authorized shall be maintained, unless it is later determined that the structure is further contributing to other adverse conditions to public property. In such situations, corrective measures will be taken to rectify these adverse conditions, including removal and/or redesign of the original emergency corrective action, or appropriate mitigation as determined through coordination with the permittee and the appropriate Federal and State agencies.

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

62. Under Department of the Army Nationwide Permit (NWP) 5, a permittee is authorized to construct a small weir for the recordation of water quantity and velocity provided the discharge is limited to 25 cubic yards.

63. Under NWP 5, the measuring device must be removed to the maximum extent practicable and the site restored to pre-construction elevations upon the completion of the use of the device to measure and record scientific data.

64. Under NWP 5, no discharge of dredged or fill material may occur in the proximity of a public water supply intake except where the discharge is for the repair of the public water supply intake structures or adjacent bank stabilization.

65. Under NWP 5, an individual 401 Water Quality Certification must be obtained for the device.

66. Under NWP 5, prospective permittee must notify the district engineer by submitting a pre-construction notification.

67. Under Department of the Army Nationwide Permit (NWP) 14, a permittee is authorized to conduct activities required for crossings of waters of the U.S. associated with construction, expansion, modification, or improvement of linear transportation projects such as unpaved roads and trails.

68. Under NWP 14, any stream channel modification is limited to the minimum necessary to construct or protect the linear transportation project.

69. Under NWP 14, a permittee is not authorized to add non-linear features commonly associated with transportation projects, such as a storage unit.

70. Under NWP 14, a permittee is required to submit a pre-construction notification to the district engineer prior to commencing the activity if there is a discharge in a special aquatic site, including wetlands.

71. Under NWP 14, no activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization.

72. Under NWP 14, restricting the flow of water from the activity must be minimized to the maximum extent practicable.

Exhibit 1
Page | 18

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

73. Under NWP 14, non-federal permittees must submit a pre-construction notification to the district engineer if any listed species or designated critical habitat might be affected or is in the vicinity of the activity to ensure that the requirements of the ESA have been satisfied.

74. Under NWP 14, the permittee is responsible for ensuring their action complies with the Bald and Golden Eagle Protection Act.

75. Under NWP 14, mitigation in all its forms will be required to the extent necessary to ensure that the individual and cumulative adverse environmental effects are no more than minimal.

76. Under NWP 14, compensatory mitigation plans for NWP activities in or near streams or other open waters will normally include a requirement for the restoration or enhancement, maintenance, and legal protection of riparian areas next to open waters.

77. Under NWP 14, the permittee shall employ all best management practices to ensure that pollution does not enter waterways or water bodies.

78. Under NWP 14, individual 401 Water Quality Certification must be obtained or waived if not previously issued.

79. Under Department of the Army Nationwide Permit (NWP) 3, a permittee is authorized to repair, rehabilitate, or replace any previously authorized structure, including those damaged by storms.

80. Under NWP 3, the structure or fill cannot be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification.

81. Under NWP 3, any stream channel modification is limited to the minimum necessary to construct or protect the linear transportation project.

82. Under NWP 3, a permittee is required to submit a pre-construction notification to the district engineer prior to commencing the activity if the permittee wishes to remove accumulated sediment and debris outside the immediate vicinity of existing structures.

83. Under NWP 3, no activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization.

84. Under NWP 3, restricting the flow of water from the activity must be minimized to the maximum extent practicable. To the maximum extent practicable, the pre-construction course, condition, capacity, and location of open waters must be maintained, including temporary and permanent road crossings. The activity must be able to withstand expected high flows.

Exhibit 1
Page | 19

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

85. Under NWP 3, any authorized structure shall be properly maintained, including maintenance to ensure public safety and compliance with applicable NWP general conditions.

86. Under NWP 3, non-federal permittees must submit a pre-construction notification to the district engineer if any listed species or designated critical habitat might be affected or is in the vicinity of the activity to ensure that the requirements of the ESA have been satisfied.

87. Under NWP 3, the permittee is responsible for ensuring their action complies with the Bald and Golden Eagle Protection Act.

88. Under NWP 3, mitigation in all its forms will be required to the extent necessary to ensure that the individual and cumulative adverse environmental effects are no more than minimal.

89. Under NWP 3, compensatory mitigation plans for NWP activities in or near streams or other open waters will normally include a requirement for the restoration or enhancement, maintenance, and legal protection of additional riparian areas next to open waters.

90. The amount of compensatory mitigation required by the district engineer must be sufficient to ensure that the authorized activity results in no more than minimal individual and cumulative adverse environmental impacts.

91. Under NWP 3, where certain functions and services of waters of the United States are permanently adversely affected by a regulated activity, such as discharges of dredge or fill material into waters of the United States that will convert a forested or scrub-shrub wetland to a herbaceous wetland in a permanently maintained utility line right-of-way, mitigation may be required to reduce the adverse environmental effects of the activity to no more than minimal level.

92. Under NWP 3, to ensure that all impoundment structures are safely designed, non-federal applicants should demonstrate that the structures comply with established state dam safety criteria or have been designed by qualified persons.

93. Under NWP 3, the permittee shall employ all best management practices to ensure that pollution does not enter waterways or water bodies.

94. Under NWP 3, individual 401 Water Quality Certification must be obtained or waived if not previously issued.

95. Under Department of the Army Nationwide Permit (NWP) 13, a permittee may engage in bank stabilization activities necessary for erosion control or prevention, such as vegetative stabilization, bioengineering, sills, rip rap, revetment, gabion baskets, stream barbs, and

Exhibit 1
Page | 20

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

bulkheads, or combinations of bank stabilization techniques, provided the activity meets the
following criteria: the activity does not involve discharges of dredged or fill material into special
aquatic sites; no material is placed in a manner that will be eroded by normal or expected high
flows; no material is of a type, or is placed in any location, or in any manner, that will impair
surface water flow into or out of any waters of the United States; and native plants must be
used for bioengineering or vegetative bank stabilization.

96. Under NWP 13, the permittee must submit a pre-construction notification to the district
engineer prior to commencing the activity if the bank stabilization activity involves discharges
into wetlands and other special aquatic sites.

97. Under NWP 13, no activity may occur in the proximity of a public water supply intake, except
where the activity is for the repair or improvement of public water supply intake structures or
adjacent bank stabilization.

98. Under NWP 13, restricting the flow of water from the activity must be minimized to the
maximum extent practicable. To the maximum extent practicable, the pre-construction course,
condition, capacity, and location of open waters must be maintained, including temporary and
permanent road crossings. The activity must be able to withstand expected high flows.

99. Under NWP 13, any authorized structure shall be properly maintained, including maintenance to
ensure public safety and compliance with applicable NWP general conditions.

100.      Under NWP 13, non-federal permittees must submit a pre-construction notification to
the district engineer if any listed species or designated critical habitat might be affected or is in
the vicinity of the activity to ensure that the requirements of the ESA have been satisfied.

101.      Under NWP 13, the permittee is responsible for ensuring their action complies with the
Bald and Golden Eagle Protection Act.

102.      Under NWP 13, mitigation in all its forms will be required to the extent necessary to
ensure that the individual and cumulative adverse environmental effects are no more than
minimal.

103.      Under NWP 13, compensatory mitigation plans for NWP activities in or near streams or
other open waters will normally include a requirement for the restoration or enhancement,
maintenance, and legal protection of riparian areas next to open waters.

104.      The amount of compensatory mitigation required by the district engineer must be
sufficient to ensure that the authorized activity results in no more than minimal individual and
cumulative adverse environmental impacts.

Exhibit 1
Page | 21

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

105.     Under NWP 13, where certain functions and services of waters of the United States are permanently adversely affected by a regulated activity, such as discharges of dredge or fill material into waters of the United States that will convert a forested or scrub-shrub wetland to a herbaceous wetland in a permanently maintained utility line right-of-way, mitigation may be required to reduce the adverse environmental effects of the activity to no more than minimal level.

106.     Under NWP 13, to ensure that all impoundment structures are safely designed, non-federal applicants should demonstrate that the structures comply with established state dam safety criteria or have been designed by qualified persons.

107.     Under NWP 13, the permittee shall employ all best management practices to ensure that pollution does not enter waterways or water bodies.

108.     Under NWP 13, individual 401 Water Quality Certification must be obtained or waived if not previously issued.

**D. City of Poway's Habitat Conservation Plan Required by the ESA**

109.     Preparation and implementation of the citywide Poway Subarea Habitat Conservation Plan/Natural Community Conservation Plan (HCP) is necessary to allow for the incidental take of listed species by public projects and private projects which rely upon the City's incidental take/management authorization permit. This subarea HCP fulfills requirements pursuant to Section 10(a) of the federal Endangered Species Act (ESA).

110.     Poway's HCP plays a number of legal roles as an environmental planning document, and the implementing agreement for the HCP, properly signed by the City of Poway and the wildlife agencies, assures that the HCP will be fully implemented.

111.     Collectively, the laws and planning efforts require protection and management of sufficient, interconnected habitat areas to support listed species – or "target" species that serve as indicators of ecosystem health – in exchange for allowing limited "take" of the species or its habitat.

112. .   Section 1.0 of the HCP points out that Incidental take may occur during otherwise lawful endeavors, such as development allowed under the community's adopted General Plan.

113.     The issuance of an ITP authorizes "take" by any entity under "direct control," including regulatory jurisdiction (50 CFR 13.25(d)).

Exhibit 1
Page | 22

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

114.     The Poway Subarea HCP serves as a multispecies HCP as called for under Section 10(a)(1)(B) of the federal ESA. Listed species covered under the plan include: Encinitas Baccharis (*Baccharis vanessae*), Southwestern willow flycatcher (*Empidonax traillii*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*).

115.     Section 7.4: Impacts to vegetation communities and wildlife habitats in the City of Poway shall require compensating mitigation, restoration, or revegetation, or a combination thereof. Compensating mitigation can consist of 1) outright purchase or dedication of lands inside the Mitigation Area as biological open space or 2) payment of in-lieu fees into a mitigation bank administered by the City of Poway or a land trust acting as an agent of the City of Poway.

116.     Section 7.4: the compensation strategy applies to planned public and private development projects within the City or within other jurisdictions that choose to mitigate within Poway.

117.     Section 7.4: The specific mitigation strategy for a project will be based on the results of a biological resource survey technical report prepared by a qualified biologist.

118.     Section 7.4.3: The following mitigation ratios shall apply to all projects resulting in removal of natural vegetation or wildlife habitat within the City of Poway and that are subject to the HCP, whether inside or outside of the Mitigation Area.

   a.  Any unavoidable impacts to wetland habitat will be mitigated by replacement or enhancement at a minimum ratio of 3:1 for woodland types and 2:1 for shrub-dominated types. Mitigation ratios for disturbed wetlands will generally be mitigated in-kind at no less than 1:1 ratio as determined on a case-by-case basis.

   b.  Impacts to oak-dominated habitats shall require mitigation by in-kind habitat creation, restoration, or enhancement. Impacts shall require a minimum of a 3:1 replacement ratio.

   c.  Direct impacts to coastal sage scrub or mixed coastal sage scrub/chaparral shall be compensated at a minimum 2:1 ratio.

119.     Section 1: Mitigation for public and private projects will include direct purchase of mitigation land in the Mitigation Area based on appropriate mitigation ratios or payments into a mitigation bank (in-lieu fees) for purchase of additional cornerstone lands within the Mitigation Area. If a parcel contiguous to the existing Mitigation Area is found to support high quality habitat or covered species, the property owner may voluntarily request that the property be added to the Mitigation Area.

Exhibit |
Page | 23

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

**E.   City of Poway's Operations, Discharges, and Permit and/or Statutory Violations**

120.      The City of Poway is a municipality of the State of California and, therefore, a "person" as defined by Section 502(5) of the CWA, 33 U.S.C. 1362(5), and Section 3 of the ESA, 16 U.S. § 1532(13) and subject to both Acts' requirements.

121.      The City of Poway is primarily responsible for the design, construction, management, and maintenance of the trails surrounding Lake Poway, including the dirt roads, stream crossings, and maintenance facilities in the vicinity. These operations include roads with drainage systems, catch basins, ditches, man-made channels, and storm drains.

122.      The City of Poway maintains trails above Lake Poway that are on City-owned land as well as privately owned land, including APN: 278-210-2900 and 278-210-3000. The trails cross waters of the United States and State of California in at least five places, including on City-owned land and on privately owned land (APN: 278-210-3000). Trail construction and maintenance involve cutting wood and living plants, including state and federally protected threatened and endangered species such as Encinitas Baccharis (*Baccharis vanessae*) and Del Mar Manzanita (*Arctostaphylos glandulosa ssp. Crassifolia*). Trail maintenance also involves disturbing the habitat of threatened and endangered species including the Southwestern willow flycatcher (*Empidonax traillii*), Golden eagle (*Aquila chrysaetos canadensis*), California gnatcatcher (*Polioptila californica californica*), and the Least Bell's vireo (*Vireo bellii pusillus*). Trail construction and maintenance also involve dredging and filling activities in waters of the United States.

123.      The City of Poway owns and operates a MS4 and its components. The City of Poway's access road and trails cross its MS4 system in several locations above Lake Poway. The City of Poway's MS4 system encompasses Warren Creek from Poway's city limits off of Highway 67 and all the way downstream into Lake Poway. The MS4 owned by the City of Poway includes Warren Creek and the culverts within Warren Creek and its tributaries. Poway's MS4 is a collection of point sources, including outfalls, that discharge into the navigable waters of the United States. See NRDC v. CNTY. of Los Angeles, 725 F.3d 1194, 1198 n.6 (9th Cir. 2013).

124.      "[S]tream crossings for roads may involve point source discharges of dredged or fill material." See 40 C.F.R. § 122.27(b)(1).

125. .     The Army Corps has asserted jurisdiction over Warren Creek, its onsite tributaries, and Lake Poway as waters of the United States.

126.      Lake Poway is considered a receiving body of water and "waters of the state." It is a navigable body of water in the traditional sense.

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

127.     Lake Poway and Warren Creek are within the San Dieguito watershed.

128.     The City of Poway conducts and/or controls construction activities, including clearing, grading, and excavation, and other land disturbance activities at various locations around Lake Poway and other locations within the San Dieguito watershed. ("Construction activities").

129.     The City of Poway conducts maintenance activities, including road maintenance (such as slope stabilization, vegetation control, and drain inlet cleaning) and road surveillance, throughout the City of Poway. The City of Poway also owns and/or operates maintenance facilities, including vehicle maintenance facilities, sand storage facilities, material and equipment storage facilities in the City of Poway. The City of Poway maintains the dirt roads and trails in and around Lake Poway, including clearing them of debris and runoff damage after storms, dredging and filling activities to repair stream crossings, and regularly trimming tree and plant growth along its trails. ("Maintenance activities.")

130.     The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain the City's trails, including those on privately owned land (APN: 278-210-2900 and 278-210-3000).

131.     The City of Poway also has staff under the direction of Mike Obermiller who undertakes construction and maintenance activities of the City's trails and access roads above Lake Poway.

132.     The City of Poway's discharges consist of storm water and non-storm water runoff generated from its operations and properties, including its Construction Activities, Maintenance Activities, and Maintenance Facilities. The City of Poway's point-source earthen culvert crossings have discharged pollutants as effluent into its MS4 and into Lake Poway, a navigable water of the state.

133.     The City of Poway's discharges of pollutants into storm water and non-storm water have caused and have threatened to cause pollution in waters of the United States. Pollutant sources from the City of Poway's operations include motor vehicles, road maintenance, construction site runoff, maintenance facility runoff, dumping, spills, landscape care, vegetation removal, dredging and filling, sediment runoff coming from dirt bridges placed in streams, water discharged out of a recording device, and road reconstruction activities in and near tributaries and other receiving waters, including Lake Poway. Pollutant categories include metals, synthetic organics, sediment, nutrients, debris, oxygen demanding substances (decaying vegetation, animal waste, and other organic matter), and other pollutants which may cause aquatic toxicity in the receiving waters. There are at least eight culverts under the trails above Lake Poway draining storm water and effluent into Waters of the United States.

Exhibit 1
Page | 25

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

134.   The beneficial uses of the streams in Warren Canyon and in Lake Poway itself include municipal and domestic supply, agricultural supply, industrial service supply, industrial process supply, wildlife habitat, cold freshwater habitat, preservation of biological habitats of special significance, contact water recreation, and non-contact water recreation. See State Water Resources Control Board, Beneficial Use Designation under the Porter-Cologne Water Quality Control Act.

135.   The City of Poway's Jurisdictional Runoff Management Plan has identified the following pollutants coming from its MS4 in Warren Canyon: Indicator Bacteria, Color, Manganese, Mercury, Nitrogen, pH, Phosphorus, Viruses, Turbidity, and Nutrients.

   1.   **The City of Poway is liable for the point source pollution coming from its unpaved road culvert crossings following the winter storms of 2017.**

136.   The City of Poway owns a MS4 above Lake Poway. The MS4 comprises Warren Creek and two tributaries to Warren Creek, all of which flow into Lake Poway. The City of Poway has three culvert crossings composed of dredge and fill material over these creeks, and the City regularly maintains them on at least a yearly basis with machinery such as tractors, which add new fill materials to the jurisdictional waters. The photograph below depicts the hiking trails above Lake Poway in 2012 (the red arrow shows the approximate location of the main Warren Creek crossing).



Exhibit 1
Page | 26

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

137.      Beginning on January 20, 2017, the crossings over Warren Creek and its tributaries began to wash away when heavy rains commenced. On February 27, 2017, the largest portions of the access road/trails surrounding Lake Poway were washed out, including at least three crossings over Warren Creek and its tributaries upstream of Lake Poway. The photograph below, taken in March 2017, depicts the City's hiking trails above Lake Poway. Three red arrows point to the approximate location of the culvert crossings that were destroyed. As shown by the red arrow at the bottom right of the photograph below, one of the crossings had not been repaired when the photograph was taken (the crossing within Warren Creek located at 33° 0.187' N; 117° 0.325' W). There are at least five additional culverts placed under the trails above Lake Poway.



Exhibit 1
Page | 27

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

138.     Between January 20, 2017 and April 17, 2017, several tons of dredge and fill material
slowly made its way into Lake Poway after the disintegration of the dirt crossings caused by the
surge of storm water that flowed each and every day between January 20, 2017 and April 17,
2017. With the addition of pollution from the City's point sources, the storm water flowing
through the City's MS4 upstream of Lake Poway was composed of highly concentrated amounts
of sediment, debris, waste, herbicides, pesticides, metals, asbestos, and other illicit substances
before the water hit the Boulder Bay area of Lake Poway. The polluted water was discharged
into Lake Poway on a daily basis from January 20, 2017 to April 17, 2017 and caused high
turbidity levels in the reservoir for 87 days straight. The high turbidity levels also decreased the
oxygen levels in the stream and reservoir which harmed aquatic species. The effluent also
destroyed wetland habitat in the area above Boulder Bay. The photograph below, taken in
March 2017, depicts the long-running plume of pollution migrating from Warren Creek and its
tributaries into Lake Poway, the receiving body of water. The excess sediment now sits at the
bottom of the reservoir.



Lake Poway, March 2017

Print Date:
7/20/2018

Map Scale:
1:954

Exhibit 1
Page | 28

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

139.     The City of Poway failed to prevent the high turbidity levels in violation of its NPDES Permit, Order No. R9-2013-0001, as amended by Order No. R9-2015-0001, NPDES No. CAS0109266. The City of Poway should have instituted controls like a turbidity curtain to reduce the discharge of pollutants to the maximum extent practicable, but the City did nothing to prevent the long-running sediment plume from reducing the beneficial uses of Lake Poway as a water storage facility between January 20, 2017 and April 17, 2017. The lost capacity of Lake Poway remains to this day.

140.     On each and every day between January 20, 2017 and April 17, 2017, the City of Poway violated NPDES Permit No. CAS0109266 and the Clean Water Act, 33 U.S.C. § 1311(a) and 33 U.S.C. § 1342(p) as follows:

   a.   NPDES Permit No. CAS0109266, Provision A.1.a provides that "Discharges from MS4s in manner causing, or threatening to cause, a condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited." The City of Poway violated this provision at least 87 times during the winter and early spring months of 2017. Here, the "MS4" encompasses the portion of unpaved access road with drainage systems (culverts) in at least eight locations above Lake Poway; the MS4 also comprises Warren Creek and its tributaries; the "discharge" encompasses the dirt, gravel, fill, and chemical and biological pollutants attached to the sediment that comprised the earthen crossings which disintegrated and became effluent after the winter storms of 2017; the "pollution" comprises the *unreasonable* amounts of dirt, gravel, fill, and chemical and biological pollutants attached to the sediment that was transported into the wetlands downstream of the crossings and into Lake Poway that resulted in the significant losses of many of the beneficial uses of the wetlands and the reservoir; and the receiving waters include the downstream wetlands and Lake Poway. This pollution reduced the beneficial uses of the wetlands by burying the vegetation as well as reduced the storage capacity of the reservoir. Because the City of Poway violated the water quality standards as articulated in narrative form in Provision A.1.a, the City has violated its NPDES permit.

   b.   "The stormwater discharges came from point sources, because they flowed out of artificial 'pipe[s],' 'ditch[es],' and 'channel[s],' 33 U.S.C. § 1362(14)." Decker v. Northwest Environmental Defense Center, 568 U.S. 597, 623 (Scalia, J., concurring in part and dissenting in part). The point source also includes the dredged and fill materials placed around the culverts inside waters of United States by machines such as back hoes. "[T]he definition of a point source is to be broadly interpreted," and courts have uniformly held that earth-moving equipment, such as dump trucks, bulldozers, excavators, plowing equipment, back hoes, and related heavy machinery, are all point sources. See, e.g., Peconic Baykeeper, Inc. v. Suffolk County, 600 F.3d 180, 188 (2d Cir. 2010); Concerned Area Residents for the Environment v. Southview Farm, 34 F.3d 114,

Exhibit 1
Page | 29

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

118 (2d Cir. 1994); <u>Avoyelles Sportmen's League v. Marsh</u>, 715 F.2d 897, 922 (5th Cir. 1983).

c. The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.1.c: "Discharges from MS4s are subject to all waste discharge prohibitions in the Basin Plan" for the reasons given above on each and every day between January 20, 2017 and April 17, 2017. The Basin Plan states: "The discharge of waste to waters of the state in a manner causing, or threatening to cause a condition of pollution, contamination, or nuisance as defined in California Water Code Section 13050, is prohibited."

d. The City of Poway has also violated NPDES Permit No. CAS0109266, Provision A.2.a: "Discharges from MS4s must not cause or contribute to the violation of water quality standards in any receiving waters" for the reasons given above on each and every day between January 20, 2017 and April 17, 2017. "The receiving water limitations included in this Order consist of all applicable numeric or narrative water quality objects or criteria, for receiving waters as contained in the Basin Plan … or in federal regulations."[6] Narrative water quality standards include protecting particular designated uses such as for recreation or public water supply (Lake Poway serves both of these purposes). When pollutants cannot be precisely measured, narrative criteria are used to express a parameter in a qualitative form.

e. The term "pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: the waters for beneficial uses; or facilities which serve those beneficial uses. "Beneficial uses" of the waters of the state that may be protected against quality degradation include, but are not limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves. The City of Poway has violated Provisions A.1.a, A.1.c and A.2.a of its NPDES Permit because its discharge of pollutants from its point sources caused a condition of pollution in the wetlands of Warren Canyon and in Lake Poway that has resulted in the loss of the beneficial uses of these aquatic resources. The reservoir has lost some of its water storage capacity because of Poway's pollution from its point sources – i.e. earthen stream crossings. Also the beneficial uses of the wetlands immediately above Boulder Bay at the entrance into Lake Poway has been lost because of increased sedimentation that has changed the nature of the wetlands there from forested wetlands into herbaceous wetlands.

---

[6] In 2017, Lake Poway had a higher numeric turbidity level than in 2016 and a higher level than allowed by state law for drinking water.

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

    i.   Sediment-laden runoff results in increased turbidity and decreased oxygen in a stream and the receiving reservoir, which in turn results in loss of in-stream habitat for fish and other aquatic species.

    ii.   Sediment-laden runoff can kill fish directly, destroy spawning beds, and suffocate fish eggs and bottom dwelling organisms.

    iii.   Sediment-laden runoff can increase difficulty in filtering drinking water, resulting in higher treatment costs, and can result in the loss of drinking water reservoir storage capacity and decrease the navigational capacity of waterways.

    iv.   Sediment-laden runoff blocks light and reduces growth of beneficial aquatic grasses.

    f.   While exiting the stream crossings, the rush of storm water traveling through the City of Poway's MS4 during the winter storms of 2017 mobilized the stream crossing one piece of sediment at a time until the polluted storm water traveled toward Lake Poway and most of the dredge and fill material from the crossings was deposited either in the wetlands above Boulder Bay or in the lake bottom. The City of Poway is liable under the CWA because (1) the City "discharged pollutants from a point source, (2) the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water, and (3) the pollutant levels reaching navigable water are more than de minimis." Hawai'l Wildlife Fund v. County of Maui, 886 F.3d 737, 749 (9th Cir. 2018).

141.      On February 1, 2018, the City of Poway entered into a contract with CLE Engineering Inc. to perform a bathymetric survey of Lake Poway in order to characterize the thickness of the terrestrial sediment that has deposited in the reservoir from its MS4 system following the Winter Storm Events of 2017. To supply City engineers with options for the removal of terrestrial sediment from Boulder Bay and other identified areas of Lake Poway, CLE will compile a dredge report. The stated goal of the project is to assess the siltation and storage capacity of Lake Poway and a review of the removal of silt from Boulder Bay and adjacent areas. The Feasibility Report will include an evaluation of the constraints and opportunities associated with dredging and dredged material disposal, dredge volumes, dredging needs, and overall project costs of removing the lodged sediment buildup in Lake Poway caused by the City of Poway's illicit activities.

142.      A permittee violates the CWA when it violates any term of its NPDES permit. See Russian River Watershed Prot. Comm. V. City of Santa Rosa, 142 F.3d 1136, 1138 (9th Cir. 1998); see also 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for [an] enforcement action"); Nw. Envtl. Advocates v. City of Portland, 56 F.3d

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

979, 986 (9th Cir. 1995) (noting that "[t]he plain language of [the CWA citizen suit provision] authorizes citizens to enforce all permit conditions"); Environmental Law Handbook 327 ("The primary purpose of NPDES permits is to establish enforceable effluent limitations.").

143.       The City of Poway has failed to fulfill Provision A.4 of its NPDES permit, which provides: "Each Copermitte must achieve compliance with A.1.a, A.1.c, and A.2.a through timely implementation of control measures. . . .Upon a determination by either the Copermittees or the San Diego Water Board that discharges from the MS4 are causing or contributing to a new exceedance of an applicable water quality standard not addressed by the Water Quality Improvement Plan, the Copermittees must submit the following updates to the Water Quality Improvement Plan . . .: Water quality improvement strategies (i.e. BMPs, retrofitting projects, stream and/or habitat rehabilitation projects, adjustments to jurisdictional runoff management programs, etc.) that will be implemented to reduce or eliminate any pollutants or conditions that are causing or contributing to the exceedance of water quality standards."

   a.   Many of the steps to control storm water discharges are simple and not costly, including: installing relatively simple and low cost sediment and erosion control devices such as silt fences before huge storms as a temporary measure until the earthen crossings can be replaced with engineered bridges that will not contribute to the point source pollution in Lake Poway.

   b.   "[C]ompliance with the Provision A.4 does not shield a Copermittee who may have violated Provision A.1.a, A.1.c or A.2.a from an enforcement action" including a citizen suit. The engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. The NPDES permit is designed to allow the iterative process to continue as many times as necessary to fulfill strict water quality standards.

   c.   In my citizens suit, I will seek injunctive relief including a stream restoration and constructed wetland project on APN: 278-210-1800 upstream from Lake Poway to mitigate the environmental damage done by the City of Poway and to fulfill the City's NPDES permit requirements. See Exhibit A. The details of this project have been prepared by Tory R. Walker, who is a registered Professional Engineer, a Certified Floodplain Manager, and a widely recognized storm water quality expert, with over 30 years of experience in water resources planning and engineering. He has overseen hundreds of hydrologic studies, including the preparation of regional drainage master plans and hydrologic model calibrations, and he has analyzed and designed numerous flood and storm water facilities and structures, including in-stream stabilization structures, embankments, channels, culverts and basins. He has analyzed the storm water issues above Lake Poway and has designed a plan to reduce peak flows and to reduce sediment load into the downstream reservoir by reducing non-point source

Exhibit 1
Page | 32

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

pollution through stream bank stabilization and grade control structures that will lead to improved ground water absorption rates on APN: 278-210-1800. The overall project will include wetland habitat creation and enhancement suitable for a mitigation bank. See Exhibit B.

**2. In 2017, the City of Poway rebuilt the destroyed earthen crossings in its MS4 right above Lake Poway in violation of sections 301, 401, and 404 of the Clean Water Act.**

144.     On January 24, 2017, the Poway City Council adopted Resolution No. 17-004 which declared an emergency within the City of Poway and suspended environmental review and the notice and bidding requirements in connection with emergency repairs due to significant winter storms that occurred on January 20 and February 27 of 2017.

145.     In its July 18, 2017 Report of Emergency Repair Expenditures Pertaining to Resolution No. 17-004, the City listed $4,500 as a current expenditure on storm drain/CMP (corrugated metal pipe) repairs at Lake Poway. There are at least eight locations in the vicinity of Lake Poway where storm drain CMP culverts are used to drain water into Lake Poway from various streams and tributaries coming off the nearby hills and mountains. At least three of these culverts were repaired following the 2017 Winter Storm Event.

146.     On April 17, 2017, the City of Poway started a project in Warren Creek, a blue-line stream as depicted on a USGS topographic map that flows into Lake Poway, which is considered navigable "waters of the United States." The City described the project in its Army Corps of Engineers' Regional General Permit 63 as follows: "Place 48" tall x 72" wide x 20' long oval corrugated metal pipe (CMP) into 0.007 acre of non-wetland waters of the U.S. No excavation, pushing, shoving or contouring of the soil occurred while placing the pipe." After placement of the CMP, staff hand placed rocks and boulders with the assistance of a back hoe and backfilled/compacted the remaining area with soil and class II base material." The City described the purpose of the activity as follows: "Provide vehicular access around the lake for the maintenance of trash receptacles, trails, and other related assets, and the pumping of spoiled porta pots to eliminate the potential for human waste in proximity of drinking water. Provide emergency access for the City of Poway Fire Department in response to reports of traumatic injury, dehydration, acute medical emergencies such as heart attacks and strokes. Many of these emergencies require a rapid delivery of paramedic services and transport to a hospital for continued patient care. The activity was the minimum necessary to alleviate the immediate emergency." The City described the following erosion and sediment control measures implemented: "Straw wattles and booms were placed downstream. Staff performed all work from the adjacent access control road, and no upstream and downstream material in the tributary was pushed, shoved, or contoured." The City described the following pollution prevention measured implemented: "Spill containment materials were onsite; no equipment or

Exhibit 1
Page | 33

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

vehicle fueling, lubrication, or maintenance were performed onsite; no equipment was placed in the tributary."  The City finished the project on April 20, 2017.

a.  Although the City of Poway described the project as occurring under "emergency" conditions, "emergency" conditions (as defined by state and federal law) ended by March 2017 when the winter rains subsided. Thus, the City of Poway violated the timing and situational requirements of its RGP 63 general permit because the threat of stormy weather had greatly subsided by the spring of 2017.  The pictures below were taken on April 17, 2017, the day that construction of the new stream crossing began.



b.  The City of Poway submitted the pictures above and the pictures below to the Department of the Army and to the State Water Board in its "Final Report for Regional General Permit 63 for Repair and Protection activities in Emergency Situations (RGP 63)."

Exhibit 1
Page | 34

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935



c.  However, the City of Poway completed unauthorized work in addition to this rebuilt culvert crossing pictured above and violated the RGP 63 condition that the work authorized be the minimum necessary to alleviate the immediate emergency. The City of Poway failed to disclose to the federal and state authorities the recording device placed adjacent to the crossing within the location of the historical stream and the discharge pipe attached to the culvert releasing non-storm water into its MS4. The pictures below were taken in April 2018 at this same location.



Exhibit |

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935



d. The RGP 63 permit states that work not described in the permit application documentation but deemed necessary after a field assessment is not authorized unless acknowledged by appropriate means. Permit modifications must also be described in sufficient detail in the post-project report. The City of Poway failed to mention the recording device and the discharge pipe, and the resulting loss of wetlands for their placement, in its post-project report.

e. The recording device and the attached discharge pipe have additional adverse effects on aquatic resources including wetlands in the immediate vicinity. The City of Poway has not engaged in a mitigation project to compensate for these effects.

Exhibit I
Page | 36

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

f.   Although the City of Poway obtained a generalized Section 401 Water Quality
Certification by submitting its Final Report to the State Water Board, the certification
that the City received violated the RGP 63 condition that situations that do not meet the
definition of "emergency" require an individual water quality certification. The City of
Poway never obtained an individual water quality certification for its crossing and its
discharge pipe in Warren Creek. The individualized Section 401 certification should have
addressed the local basin plan and water quality standards as they pertain to this
project.

g.   The City of Poway failed to engage in all necessary BMPs to control erosion and runoff
from areas associated with the aforementioned action in violation of its CWA permits.

h.   Under RGP 63, restoration must include revegetation with native species. As the
pictures above show, the area has been denuded of native vegetation and has evasive
species such as yellow mustard weed growing there instead.

i.   Most importantly, the City of Poway has not adhered to the requirements of RGP 63
because no discharge of dredge or fill material may occur in the proximity of a public
water supply intake. The City of Poway cannot use RGP 63 or any other general permit
to repair its trail crossings above Lake Poway because the crossings occur in proximity of
a public water supply intake (the Boulder Bay MS4 intake area of Lake Poway is a stone's
throw away from the earthen crossings). The City must apply for an individualized
permit to undertake any access road repair projects above Lake Poway because this
generalized permit condition (or any of the other general permits) can never be
satisfied.

j.   The City of Poway did not adhere to the RGP 63 permit condition mandating that the
structure not impede the normal or expected high flows or cause the relocation of the
water. A future heavy storm would destroy the earthen crossing and mobilize the
dredged and fill material as effluent into the wetlands and reservoir below.

k.   The City of Poway cannot justify placing the recording device and the discharge pipe into
its Warren Creek crossing under NWP 5 because of their proximity to a public water
supply intake. Also, no pre-construction notification was given to the appropriate
authorities and no individual 401 water quality certification was obtained for the device
or the discharge pipe, all of which would have been required by NWP 5 or any
generalized permit.

l.   The City of Poway is likely to repair these crossings without future Department of the
Army authorization.

Exhibit |
Page | 37

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

m.  The City of Poway has no intention of removing the discharge pipe or the recording device. These fixtures are not for temporary scientific research but are required by a Water Rights Agreement signed in 1968 by Poway Municipal Water District and the City of San Diego.

n.  Based on the aforementioned information, I plan to file a citizen suit under the CWA against the City of Poway for conducting unauthorized work in waters of the U.S. without a valid § 404 permit or § 401 certification. The City of Poway has been in violation of § 404 of the CWA for at least 365 days at this location, for a total of at least 365 violations, and the violations are accumulating with each passing day. To the extent that any work done by the City of Poway is deemed to be "permitted" by the EPA, I will sue the EPA under the Administrative Procedure Act for the EPA's failure to veto a "permit" issued by United States Army Corps of Engineers for discharges that have unacceptable adverse effects on waters of the U.S. However, the facts presented here show that at least some of the work was unauthorized and unpermitted, and none of the work received an individualized water quality certification.

o.  The City of Poway has also violated its NPDES Permit No. CAS0109266, Provision A.1.a, which provides: "Discharges from MS4s in a manner causing, or threatening to cause, a condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited." Discharges resulting from winter rains on January 9, 2018 and February 27, 2018 from City of Poway's rebuilt crossing threatened to cause a condition of pollution in the wetlands above Boulder Bay and in Lake Poway. Small amounts of effluent released from its point source crossings entered into the wetlands above Lake Poway and into the reservoir on those dates.

p.  Provision A.1.b of NPDES Permit No. CAS0109266 prohibits non-storm water discharges into MS4s unless such discharges are authorized by a separate NPDES permit. The City of Poway does not have a separate NPDES permit for its discharge pipe attached to its culvert in Warren Creek. The discharge pipe has released processed water that runs through a recording machine that add contaminants such as oils to the water before the water is discharged into the City's MS4. Discharges from this pipe/recording device occurred on January 9, 2018 and February 27, 2018 and will occur in the future on days with heavy rains.

q.  As a remedy for the unauthorized and unpermitted work, I will seek to enjoin the City to undertake a stream restoration and a constructed wetlands project on APN: 278-210-1800 and to purchase the habitat and water quality credits to fulfill the requirements of the CWA and ESA. See Exhibits A and B.

Exhibit 1
Page | 38

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

147.     On July 17, 2017, the City of Poway entered into a contract for the Lake Poway Trail Slope Repair project with the Piperin Corporation. This project was constructed under the January 24, 2017 Proclamation of Local Emergency, which was the City's justification for waiving environmental review and the formal bidding procedures normally associated with this type of project. After the heavy rains in January and February of 2017, City staff discovered cracks in the soil slope adjacent to the Lake Poway access road. The City utilized its on-call geotechnical consultant to perform a limited geotechnical evaluation of the dirt road surrounding Lake Poway. The limited geotechnical evaluation specifically focused on an area where a large crack had formed parallel to the road. During the investigation, it was discovered that the tension crack had formed due to surficial instability of the slope at this location. The project repaired the slope by replacing a section of clogged storm drain pipe and reconstructing the slope by benching the exposed slope face into competent material, and rebuilding the slope with compacted fill. The final cost of the project was $38,976.70. The picture below depicts work done by the Piperin Corporation.



Exhibit 1
Page | 39

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

a. The Piperin project was not executed in "emergency" conditions as the work was done in the dry summer months. The City of Poway abused its emergency powers by suspending environmental review and state bidding laws to repair all of its earthen crossings above Lake Poway including the one repaired by the Piperin Corp. Under state law, the Piperin Corporation may be required to pay the City back for the payment made to them for its work as the work was done in violation of state bidding laws.

b. The City of Poway, the Piperin Corporation, or any other organization failed to procure a valid permit for any of the storm drain/crossing repairs over any of the tributaries feeding Lake Poway. The City of Poway cannot use NWP 14, 3, or 14 to justify any of its culvert crossing repairs above Lake Poway because of the crossings' proximity to a public water supply intake.

c. The City cannot fulfill NWP 14, 3, 14 or any other generalized Department of the Army permit because the City failed to submit pre-construction notifications to the district engineer prior to commencing the repair activity which involved discharges in a special aquatic area and which involved activity in the vicinity of endangered and threatened species protected by the ESA. Because the crossings will not withstand expected high flows and because the City failed to engage in compensatory mitigation of additional riparian areas as required by the generalized permits and the City's Habitat Conservation Plan, the City cannot claim that the work done by City or the Piperin Corporation in waters of the United States was authorized or permitted.

d. The City of Poway is likely to repair these crossings without Department of the Army authorization and without water quality certifications in the future.

e. Based on the aforementioned information, I plan to file a citizen suit under the CWA against the City of Poway for conducting unauthorized work in waters of the U.S. without valid § 404 permits. The City of Poway has been in violation of § 404 of the CWA for at least 365 days at the two other crossing locations in the area above Lake Poway including the one repaired by the Piperin Corporation, for a total of at least 730 violations (the other crossing was repaired by the City of Poway staff). To the extent that any work done by the City of Poway or its agents is deemed to be "permitted" by the EPA, I will sue the EPA under the Administrative Procedure Act for the EPA's failure to veto a "permit" issued by United States Army Corps of Engineers for discharges that have unacceptable adverse effects on waters of the U.S. However, the facts presented here show that all of the work done to repair the other two crossings in tributaries above Lake Poway was unauthorized and unpermitted.

f. The City of Poway has also violated its NPDES Permit No. CAS0109266, Provision A.1.a, which provides: "Discharges from MS4s in a manner causing, or threatening to cause, a

Exhibit |
Page | 40

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

condition of pollution, contamination, or nuisance in receiving waters of the state are prohibited." Discharges resulting from winter rains on January 9, 2018 and February 27, 2018 from the City of Poway's rebuilt crossings threatened to cause a condition of pollution in the wetlands above Boulder Bay and in Lake Poway. Effluent is likely to be released from these point sources every time it rains more than one half of an inch in the future.

g.   The City of Poway failed to procure individualized water quality certifications for any of its tributary crossing repairs in violation of Section 401 (and Section 404) of the Clean Water Act.

h.   As a remedy for the unauthorized and unpermitted work, I will seek to enjoin the City to undertake a stream restoration and a constructed wetlands project on APN: 278-210-1800 and to purchase the habitat and water quality credits to fulfill the requirements of the CWA and ESA. See Exhibits A and B.

148.      The CWA provides independent protection to waters within the jurisdiction of the United States, and this protection extends to critical habitat for threatened and endangered species as listed under the Endangered Species Act. The CWA, like the ESA, is structured to prohibit any harmful action unless the responsible agency concludes that certain ecological standards have been met to minimize and mitigate for that harm. 33 U.S.C. §§ 1251, 1311, 1344; e.g., 33 C.F.R. §§ 323, 325. The combined ecological loss to wetlands has exceeded 0.1 acres when one accounts for the three crossings above Lake Poway in toto and the sensitive wetlands that exists near the exit point of the tributaries which all have been harmed by the sediment deposits coming from the dredged and fill material becoming effluent with the addition of storm water. These wetlands contain Pacific shining willows and other obligate wetland species that are home to endangered and threated species such as California gnatcatcher (Polioptila californica californica), and the Least Bell's vireo (Vireo bellii pusillus). Any valid Army Corp permit would require ESA § 7 consultation, and that consultation for the loss of wetlands was not accomplished. The City of Poway failed to conserve similar habitat as compensatory mitigation for its crossings and the destructive impact that the crossings have had and will have in the future. Alternatively, the regulations require § 7 consultation to be re-initiated when the action of the City causes effects to listed species or critical habitat that were not previously considered. 50 C.F.R. § 402.16.

a.   The City of Poway's unpermitted/unauthorized work in waters of the United States has led to effluent being deposited in other waters of the United States and has destroyed habitat. Based on this theory, I will file a cause of action for the City of Poway's violation of § 404 of the CWA as no discharge of dredged or fill material may be permitted if: (1) a practicable alternative exists that is less damaging to the aquatic environment or (2) the nation's waters would be significantly degraded. In other words, if the City had obtained

Exhibit 1
Page | 41

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

proper permits and had undergone the normal environmental review process, it would have showed that steps were taken to avoid impacts to wetlands, streams and other aquatic resources; that potential impacts were minimized; and that compensation will be provided for all remaining unavoidable impacts. These impacts have harmed sensitive habitat for endangered and threatened species.

b. ESA section 11(g) citizen suits and suits under the Administrative Procedure Act may be brought for a municipality's failure to engage in ESA section 7 consultation that is required for every federal agency action under the Clean Water Act. Alternatively, the federal agencies can be sued for their failure to engage in the section 7 consultation process. The City of Poway has failed to follow the terms of its Habitat Conservation Plan and its requirement that all environmental losses be compensated at higher ratios with purchases of additional land containing *equivalent* habitat values as a result of its activities in waters of the United States.

c. As a remedy for the City's ecological harm in the past and future, I will seek to enjoin the City to undertake a stream restoration and a constructed wetlands project on APN: 278-210-1800 and to purchase those wetland habitat and water quality credits as compensatory mitigation. See Exhibits A and B.

**3. In 2017, the City of Poway rebuilt a destroyed earthen crossings in its MS4 on APN: 278-210-1100 about a mile away from Lake Poway in violation of sections 301, 401, and 404 of the Clean Water Act.**

149.    The City of Poway owns APN: 278-210-1100. The parcel is zoned open-space resource management. According to the City's Habitat Conservation Plan, the parcel contains a listed species, Encinitas baccharis (*Baccharis Vanessae*). The species extends to Mount Woodson and Poway where it is associated with dense southern mixed chaparral. 61 Fed. Reg. 195 (October 7, 1996). The parcel also contains a portion of Warren Creek.

a. The City of Poway maintains a hiking trail on APN: 278-210-1100 called the Warren Canyon Trail. A portion of the trail meets Highway 67 in an extremely steep portion of Caltrans' right of way. The Warren Canyon Trail meanders through the lower reaches of Mount Woodson and leads to Lake Poway.

b. The Warren Canyon Trail crosses over Warren Creek on APN: 278-210-1100. The approximate location of the point of crossing is depicted by a red arrow on the photograph below:

Exhibit 1
Page | 42

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935



Map Provided by the City of Poway

c. After the heavy rains of 2017, the crossing was destroyed and the effluent was deposited in the wetlands of Warren Canyon and into Lake Poway below.

d. As an intermittent stream, water flows in Warren Creek on APN: 278-210-1100 continuously from January to the beginning of April during most years. Rock Haven Spring is located near the parcel and on the adjacent Caltrans right of way. Water from this spring as well as the blue-line stream draining Rock Haven contributes to the water flowing into this portion of Warren Creek.

e. I own the five parcels surrounding the City's open-space parcel: APNs 278-210-1800, 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000. All of this land that I own is zoned rural residential.

f. The City's trail crossing on APN: 278-210-1100 over Warren Creek has resulted in dredged and fill material being intentionally placed in waters of the United States.

g. During the heavy storms of 2017, effluent from the City's crossing resulted in pollution traveling onto my property at APN: 278-210-1800. This pollution harmed the wetlands located on the City's property and my property on each and every day between January



Exhibit 1
Page | 43

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

20, 2017 and April 1, 2017, for a total of 70 violations. This pollution violated the City's NPDES permit, Provisions A.1.a, A.1.c, and A.2.a for many of the same reasons as mentioned above on pages 29-31, #140. Some of this pollution traveled all the way into Lake Poway on those dates (approximately).

h.   In the Spring of 2017, the City repaired this crossing without a proper CWA § 404 permit because the City failed to file a pre-construction notification or obtain a water quality certification for this crossing. The City violated § 404 of the CWA at this location for at least 365 days and the violation continues into the present.

i.   The repaired crossing violated the City's NPDES permit because effluent released from the City's point source of dredged and fill material at its crossing on APN: 278-210-1100 caused and threatened to cause pollution in the form of sediment to be placed on the City's wetlands and my downstream wetlands located on APN: 278-210-1800 on January 9, 2018 and February 27, 2018, both days with heavy rains.

j.   The threat of a discharge onto the City's wetlands and my wetlands continues to this day and will be especially pronounced during the next rainy season, which has been forecasted to be a wet one. In 2017, the area received about 21 inches of rain for the season. In some years, the area has been known to receive over 50 inches of rain, which would wreak havoc on the ecosystem below without safeguards in place ahead of time.

k.   As a remedy, I will seek to enjoin the City to remove the earthen crossing at APN: 278-210-1100 and to undertake a stream restoration and a constructed wetlands project on APN: 278-210-1800 to capture sediment and to reduce peak flows into Lake Poway. Engineer Tory Walker has designed a plan to reduce the pollution in Lake Poway through upstream bank stabilization and grade control structures that will slow flows, reduce erosion, and stabilize an already eroded creek section on APN: 278-210-1800. The overall project will be wetland and upland habitat creation and enhancement suitable for a mitigation bank. See Exhibits A and B.

Exhibit 1
Page | 44

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

I.    The photograph below depicts my parcel APN: 278-210-1800 in yellow; the City's parcel
APN: 278-210-1100 is in pink; Lake Poway is colored blue; and Warren Creek as well as
the stream coming off of Mount Woodson on my parcel are outlined in blue.



4.    **The City of Poway has constructed and maintained an unauthorized hiking trail on
my parcels, APN: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000,
in violation of state trespassing laws and in violation of the ESA and the CWA.**

150.    These four parcels (described in two separate deeds) are located adjacent to the City of
Poway's parcel APN: 278-210-1100. The property line of my parcels reaches to Poway's northern
and northeastern city limit. These four parcels, like the City's parcel, are in Warren Canyon and
contain a portion of Warren Creek, the blue-line stream draining Rock Haven.

Exhibit 1
Page | 45

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

a.  The photograph below depicts four of my parcels (zoned rural residential). The well-maintained hiking trails as shown cross over a portion of Warren Creek. Although most of the water on APN: 278-210-3000 is actually diverted downstream through a culvert that was installed by Caltrans, the historical stream on this parcel is still considered jurisdictional waters of the United States. The City of Poway regularly clears the stream and upland areas of wooded vegetation in violation of state trespassing laws and without a valid § 404 permit, which may be needed if the City has used machinery to clear the remnants of the stream bed. In the picture below, the X marks in lime green are the approximate locations of the endangered species that the City of Poway has cut or destroyed in the process of constructing and maintaining its trails on my parcels.



**Map Provided by the City of Poway**

b.  Under Cal. Penal Code § 601 and 602, it is unlawful to cut down, destroy, or injure any kind of wood growing upon the lands of another. Two federally listed threatened and endangered species have been harmed by the City of Poway: *Arctostaphylos glandulosa ssp. Crassifolia* (Del Mar or Costa Baja manzanita, pictured below) and *Baccharis vanessae*, which has been documented to grow in Poway and on Mount Woodson by the federal government at 61 Fed. Reg. 195 (October 7, 1996).

Exhibit 1
Page | 46

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935



c. Because the City has violated a state criminal trespass law and other state laws, the City is liable under Section 9(a)(2) of Endangered Species Act, 16 U.S.C. § 1538(a)(2)(B), which makes it unlawful to remove, cut, dig up, or damage or destroy any endangered plant in knowing violation of any state law or regulation or in the course of a violation of a state criminal trespass law. The "violation of any law . . . of any State" language of

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

Section 9(a)(2)(B) federalizes the City's violation of state law. The City may also be in violation of 16 U.S.C. § 1538(a)(1) because my parcels contain critical habitat for the California gnatcatcher, the least bell's vireo, and the golden eagle (currently de-listed but protected by another statute), and the City's activities on my parcels may have harmed these species.

d. The City of Poway has several volunteers under the authority and direction of Bob Hahn, Poway's Parks Maintenance Supervisor, who help maintain the City's trails, including those on my parcels. I have spoken with Mr. Hahn, and he has confirmed that the City maintains the trails on my property on a regular basis. I observed the City's maintenance activities on my property during the first week of May of 2018.

e. Although the issuance of an Incidental Take Permit authorizes "take" by any entity under "direct control," Poway's Habitat Conservation Plan is not applicable to my parcels of land unless I agree to be a participant and abide by its terms.

f. According to the City's HCP, if a parcel contiguous to the existing Mitigation Area is found to support high quality habitat or covered species, the property owner may voluntarily request that the property be added to the Mitigation Area. According to Poway's City Planner Joseph Lim, the California Department of Fish and Wildlife had previously urged the City of Poway to purchase APNs: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000 because of the high habitat values and because of the hiking trails through the properties, but the City of Poway decided to pursue other projects instead of obtaining a legal right to use the trails. The fire department uses the trails on my property as an auxiliary route in wildfire situations, and City maintenance crews and volunteers use my trails instead of the City's official access point further south for safety reasons. Several people park their cars on my property to access the Warren Canyon trail rather than parking on the opposite side of Highway 67 and running through the plethora of speeding cars to get to the side where the trailhead is located. Even googlemaps has the trailhead for the Warren Canyon trail on my parcel, APN: 278-210-3000, because it is a better maintained and safer trail with easier access than the alternative.

g. Caltrans has essentially built a crossing over Warren Creek on my property by culverting the water from the stream and diverting it further south into the Caltrans right of way. The City uses my property because the alternative route is steep and dangerous. The City could avoid using its point source crossing at APN: 278-210-1100, which is often impassable during heavy winter storms anyway, by purchasing the right to access my property. Furthermore, by purchasing my parcels, the City would no longer be in violation of the ESA because its taking of listed species would be on City property and under its HCP.

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

h.  My four parcels, APN: 278-210-0300, 278-210-0400, 278-210-2900, and 278-210-3000,
    plus my parcel further downstream, APN: 278-210-1800, have been presented to the
    California Department of Fish and Wildlife as part of a proposed Mitigation Bank. See
    Exhibit B.

i.  I will seek declaratory order and an injunction and civil penalties for the City's violation
    of the Endangered Species Act on my property. In the alternative, I will seek to enjoin
    the City to purchase my five parcels for their full ecological value to fulfill its obligations
    under the ESA and the City's Habitat Conservation Plan's requirements to conserve
    sensitive habitats. (See Exhibit C for the City of Escondido's published habitat credit
    values that are available for purchase as a comparison.)

j.  ESA section 10 provides that "[t]he Secretary shall revoke a permit issued under [the
    Take Permit provisions] if he finds that the permittee is not complying with the terms
    and conditions of the permit." 16 U.S.C. § 1539(a)(2)(C). Some or all of the privileges
    under the permit "may be suspended at any time if the permittee is not in compliance
    with the conditions of the permit, or with any applicable laws or regulations governing
    the conduct of the permitted activity." 50 C.F.R. § 13.27(a) (emphasis added). The
    Secretary should urge the City of Poway to adhere to the terms of its Habitat
    Conservation Plan, including Section 7.1: "Create a legally defensible plan that does not
    result in the taking of private property without just compensation."

**F.   Summary of the Remedies Sought for all of the City of Poway's Violations**

151.    I will seek a court order declaring the City of Poway to have violated and to be in
        violation of its MS4 permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §
        1311(a) and 1342(p), for discharges causing and contributing to exceedances of water quality
        standards. The City of Poway is liable for at least 261 violations from its point source pollution
        coming from its unpaved road culvert crossings between January 20, 2017 to April 17, 2017 and
        for an additional 10 violations on January 9, 2018 and February 27, 2018.

152.    I will seek a court order declaring the City of Poway to have violated and to be in
        violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for engaging in dredge and fill
        activities without a valid permit in five different locations upstream of Lake Poway. The City of
        Poway is liable for a sum total of 1,825 violations of Section 404 of the CWA.

153.    A court order declaring the City of Poway to have violated and to be in violation of
        Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for engaging in dredge and fill
        activities without a 401 Certification pursuant to the Act in at least five locations above Lake
        Poway.

Exhibit 1

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

154.     A court order permanently enjoining the City of Poway from discharging or causing the discharge of dredged or fill materials or other pollutants into any waters of the United States except in compliance with a § 404 permit and § 401 certification.

155.     A court order declaring the City of Poway to have violated and to be in violation of its MS4 permit and Sections 301(a) and 402(p) of the CWA for discharging non-storm water without a separate NPDES permit. The City of Poway is liable for a total of two discharges on January 9, 2018 and February 27, 2018.

156.     A court order declaring that the City of Poway to have violated and to be in violation of the Endangered Species Act for its activities on public land and on private land, APN: 278-210-2900 and APN: 278-210-3000.

157.     A court order adding Lake Poway to the section 303(d) of the CWA list of impaired water bodies.

158.     A court order directing the City of Poway to undertake measures, at the City's own expense and at the direction of the Regional Board and Army Corps, to effect complete restoration of waters of the United States within Warren Creek and its tributaries, to restore the capacity of Lake Poway through sediment removal and to conduct on-site and off-site mitigation for unauthorized and/or unavoidable impacts to waters of the United States, as appropriate.

        i.   As one component of this order, the City can seek CWA Section 319 funds which can be used to conduct activities to ensure the use of Best Management Practices (BMPs) and to develop and implement quality standards in the San Dieguito watershed where nonpoint sources are a substantial contributor of loadings of the pollutants causing impairment (e.g., sediment). These funds can be used to undertake the stream restoration projects on APN: 278-210-1800.

        ii.  As another component of this order, the City can seek FEMA funds under the Hazard Mitigation Assistance (HMA) grant programs, which are available for hazard mitigation measures such as controlling peak flows in the streams above Lake Poway to reduce or eliminate long-term risk to people and property from future disasters such as Poway Dam inundation. Studies have shown that every $1 spend equals $4 of future damages mitigated. HMGP funding can be used for mitigation planning activities. FEMA requires state, tribal, and local governments to develop and adopt hazard mitigation plans as a condition for receiving certain types of non-emergency disaster assistance. Aquifer storage and recovery, floodplain and stream restoration, flood diversion and storage, or green infrastructure methods may support communities in reducing risks

Exhibit 1
Page | 50

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

associated with the impacts of flood and drought conditions. These funds can be used to undertake the stream restoration and constructed wetland projects on APN: 278-210-1800.

iii.   As off-site mitigation, I will seek an order for the City to undertake as many stream, channel, and/or habitat rehabilitation projects within the Watershed Management Area that can feasibly be implemented to protect and/or improve conditions in receiving waters from MS4 pollutants and/or stressors within the Lake Poway/Warren Canyon sub-watershed area including the projects outlined in Exhibit A.  The photograph below depicts the two streams located on APN: 278-210-1800 (the Kelly property) and the location of the proposed restoration projects.  The northerly and southerly drainage areas both drain storm water and spring water into Lake Poway.



Exhibit 1
Page | 51

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

159.    A court order directing the City of Poway to cease illegal activities on my parcels and to justly compensate me for the taking of my private property, which is part of a proposed mitigation bank that has been evaluated by the California Department of Fish and Wildlife. See Exhibit B.

160.    A court order assessing civil monetary penalties for each violation of the CWA and ESA as described.

161.    A court order awarding my reasonable costs of suit, including attorney, witness, expert and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); Section 11(g)(4) of the Endangered Species Act, 16 U.S.C. § 1540(g)(4); and Section 2412(d) of the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

**G.    Notice Requirements and Conclusion**

I am representing myself pro se in the matters discussed in this letter. I can be reached at the address and telephone number located on the letterhead for notification purposes.[7] I am open to discuss ways to avoid litigation, and I hope that I can work with the City of Poway and the state and federal agencies in crafting a legal solution to the matters discussed in this letter.

Sincerely,

Kevin T. Kelly

Cc:

David W. Gibson
Executive Officer
California Regional Water Quality Control Board
San Diego Region
2375 Northside Drive, Suite 100
San Diego, California 92108
SanDiego@waterboards.ca.gov

---

[7] For purposes of section 910 of the California Government Code, any lawsuit that may be filed on matters discussed in this notice letter would not be a limited civil case.

Exhibit 1
Page | 52

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

Department of the Army
U.S. Army Corps of Engineers, Los Angeles District
Regulatory Division, Attn: Eric Sweeney
5900 La Place Court, Suite 100
Carlsbad, California 92008
Eric.R.Sweeney@usace.army.mil

California Department of Fish and Wildlife
South Coast Region (Region 5)
Ed Pert, Regional Manager
3883 Ruffin Road
San Diego, California 92123
R5LakeandStreambed@wildlife.ca.gov

Alan B. Fenstermacher
City Attorney, City of Poway
Rutan & Tucker, LLP
611 Anton Boulevard, 14th Floor
Costa Mesa, California 92626

Mike Obermiller, P.E.
Director of Public Works
14467 Lake Poway Road
Poway, California 92064

Steve Vaus
Mayor
City of Poway
13325 Civic Center Drive
Poway, California 92064

John Mullin
Deputy Mayor
City of Poway
13325 Civic Center Drive
Poway, California 92064

Exhibit |

Kevin T. Kelly
Patent Attorney (SBN: 244402)
2669 Hamilton Avenue
El Centro, California 92243
(310) 709-5935

Caylin Frank
Councilmember
City of Poway
13325 Civic Center Drive
Poway, California 92064

Dave Grosch
Councilmember
City of Poway
13325 Civic Center Drive
Poway, California 92064

Barry Leonard
Councilmember
City of Poway
13325 Civic Center Drive
Poway, California 92064

John Ramirez
Assistant City Attorney, City of Poway
Rutan & Tucker, LLP
611 Anton Boulevard, 14th Floor
Costa Mesa, California 92626

Attorney General Jeff Sessions
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Exhibit 1
Page | 54

# EXHIBIT A

Exhibit 1
PS 55



**TORY R. WALKER ENGINEERING**

RELIABLE SOLUTIONS IN WATER RESOURCES

## MEMORANDUM

Date:      August 7, 2018

FROM:    Tory R. Walker, PE, CFM, LEED GA, QISP

TO:        Kevin Kelly
             2669 Hamilton Avenue
             El Centro, CA 92443

RE: Mt. Woodson-Rock Haven Spring Mitigation Bank – Hydrology and Basis of Design

**PURPOSE**

The proposed Mt. Woodson-Rock Haven Spring Mitigation Bank, including its location, site history and resources, surrounding area and topography, is described in greater detail in a companion document the Mt. Woodson-Rock Haven Spring Mitigation Bank Draft Prospectus.

 The prospectus provides a detailed description of the geographical setting for the San Dieguito Watershed, and the potential for water quality benefits and habitat gained with proposed restoration efforts on the Kelly property.  The decline of wetlands nationwide, and in this area in particular, are noted and described.  The purpose of this memorandum is to provide a preliminary hydrologic analysis and basis for design of a bioengineered creek restoration and rehabilitation that will:

1) ensure both the interim and long-term success of proposed wetlands within the mitigation bank, and
2) provide water quality improvements to the downstream watershed.

**WATERSHED HYDROLOGY**

The proposed wetland creation and enhancements within the mitigation bank are located within USGS blue line streams at the west property boundary of the Kelly property (APN 278-210-1800). It is comprised of two separate locations, one on a southerly blue line drainage, and one on a northerly blue line drainage. Each is distinct in design, but also with common elements required for creek stabilization.

One of the elements in common to both is the characteristics of the tributary watersheds; side by side, these two watersheds are very similar in size, shape, soils and geology (high runoff potential), vegetative cover and topography.  Because of these similarities, it is reasonable to estimate storm runoff peak flows as approximately the same; with the northerly watershed



Exhibit 1
Pg 56



Kelly Mitigation Bank
August 7, 2018

—TRWE—

being approximately 233 acres and the southerly watershed being approximately 229 acres, we are estimating peak flows at the northerly restoration site to be 1 percent higher.  Peak flow rates are estimated from StreamStats (see attached) for the 2-, 5-, 10-, 25-, 50- and 100-year recurrence interval storms and listed in Table 1.

### Table 1:  Watershed – Hydrologic Data (cfs)

| Drainage Channel | $Q_2$ | $Q_5$ | $Q_{10}$ | $Q_{25}$ | $Q_{50}$ | $Q_{100}$ |
|---|---|---|---|---|---|---|
| Northerly Drainage (233 Acres) | 14 | 39 | 60 | 89 | 111 | 134 |
| Southerly Drainage (229 Acres) | 14 | 39 | 59 | 88 | 110 | 133 |

On the other hand, seasonal low flows in the northerly drainage are more influenced by the presence of a number of seasonal springs within the watershed, including some perennial springs on the south-facing slopes of Mount Woodson and one spring on the Kelly property upstream of the restoration site.  Absent stream gage data, some subjectivity and additional evidence is required to estimate seasonal flows in these two upper watersheds.  The presence of wetland vegetation at the northerly restoration site does provide evidence for the viability of a small created wetland.  Estimated seasonal average flows (not accounting for baseflows from springs) are listed below in Table 2.

### Table 2:  Monthly Average Flows

| Month | Basin Average Flow (cfs) | |
|---|---|---|
| | North | South |
| Jan | 0.27 | 0.26 |
| Feb | 0.30 | 0.29 |
| Mar | 0.24 | 0.24 |
| Apr | 0.11 | 0.11 |
| May | 0.03 | 0.03 |
| Jun | 0.01 | 0.01 |
| Jul | 0.00 | 0.00 |
| Aug | 0.01 | 0.01 |
| Sep | 0.02 | 0.02 |
| Oct | 0.05 | 0.05 |
| Nov | 0.15 | 0.15 |
| Dec | 0.18 | 0.18 |

These estimated average flowrates are calculated using the rational method, $Q = CiA$, where:
   $C$, runoff coefficient = 0.35 (undeveloped, hydrologic soil group Type D)
   $i$, rainfall intensity (inches per hour) = average per month hourly rainfall intensity (in/hr) from Poway precipitation station data analysis, 1962-2008
   $A$, area (acres) = 233 ac (north); 229 ac (south)

Exhibit 1
PS57

2

513-01



Kelly Mitigation Bank
August 7, 2018

—TRWE—

## APPROACH AND DESCRIPTION OF CREEK RESTORATION AND REHABILITATION

Due to the near-pristine nature of the site, a bioengineering design approach is taken for both proposed sites; the flexibility afforded by using bioengineering techniques must of course be balanced by the need for both short-term and long-term sustainability and stability of the restoration and rehabilitation. Therefore, natural rock grade stabilization structures are proposed at the downstream end of both sites. A portion of both stabilization structures would lie within 60-foot easements for public utilities appurtenant to APN: 278-210-1800.

### Southerly Drainage

The restoration at the southerly drainage location would consist of a natural rock weir, possibly with additional stabilization/reinforcement for potential temporary vehicle access, i.e. Enviroblock® or similar. Enviroblock is a sustainable aggregate building block. The weir elevation would allow for stable slope and other benefits noted below:

- Reestablishes creek profile
- Interim – slows down higher flows that are more erosive by detaining these higher flows; captures sediment, which reduces sedimentation downstream
- Longer term – stable slope with alluvium will increase infiltration of low flow runoff, which will recharge groundwater, facilitate facultative wetland vegetative growth and reduce hydromodification impacts downstream.

Refer to the profile and cross section exhibits attached with this report for reference.

### Northerly Drainage

The restoration at the northerly drainage location would again consist of a natural rock weir, along with some minor grading upstream to create a flat area for wetland habitat. The grading is proposed on the northerly bank and is proposed at an area with little or no native habitat. The upland and oak habitat on the south side of the drainage would remain untouched. The incised gully upstream of the weir/existing road would be filled in and covered by new wetland. The weir elevation would allow for stable slope and other benefits noted below:

- Reestablishes creek profile
- Creates 0.03 additional acres of wetland
- Flows will spread out and increase infiltration of low flow runoff, which will recharge groundwater, sustain wetland vegetation and reduce hydromodification impacts downstream.

Refer to the profile and cross section exhibits attached with this report for reference.



Exhibit 1
PJ 58

513-01



**Kelly Mitigation Bank**
**August 7, 2018**

—TRWE—

**CONCLUSIONS**

The proposed stream and habitat rehabilitation projects at the southerly and northerly drainages on the Kelly property would provide restoration, water quality improvement, and wetland creation benefits to the City of Poway and to the overall San Dieguito Watershed. Finding suitable locations for mitigation banks is becoming more challenging, and this report with backup documentation presents a viable mitigation bank location.  Rehabilitating the streams on the Kelly property to be more sustainably configured would slow down storm water flows and provide more assimilative capacity for pollutants while still being supportive of designated beneficial uses of wetlands.

Exhibit 1
PJ 59

4

513-01



KELLY PROPERTY RESTORATION
for POTENTIAL MITIGATION BANK

RESTORATION LOCATION MAP
and WATERSHED BOUNDARIES



AUGUST 7, 2018

Exhibit 1
Pg 60

# StreamStats Report

**Region ID:**   CA
**Workspace ID:**   CA20180726164820736000
**Clicked Point (Latitude, Longitude):**   32.99765, -116.97571
**Time:**   2018-07-26 09:48:40 -0700



Basin Characteristics

| Parameter Code | Parameter Description | Value | Unit |
|---|---|---|---|
| DRNAREA | Area that drains to a point on a stream | 0.7 | square miles |
| PRECIP | Mean Annual Precipitation | 19 | inches |

Peak-Flow Statistics Parameters [2012 5113 Region 5 South Coast]

| Parameter Code | Parameter Name | Value | Units | Min Limit | Max Limit |
|---|---|---|---|---|---|
| DRNAREA | Drainage Area | 0.7 | square miles | 0.04 | 850 |

Exhibit 1
pg 61

7/26/2018                                                        StreamStats

| Parameter Code | Parameter Name | Value | Units | Min Limit | Max Limit |
|---|---|---|---|---|---|
| PRECIP | Mean Annual Precipitation | 19 | inches | 10 | 45 |

Peak-Flow Statistics Flow Report (2012 5113 Region 5 South Coast)

PII: Prediction Interval-Lower, PIu: Prediction Interval-Upper, SEp: Standard Error of Prediction, SE: Standard Error (other -- see report)

| Statistic | Value | Unit | PII | PIu | SEp |
|---|---|---|---|---|---|
| 2 Year Peak Flood | 26 | ft^3/s | 4.68 | 144 | 134 |
| 5 Year Peak Flood | 74.4 | ft^3/s | 22 | 252 | 83.1 |
| 10 Year Peak Flood | 116 | ft^3/s | 43.1 | 311 | 64 |
| 25 Year Peak Flood | 171 | ft^3/s | 75.3 | 387 | 51.5 |
| 50 Year Peak Flood | 214 | ft^3/s | 101 | 455 | 47.6 |
| 100 Year Peak Flood | 258 | ft^3/s | 121 | 549 | 47.2 |
| 200 Year Peak Flood | 306 | ft^3/s | 142 | 658 | 47.7 |
| 500 Year Peak Flood | 361 | ft^3/s | 160 | 817 | 52 |

*Peak-Flow Statistics Citations*

**Gotvald, A.J., Barth, N.A., Veilleux, A.G., and Parrett, Charles, 2012, Methods for determining magnitude and frequency of floods in California, based on data through water year 2006: U.S. Geological Survey Scientific Investigations Report 2012–5113, 38 p., 1 pl. (http://pubs.usgs.gov/sir/2012/5113/)**

USGS Data Disclaimer: Unless otherwise stated, all data, metadata and related materials are considered to satisfy the quality standards relative to the purpose for which the data were collected. Although these data and associated metadata have been reviewed for accuracy and completeness and approved for release by the U.S. Geological Survey (USGS), no warranty expressed or implied is made regarding the display or utility of the data for other purposes, nor on all computer systems, nor shall the act of distribution constitute any such warranty.

USGS Software Disclaimer: This software has been approved for release by the U.S. Geological Survey (USGS). Although the software has been subjected to rigorous review, the USGS reserves the right to update the software as needed pursuant to further analysis and review. No warranty, expressed or implied, is made by the USGS or the U.S. Government as to the functionality of the software and related material nor shall the fact of release constitute any such warranty. Furthermore, the software is released on condition that neither the USGS nor the U.S. Government shall be held liable for any damages resulting from its authorized or unauthorized use.

USGS Product Names Disclaimer: Any use of trade, firm, or product names is for descriptive purposes only and does not imply endorsement by the U.S. Government.

Exhibit 1
PJ 62

Exhibit 1
PS 63



PROPERTY LINE

65

60

58.5

NATURAL ROCK
(WITHIN EASEMENT)

20'

FL WEIR

58.5

FILL

FILL IN EXISTING GULLY

CREATED WETLAND 0.03 AC

NATURAL ROCK

1" = 20'

N

**TORY R. WALKER ENGINEERING**
RELIABLE SOLUTIONS IN WATER RESOURCES
122 CIVIC CENTER DR, STE 206, VISTA, CA 92084 · 760-414-9212

NORTHERLY DRAINAGE ENHANCEMENT
CONCEPT DRAWING

August 2, 2018

MT. WOODSON - ROCK HAVEN SPRING
MITIGATION PLAN



PROFILE VIEW
NORTHERLY WEIR

Exhibit 1
PS 64



CROSS SECTION
WEIR @ NORTHERLY DRAINAGE

Exhibit 1
pg 65



Exhibit 1
Pg 66

STABILIZED SURFACE

ONSITE WETLAND ENHANCEMENT AREA

PROPERTY LINE

OFFSITE WETLAND ENHANCEMENT AREA

NATURAL ROCK
(WITHIN EASEMENT)

EXISTING ROAD

1"= 20'

N

**TORY R. WALKER ENGINEERING**
RELIABLE SOLUTIONS IN WATER RESOURCES
122 CIVIC CENTER DR, STE 206, VISTA, CA 92084 · 760-414-9212

*SOUTHERLY DRAINAGE ENHANCEMENT*
*CONCEPT DRAWING*

*August 2, 2018*

*MT. WOODSON - ROCK HAVEN SPRING*
*MITIGATION PLAN*



PROFILE VIEW
SOUTHERLY DRAINAGE ENHANCEMENT

Exhibit 1
pg 67



CROSS SECTION
WEIR @ SOUTHERLY DRAINAGE

Exhibit 1
Pg 68

# EXHIBIT B

Exhibit 1
pg. 69



# Mt. Woodson-Rock Haven Spring Mitigation Bank

# DRAFT PROSPECTUS

Bank Sponsor: Kevin T. Kelly
2669 Hamilton Avenue
El Centro, California 92243
Phone: (310) 709-5935
FAX: (760) 353-9143
Email: ktkelly@me.com

RECEIVED

FEB 0 9 2018

DEPT OF ... LAND CURE

Exhibit 1
pg 70



State of California – Natural Resources Agency          **EDMUND G. BROWN JR., Governor**
DEPARTMENT OF FISH AND WILDLIFE                         **CHARLTON H. BONHAM, Director**
South Coast Region
3883 Ruffin Road
San Diego, CA 92123
(858) 467-4201
www.wildlife.ca.gov

March 26, 2018

Mr. Kevin Kelly
2669 Hamilton Avenue
El Centro, California 92243
ktkelly@me.com

**Subject: Draft Prospectus Evaluation for Mt. Woodson-Rock Haven Spring
Mitigation Bank; Tracking Number: 1798-2018-01-R5**

Dear Mr. Kelly:

The California Department of Fish and Wildlife (Department) has completed the initial evaluation
of your draft prospectus that we received on February 8, 2018, for the Mt. Woodson-Rock
Haven Spring Mitigation Bank. This evaluation is distinct from that of any other potential
signatory agency.

A number of issues have been identified that would need to be resolved before the Department
could accept the Mt. Woodson-Rock Haven Spring Mitigation Bank proposal. These issues
include:

  1) Unclear relationship of the bank sponsor with entities identified as fee title holders to the
     proposed bank property in the Draft Prospectus submittal.
  2) Existing and recorded easements and encumbrances that may affect bank
     establishment, operation, and management.
  3) Proposed residence within the current property boundaries.

If a prospectus is submitted, we recommend clarifying all ownership interests in the bank
property and an explanation of how these entities will be involved in the bank's establishment.
Existing easements and encumbrances on the bank property should be summarized and
evaluated for potential effects on conservation values of the bank. Easements and
encumbrances should be depicted on a map. Boundaries may need to be surveyed or
resurveyed by a licensed surveyor and these areas may be excluded from the bank acreage.
The proposed residential site may be outside the future bank boundaries, but access, fuel
modification, and other uses associated with the residence may be excluded from bank
acreage, as well. Further details and documentation will be required and a Property
Assessment and Warranty (https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=
10098&inline) will need to be included if Mt. Woodson-Rock Haven Spring Mitigation Bank
proceeds to draft a Bank Enabling Instrument after the Prospectus.

The draft prospectus, while optional, is intended to identify potential issues early so that the
potential bank sponsor may attempt to address those issues prior to initiating the formal review
process (Fish and Game Code §1798(a)(1)). Additional issues may be identified during the
formal bank review process.

Exhibit 1
Pg 71

*Conserving California's Wildlife Since 1870*

Mr. Kevin Kelly
El Centro, California 92243
March 26, 2018
Page 2 of 2

The Department offers the following additional comments on the Draft Prospectus:

1) Habitat areas should be surveyed to refine acreages of each habitat type.

2) Focused surveys for sensitive species should be performed by experienced and/or permitted biologists at the appropriate time of year to detect presence/absence.

3) The bank sponsor should perform due diligence to ensure that the number and type of credits that may result from this bank will meet the Bank Sponsor's expectations, once establishment and implementation costs and long-term management obligations are factored in.

4) From your conversations with Department staff, it is understood that if the bank is approved, the Bank Sponsor intends to market credits to Caltrans as mitigation for nearby projects. We recommend you contact Caltrans directly to gauge interest in the site as mitigation.

If you choose to submit a prospectus it must be accompanied by a new Bank Submittal Form (https://nrmsecure.dfg.ca.gov/FileHandler.ashx?DocumentID=58780) and the current prospectus review fee[1] [Fish and Game Code § 1798(b)(1)]. For more guidance on what to include in your prospectus please view the prospectus checklist at (https://nrm.dfg. ca.gov/FileHandler.ashx?DocumentID=3954&inline=1) and the Department's web site at http://www.dfg.ca.gov/habcon/conplan/mitbank/.

If you have questions regarding your draft prospectus or the bank review process, please contact Warren Wong at (858) 627-3997 or warren.wong@wildlife.ca.gov.

Sincerely,

Edmund Pert
Regional Manager
South Coast Region

ec: Christine Medak, USFWS, Christine_Medak@fws.gov
    Michael Ladouceur, USACOE, Michael.A.Ladouceur@usace.army.mil

---

[1] Fees may be adjusted annually pursuant to FGC 1799.1(a). The current fee schedule at the time of submittal is the fee required for review of the bank document.

Exhibit 1
Pg 72



# Mt. Woodson-Rock Haven Springs Mitigation Bank

# DRAFT PROSPECTUS
# (Updated)

Bank Sponsor: Kevin T. Kelly
2669 Hamilton Avenue
El Centro, California 92243
Phone: (310) 709-5935
FAX: (760) 353-9143
Email: ktkelly@me.com

Exhibit 1
Pg 73



*The proposed Mt. Woodson-Rock Haven Springs Mitigation Bank is highlighted in yellow. The land in between the highlighted areas is owned by the City of Poway and has been zoned as an open-space resource area.*

### Property Owner

Lot 18 APN: 278-210-18-00
Lot 3 APN: 278-210-0300
Lot 4 APN: 278-210-0400
Lot 30 APN: 278-210-3000
Lot 29 APN: 278-210-2900
Kevin and Alexie Kelly
2669 Hamilton Avenue
El Centro, California 92243
Phone: (310) 709-5935
FAX: (760) 353-9143
Email: ktkelly.com

Exhibit 1
Pg 74₂

# INTRODUCTION

Mitigation banking is the restoration, creation, enhancement, and in exceptional circumstances, preservation of a wetland and/or stream, which offsets expected adverse impacts to similar nearby ecosystems. The banking process is utilized for the compensation of unavoidable wetland and stream losses prior to development actions, when such mitigation cannot be achieved on site. The goal of a successful bank is to replace the loss of function and value of the specific ecosystem that has been or will be adversely affected by a public or private works project. Mitigation banking has become increasingly popular as a mitigation tool, and the public interest is served by a mitigation bank when federal and state agencies require more habitat as mitigation, which is referred to as a mitigation ratio, than is adversely impacted by management or development of nearby acreage.

Since the 1980s the U.S. Army Corp of Engineers (USACE) and U.S. Environmental Protection Agency (EPA) have been implementing mitigation banks to help restore and conserve habitats. Mitigation is a tool for optimizing land use, while preserving and improving land quality. Over 1,800 wetland and stream mitigation banks have been approved by the USACE and the EPA as of August 2013. These are permanently protected areas that are deemed valuable and contain productive stores of natural resources. The main issues addressed on each site are water quality, flood amelioration, ecological diversity, and managed wildlife habitat. These banks serve as offsets for adverse impacts that have been sustained elsewhere; this is also known as "off-site mitigation." A specified number of credits are issued to bank owners, who then sell them to developers once they are approved by federal and state agencies. Mitigation credits represent the environmental value of the restoration or preservation that is being implemented for a specific area. The value of these credits vary depending on hydrology, vegetation, and the presence of endangered species. These are the main parameters that are used to verify the function of the site, the number of credits that will be awarded to the site, and how much the credits are worth.  The national cost of wetlands ranges from $3,000 to $653,000 per credit; California wetlands cost around $500,000 per credit. The national range of stream value per credit is $15-$700 per linear foot with an average of $260 per foot. And upland conservation habitat and species credits can range in value from $25,000 to $80,000 an acre in California.

Wetlands are the most credited ecosystem due to historical land use. Wetlands weren't always known for the important ecosystems services they provide to people and the environment. Wetlands were once considered worthless because of their inability to produce crops or timber for harvesting or because of their barriers to inhabitable land. Wetlands were regularly drained or filled to provide productive land for agricultural uses. Naturalists began to explore the benefits of wetlands and discovered that they were an important staple in our environment. Wetlands are efficient at taking in sun rays to feed the food chain, and they are important in the global cycle of water, nitrogen, carbon and sulfur. They also provide habitat for birds and aquatic or threatened species, and are useful for water storage, purification, and flood prevention. Due to human interference, wetlands are subject to a range of damages which negatively affects a wetlands' quality or size. In the 1600s there were over 220 million acres of wetlands in the lower 48 states. Since then, there has been a rapid decline in wetlands and only a small fraction of them remain unaltered. There are many activities associated with the degradation of wetlands, including agriculture, commercial and residential development, road construction, impoundment, resource extraction, dredge disposal, and waste. The effects generated by these activities include: sediment, nutrient, pesticide, salt, heavy metal, and selenium pollution; buildup

Exhibit 1
3  Pg 75

of weeds; low dissolved oxygen; and extreme pH. Today, California alone has lost about 99% of its natural wetlands.

In the southern most counties of California (Los Angeles, Orange, and San Diego), while there has been a significant increase in subtidal water along the Southern California Bight, both intertidal and vegetated wetlands have substantially decreased since 1850. (Stein, E. D.; Cayce, K.; Salomon, M. N.; Bram, D. L.; De Mello, D.; Grossinger, R. M.; Dark, S. 2014. <u>Wetlands of the Southern California Coast: Historical Extent and Change Over Time</u>.) The terrestrial watershed process is especially important to the restoration, preservation, and management of downstream tidal wetlands.

In San Diego County, the San Dieguito Lagoon is located in Del Mar, California. The ocean inlet for the lagoon is at the northern section of Del Mar City Beach. The San Dieguito Lagoon contributes to a broad ecosystem that stretches way beyond the coast. It is fed freshwater by the San Dieguito River, whose main headwaters rise on the southern slope of Vulcan Mountain in San Diego County. The San Dieguito River officially begins at the confluence of two streams, Santa Ysabel Creek and Santa Maria Creek, near the town of San Pasqual. From there, the river flows west past the city of Escondido and under Interstate 15 before being impounded by the Lake Hodges Dam to form Lake Hodges. From the dam to its mouth, the river flows through the long and narrow San Dieguito River Park past Del Mar, and broadens into a tidal waterway and a 150-acre lagoon as it crosses under Interstate 5 to empty into the Pacific Ocean.

While the San Dieguito River flows for 23.8 miles, it drains nearly 346 square miles, including portions of the cities of Del Mar, Escondido, Poway, San Diego, and Solana Beach. Several tributaries feed the San Dieguito River, including two blue-line streams and two natural springs located in the City of Poway. These four water sources sustain the wetlands located in the proposed mitigation bank and downstream all the way to the Pacific Ocean.

## PROPOSED WETLANDS BANK LOCATION

The Mount Woodson-Rock Haven Springs area's land use history and current conservation efforts make it an ideal site for a mitigation bank within the San Dieguito watershed. The land is located in Warren Canyon, which sits at the base of Mount Woodson. Mount Woodson is a coastal mountain approximately 18 miles from the Pacific Ocean and 5.5 miles south of San Pasqual (lat. 32°51'05" N, long 116°58'10" W; at S line sec. 27, T 13 S, R 1 W), with an altitude of 2894 feet. Warren Canyon is boxed in to the south by Rock Haven, with a peak 2703 feet above sea level. A "blue-line" stream flows at the base of Rock Haven and underneath Highway 67 through a series of culverts, and it eventually flows through Warren Canyon.

Warren Canyon is drained by Warren Creek that flows nearly four miles to an unnamed canyon eight miles south-southeast of Escondido (lat. 33°01'N, long. 117°00'30"W). It is named on San Vicente Reservoir (1955) 7.5' quadrangle. Today, much of the water from Warren Creek is dammed up in Lake Poway, which was created in 1971. Water continues to flow through seepage underneath the dam or over a spillway and into the unnamed canyon and through the Blue Sky Ecological Reserve and into Sycamore Creek. Sycamore Creek continues along the edge of the Maderas' Golf Club in Poway and through the San Dieguito River Park located in Escondido. Sycamore Creek eventually merges with the San Dieguito River and empties into the Pacific Ocean.

4  Exhibit l
pg 76

The downstream portion of Warren Creek by Lake Poway is fed by four distinct water sources. The only "blue-line" stream with a starting point on Mt. Woodson, which is located half-way up the mountain at about 1800 feet in elevation as shown on the San Pasqual (1954) 7.5' quadrangle, is one source. This "blue-line" stream eventually merges with the blue-line stream coming from Rock Haven into one stream through the rest of Warren Canyon. In addition to these two streams, a natural spring flows out of Rock Haven approximately 9.5 miles north-northwest of Lakeside (lat. 32°29'45"N, long. 116°58'05" W; sec. 34, T 13 S, R 1 W). It is named on San Vicente Reservoir (1955) 7.5' quadrangle. The mouth of Rock Haven Spring is approximately 1000 feet from the proposed mitigation bank site. The spring water flows through a series of culverts located directly underneath Highway 67 and converges directly inside the proposed mitigation bank site with the main "blue-line" stream that flows through Warren Canyon. Moreover, the mouth of a second spring is located within the proposed mitigation bank near the northwestern boundary of APN: 278-210-1800 at about 1379 feet in elevation underneath a prominent boulder. The water from this spring on Mt. Woodson merges with the blue-line stream coming off of Mt. Woodson at about 1359 feet in elevation inside the proposed bank.

In addition to these sources of water, another source of water has significantly contributed to a perennial slope wetland at the base of Mount Woodson and within the proposed mitigation bank site. Slope wetlands exist where topographic or stratigraphic conditions allow groundwater to intersect the surface, creating a zone of perennial or near perennial moisture. Constant groundwater seepage along these topographic or stratigraphic breaks maintains soil saturation and wetland plant communities for prolonged portions of the growing season. Although they may be smaller than other palustrine or riverine wetlands, slope wetlands have been shown to have high plant diversity compared to other wetland types and rate comparatively high for wildlife habitat function.

Groundwater recharge that sustains the slope wetland located inside the proposed mitigation bank is influenced by subsurface geologic and edaphic features, topography, and land use between the recharge area and the point of discharge, which affect the magnitude and timing of water delivery to the wetland and its condition. Alteration of these features has the potential to indirectly affect this slope wetland by altering the hydrology, sediment delivery, and soil or water chemistry of the wetland. The condition of this slope wetland can be degraded as a result of upland activities that interfere with recharge and delivery of subsurface water to the wetland, yet fall outside the jurisdiction of wetland regulatory agencies. In addition to being adjacent to already preserved open-space land within the City of Poway and the County of San Diego, the proposed mitigation bank includes significant upland acreage to ensure the future vitality of the wetlands inside of the proposed mitigation bank. (See Figure 1.)

Exhibit 1
Pg 77

5



*Figure 1: The approximate location of the wetlands of the proposed mitigation bank are highlighted in blue; the upland acreage of the proposed bank is highlighted in green. Land already designated and protected as open space is highlighted in red.*

Most of the wetland acreage of the proposed Mount Woodson-Rock Haven Springs Mitigation Bank is located on the approximately 27.18 acre Kelly property, located at the north of Coyote Creek Trail and west of State Route 67 in the City of Poway. (See Figure 2.) The property lies within the central portion of Section 34 of the U.S. Geological Survey 7.5 minute map, San Vicente Reservoir Quadrangle, Township 13 South, Range 1 West. (See Figure 3.) Surrounding land uses include rural residential to the south and west and largely undeveloped land to the north and east. The site is approximately 18 miles from the Pacific Ocean. The site is located within the City of Poway Subarea of the Multiple Species Conservation Program (MSCP) (Ogden 1996a) and the Biological Core and Linkage Area (BCLA) of the Poway Subarea Habitat Conservation Plan/Natural Community Conservation Plan (Ogden 1996b) between the Blue Sky-Mount Woodson and Rock Haven Cornerstones. Currently, this land is zoned as rural residential and contains a conservation easement on the easterly 18.35 acres that is managed by the California Department of Fish and Wildlife. Two of the 18.35 acres within the conservation easement have been reserved for future on-site projects on APN: 278-210-1800, which can include additional wetland creation and water quality enhancement projects.

Exhibit 1
Pg 78

6



*Figure 2: The Kelly property, outlined in green, is approximately 27.18 acres. The area outlined in red is Caltrans's right-of-way for Highway 67.*

      In addition to this largely wetland acreage, the proposed Mount Woodson-Rock Haven Mitigation Bank will also include a small portion of riparian acreage and a large portion of upland acreage on a series of interconnected parcels located approximately 1,500 feet east of the Kelly property, to the north of Highway 67. It is also located in the City of Poway adjacent to land owned by the city of Poway that has been zoned as an Open Space preserve. This land sits directly adjacent to the "blue-line" stream that flows under Highway 67 and into the Kelly property downstream. This land is also zoned as rural residential. There are four parcels, with a combined area of 16.3 acres. (See Figure 4.)

Exhibit 1
Pg 79

7



*Figure 3: U.S. Geological Survey 7.5 minute map, San Vicente Reservoir Quadrangle. The proposed bank is located in Section 34. The boundaries of the proposed bank are outlined in black (lines are approximate).*

Exhibit 1
Pg 80
8



*Figure 4: The land in between the four parcels labeled in red and the 27.18-acre Kelly property on the left (see figure 2) is owned by the city of Poway.*

## SITE RESOURCES

As the Mt. Woodson-Rock Haven Springs Mitigation Bank sits at the edge of the coastal terraces of San Diego County (see Figure 5), it lies in a transition zone that contains a unique array of vegetation that can be characterized as a mixture of Diegan Coastal Sage Scrub, Southern Coast Live Oak Riparian Forest, Open Engelmann Oak Woodland, scrub oak chaparral, Southern Willow Scrub, Granitic Southern Mixed Chaparral, and biota associated with Southern Maritime Chaparral. There are several sensitive



*Figure 5: This diagram, taken from the CIA's website, shows the different physiographic zones of San Diego County. The proposed mitigation bank straddles two main biological zones.*

Exhibit I

Pg 81

9

species located in the proposed bank property that are more typically associated with the immediate coast, including Del Mar Manzanita, Encinitas Baccharis, Nutall's scrub oak, and a sole specimen of pinus muricata, a swamp pine with a very restricted range in California and Baja California that is always found on or near the coast. Growing alongside these rare species are chamise, toyon, mission manzanita, Engelmann Oaks, Coastal Live Oaks, various hybrid species of scrub oak, laurel sumac, and yerba santa. In protected areas facing north and east, several species of ferns and moss grow. In the wetland zone, there are various species of monkeyflower, snapdragons, junctus, willows, and native grasses. Along the slope wetland, mimulus cardinalis, a creeping herb from creeping rhizomes that thrives in moist areas, has been flowering into November as it taps into the groundwater seepage and coastal fog that occurs year round. (See Figure 6.) This portion of the wetlands generally support palustrine emergent plant community compositions that would be classified as freshwater seep.



*Figure 6: A shining willow tree sits on the edge of the slope wetland located in the proposed mitigation bank. The rare San Diego sagewort is growing on sandstone adjacent to the slope wetland. Scarlet monkey flower, a moisture-dependent, facultative wetland plant, is still blooming and is over 3 feet tall when this photo was taken on October 11, 2017. A sole specimen of swamp pine also grows in this area.*

The climate at the proposed mitigation site is unique. There is a weather station located on an easement 20 feet from the proposed mitigation bank that has been tracking the weather for the past year. (See Boulder Oaks Hermitage, Poway, CA at https://www.wunderground.com.) On average, the temperatures are between 5 and 10 degrees cooler than the rest of the city of Poway. Frequently, the coastal fog pushes up against Mt. Woodson, creating an extra thick layer of moisture that takes longer to burn off than other areas of north county San Diego. (See cover photo.) The proposed site also gets almost double the amount of rain than the rest of Poway. Between December 31, 2016 and January 1,

Exhibit 1
10      Pg 82

2018, the station has recorded over 21 inches of precipitation, which is about average for this mountainous region. A sizable portion of this precipitation comes from fog drip. Because of all this precipitation, the perennial streams running through the proposed bank flowed from January until the middle of April in 2017. Near the western edge of the property, a small pond forms for several weeks soon after heavy rains. Following the cessation of precipitation, the groundwater level beneath this alluvial/colluvial wetland remains near the surface for approximately 8 months, and the wetland plant species remain vigorous for the remainder of the year.  Moreover, the proposed site is in a wind-protected area; Mt. Woodson blocks the brunt of the winds coming out of the north and northeast (the dry Santa Ana winds). The strongest recorded winds, which were still under 30 miles per hour, have been recorded in the winter and spring and come out of the west off the Pacific Ocean during storm events.  The Pacific Ocean can be seen from the proposed bank site and it greatly influences the proposed bank site's weather and habitat. (See Figure 7.)



*Figure 7: This photo was taken on November 8, 2017 on the proposed mitigation bank site. The Pacific Ocean and Swami's State Marine Conservation Area, offshore of Encinitas, can be seen in the distance. Cool onshore breezes and fog regularly protect the sensitive maritime chaparral biota located in the proposed bank.*

Exhibit 1
Pg 83

11

Soils mapped onsite consist of acid igneous rock land, 30-90% boulders/rock outcrops (AcG) and Cieneba rocky course sandy loam, 9-30% slopes, eroded (CmE2). (Bowman 1973.) Acid igneous rock land is very rough terrain, containing large boulders and rock outcrops with loam or loamy coarse sand between the rocks. Cieneba rocky course sandy loam is present on the western half of the proposed site and is well-drained, shallow, sand loam soil on rolling hills. The sandstone present on the proposed site supports the rare biota normally associated with southern maritime chaparral present on the property, as well as the other types of chaparral. Rock outcrops make up approximately 10% of this soil type on the western half of the property. In the wetlands area of the proposed bank, hydric soils are present. Inside the slope wetland, thick alluvial soil is present, as indicated by the noticeable iron and manganese depletions in the layered earth visible inside the creeks at the base of Mt. Woodson.

The proposed wetlands support riparian species such as Pacific slender salamander, western road pacific tree frog, and mallard wild ducks. The site is a bird sanctuary, with several species of woodpecker like Nutall's flicker drilling into the wooded chaparral. The meow-like call of the rare California gnatcatcher has been heard onsite. Mammals such as the bobcat and mountain lions have been spotted with night-vision cameras. The Lorquin admiral butterfly has laid claim over the western edge of the property by a shining willow tree near the western property line and has been observed feeding on the mammalian dung. Large birds like the red shouldered hawk and the golden eagle hunt for the numerous rodent prey below. (See Appendix A for a list of all biological species living in the proposed bank.)

## WETLAND ACREAGE CALCULATIONS

As explained earlier, the proposed Mt. Woodson-Rock Haven Springs Mitigation Bank contains two perennial "blue-line" streams, both of which can be classified as headwater streams, as well as natural spring water coming from two sources. One stream begins halfway up Mt. Woodson and is one component of the slope wetland at this location; the other two components feeding the slope wetland are a natural spring on Mt. Woodson and a high groundwater table. The other blue-line stream is fed by runoff from Rock Haven Mountain and Rock Haven Spring to the immediate east of the proposed site. Most of the water that passes through or originates in the proposed bank is captured by Lake Poway. As 99.5% of the water from Lake Poway is imported from the San Diego County Water Authority, the remaining half of percent of water originates almost exclusively from the proposed mitigation bank. As Lake Poway has a 3,800 acre-feet capacity, this means that millions of gallons of water that are captured by the reservoir originate from the two "blue-line" streams and other water sources located in the proposed mitigation bank.

"Headwater streams tend to set the biogeochemical state (i.e., nutrient content) of the larger drainage network. Consequently, riparian buffer strips adjacent to headwater sources are a crucial first step in the movement of water from uplands to streams. Opportunities for wetlands to alter water quality are far lower by the time the water reaches the higher order of streams. In downstream reaches, infrequent over bank flooding is the only remaining mechanism by which the channel flow can come in contact with the floodplain wetland surface." Mark Brinson, *Changes in the Functioning of Wetlands along Environmental Gradients*, WETLANDS, 65, 73 (1993). From a water quality perspective, the marginal contribution of an upstream wetland will be greater than a downstream wetland. Matthew H. Bonds and Jeffrey J. Pompe, *Calculating Wetland Mitigation Banking Credits: Adjusting for Wetland*

Exhibit 1
pg 84

*Function and Location*, 43 Natural Resource Journal 962, 969 (2004). Accordingly, wetland credits allocation should not be site-specific but function-specific.

Current policies place priorities on a combination of no-net-loss quantity requirements and no-net-loss function requirements. It is clear that these are two separate objectives. If the goal is to preserve the value of wetland services (e.g., clean water), the policy focus should be on the functional value of wetlands (e.g., their contribution to water quality) and the differences associated with different wetland sites. It is possible for a system that preserves wetland services to result in a net loss of wetland functional area. Wetland location and buffer zones should thus be accounted for in credit calculations so as to better protect wetland production values and ecological quality.

The value of wetlands for control of storm waters and prevention of downstream flooding has been recognized by numerous investigators. (Coleman and Kline, 1977.) Wetlands may contain many natural resources which intercept, retain, and detain inflowing storm waters so that the outflow hydrograph has less of a peak and a greater time of concentration than the inflow hydrograph. How wetlands function to control storm water is a complex topic. (Novitzki; 1978; Larson, 1981; and Reppert, 1981.) One concept is to treat a wetland simplistically as a designed flood control device and apply standard hydrologic engineering approaches to estimating the wetland's flood storage volume. Another concept is to examine the wetland as a complex ecosystem and assess the various elements of that ecosystem as to their ability to store water and retard water flows during periods of flood or storm discharge. (Coleman and Kline, 1977.) Under the latter approach, it is recognized that wetland vegetation as well as upland vegetation that grow near streams has the potential for reducing the energy of inflowing storm water and retaining water to reduce downstream flooding.

To factor in the spatial dimension to the mitigation credit value equation and the corresponding value that stream-dependent upland vegetation has on the stability and water absorption rate of the slope wetland ecosystem, the system we use to calculate wetland credits located inside the proposed bank will include a significant amount of riparian buffer strip surrounding the two perennial streams on the site. Our basis for calculating wetland acreage is the Standard Operating Procedure of Compensatory Mitigation that has been used by the Army Corp of Engineers, Savannah District. Under their system, mitigation areas will generally not be considered acceptable if they do not include a minimum 25 foot upland or riparian buffer. The required 25 foot minimum width buffer receives no mitigation credit. Only the area of a proposed buffer in excess of the minimum 25 feet will receive consideration for mitigation credit. Portions of buffers may be excluded from calculation of credits if they have been compromised or are of questionable protection value due to shape, condition, location, excessive width, excessive proportion of the total mitigation area, or other factors.

There are approximately 1500 linear feet of streams within the proposed 27.18 Kelly property site that will be placed in the mitigation bank. This number does not account for areas that already have been placed under a conservation easement or areas that will be excluded from the mitigation bank. Additionally, within the other property parcels, there are approximately 800 linear feet of stream that sit directly below the southern portion of these parcels. We propose using an 80-foot buffer zone around these streams to be considered wetland credits. All remaining acres would be considered as non-wetland upland acre credits.

Within the 27.18 acre Kelly property, 16.35 acres have already been set aside for previous mitigation needs and cannot be included in the proposed mitigation bank. This leaves 10.83 acres of

Exhibit 1
Pg 85

13

APN: 278-210-1800 for the proposed bank. For the four other properties, most of the acreage will be included in the proposed bank, with the exception of a small foot trail easement located on one of these parcels, which totals one third of an acre. This leaves 16 acres for the proposed bank from these four other parcels. The buffer zone around the two streams on APN: 278-210-1800 will extend on both sides of the streams. The buffer zone around the one stream located on the other properties will only include the north side of the stream. Including the 80-foot riparian buffer area around each stream (and not giving value to the first 25 feet around the stream as explained above) equals approximately 4 wetland acre credits on APN: 278-210-1800 and 1 wetland acre credits on the other properties, for a total of approximately 5 wetland credits in the proposed Mt. Woodson-Rock Haven Springs Mitigation Bank. The wetland/stream acreage on these parcels can be rehabilitated and enhanced to improve their habitat and water quality values for mitigation usage. All remaining acreage, totaling approximately 21 acres, would be considered as non-wetland upland conservation and habitat species credits. (See Figure 1.)

## PROPOSED SERVICE AREA AND SPECIES CREDITS

The San Dieguito River Watershed Management Area is a drainage area that encompasses approximately 345 square miles, including portions of the cities of Del Mar, Escondido, Poway, San Diego, and Solana Beach, and unincorporated San Diego County. It lies in the west–central portion of the County and neighbors Carlsbad and San Luis Rey Watersheds to the north and Los Penasquitos and San Diego Watersheds to the south. The watershed can be divided into five primary hydrological areas, each with unique geological and environmental features (see figure 8 below):

Solana Beach (905.1)

Hodges (905.2)

San Pasqual (905.3)

Santa Maria Valley (905.4)

Santa Ysabel (905.5)



Figure 8: The Mt. Woodson-Rock Haven Springs Mitigation Bank is located on the southeastern tip of the Hodges (905.2) hydrological area.

Exhibit l
PS 86

14

The proposed mitigation bank lies in the southeastern tip of the Hodges (905.2) hydrological area of the San Dieguitio Watershed. The proposed service area of the wetlands should include all areas downstream of Hodges area and the Solana Beach area (905.1). From a water quality perspective, the marginal contribution of an upstream wetland will be greater than a downstream wetland. Moreover, coastal tidal wetlands are highly dependent on upstream wetlands for their freshwater components. Thus, the wetland credit acres in the proposed bank should be able to mitigate any wetland losses in the Solana Beach (905.1) and Hodges (905.2) areas, including near the coast. And the water quality credits created from stream restoration and wetland creation onsite can be used for Lake Poway or other downstream receiving waters of the San Dieguito watershed.

The biological and climatic resources of the proposed mitigation bank also support using the conservation and species credits generated from the proposed site for all coastally located areas stretching from the Carlsbad watershed areas to the Los Penasquitos watershed areas. The proposed site with its sandstone deposits contains species usually only found in the southern maritime chaparral plant communities like Del Mar manzanita and Encinitas Baccharis. The coastal fog belt stretches to the proposed mitigation site on a regular basis throughout the year and its thickness is often similar to the immediate coast because Mt. Woodson halts the fog belt from going further north and east into Escondido and Ramona (see cover photo). Furthermore, the proposed service area should also extend within a 40-mile radius to areas that contain similar chaparral, oak woodland, and riparian species. For certain conservation credits, it should serve all of San Diego County including coastal areas.

Currently, there are no mitigation banks established in California by CDFW within the San Dieguito watershed and few banks that have species credits. The proposed Mt. Woodson-Rock Haven Springs Mitigation Bank will help fill in a critical need for off-site mitigation needs for future construction in northern and central San Diego County, especially for the Highway 67 expansion project and Lake Poway dredging project that are expected to occur in the coming decade.

Species credits for the following species could potentially be obtained from the proposed bank:

- Coastal California Gnatcatcher

    Coastal California gnatcatcher is a small blue-gray songbird and is listed as threatened by the USFWS under the ESA. It is usually found in coastal sage scrub plant communities, especially those dominated by coastal sagebrush (*Artemisia californica*). The sponsor recorded the call of a gnatcatcher on site on February 19, 2018.

- Least Bell's vireo

    Least Bell's vireo is a small greenish to blue-gray songbird and is listed as endangered by the USFWS under the ESA and endangered under CESA. It is usually found near the water in willow-dominated riparian woodlands. The Bank Property contains and is directly adjacent to critical habitat for this species.

- Del Mar Manzanita

    *Arctostaphylos glandulosa* subsp. *Crassifolia* is a perennial burl-forming shrub in the heath family. It has aerial stems and a smooth red bark. The twigs and young stems


Exhibit 1
Pg 87

characteristically lack glandular hairs but rather have short fine hairs or scattered longer hairs. The leaves are thick, leathery, and dark grey-green, with a reddish margin. The globose fruits are smaller and flatter compared to other subspecies. Unlike the similar Arctostaphylos glauca species which produces allopathic substances that prevent other herbs from growing around its canopy, the Del Mar manzanita located on the proposed site does not produce such allopathic substances. Arctostaphylos glandulosa ssp. Crassifolia has been known to reach elevations of 2400 ft elevation in Baja California, although it is more typically found in lower elevations in San Diego County. (See Federal Register, vol. 61, no. 195, Monday, October 7, 1996.)

- Artemisia palmeri

  This is a rare species of sagebrush that is native to San Diego county. Listed as an endangered species by the state of California, it is found on sandstone along the stream banks of the proposed mitigation bank.

- Engelmann Oak

  This sub-tropical species of oak tree has a limited range and is becoming rare due to urban sprawl. Fossil evidence shows that Engelmann oaks once had a wider range, extending through what is now the Mojave and Sonoran deserts into eastern California and Arizona. There are a few specimens in the proposed bank.

- Baccharis Vanessae

  This plant occurs on steep slopes in the southern maritime chaparral communities of San Diego County and occurs on sandstone. Its range extends to Poway and Mount Woodson (see http://www.whatisthisplant.org/docs/dfg/EndangeredPlants_t_eplants.pdf; see also 61 Federal Register 195 (Monday, October 7, 1996). Encinitas baccharis is associated with Del Mar Manzanita, Mission Manzanita, and Mojave yucca, which are all present inside the proposed mitigation bank.

## SITE HISTORY AND FUTURE

The history of each parcel in the proposed mitigation bank is discussed below:

278-210-18-00 (27.18 acre Kelly property):

In 1942, the state of California secured an easement over the Southwest quarter of Section 34, Township 13 South, Range 1W for the inlet and outlet of drainage structures to build what is now Highway 67. There is a Caltrans monument in the center of the Kelly property that was used for calculating distances by the engineers who built the highway. However, there are no federal or state right of way easements on the 27.18-acre Kelly property. The main reason why the land

Exhibit 1
Pg 88

16

has not been built upon is because it is landlocked by a deep creek that has running water for several months out of the year. Previous owners have installed culverts inside this creek and mounded dirt over it in order to drive their vehicles on the land; however, these temporary crossings have been quickly destroyed by the powerful force of water that flows from Rock Haven and its spring through the "blue-line" stream that runs through the property during the winter and spring. For instance, in a 72-hour period in late February 2017, 7.70 inches of rain fell on Mount Woodson, and all this water quickly destroyed the last earthen crossing installed over this creek. These culverts are no longer in place and the water runs freely through the eroded stream at present. Moreover, a previous owner also installed a culvert inside the slope wetland/stream in the northern drainage area located on the northwestern edge of the Kelly property. Again, a storm event obliterated the culvert and the crossing in 2017. Currently, the culvert is buried underground. Both the northern reach and southern reaches of the property are ideal candidates for stream restoration and wetlands creation. (See Figures 9 and 10 for the location of water resources on the property; Figure 11 depicts the eroded stream on the Kelly property that would benefit from rehabilitation.)

The mineral and water rights have not been severed from the Kelly property. The owners of the land own the water, surface and sub-surface mineral rights.



*Figure 9: APN: 278-210-1800. A fire devastated the region in 1968. The spring on Mt. Woodson located inside the proposed mitigation bank can be seen flowing out of a prominent boulder.*

Exhibit 1
Pg 89



*Figure 10: APN: 278-210-1800. Topo map shows 2 blue-line streams.*



*Figure 11: A previous owner installed a series of culverts in this portion of Warren Creek at APN: 278-210-*
*1800 (the Kelly property) that were washed away after the winter storms of 2017.*

Exhibit 1
Pg 90

18

278-210-0300 (5 acre property)

This five-acre parcel was once owned by the federal government, the Bureau of Land Management. Under the Act of June 1, 1938, "an Act to provide for the purchase of public lands for home and other sites," the land was claimed by Walter Cummings in 1957. Per the Act, the United States reserved all mineral deposits to itself and claimed a 50-foot easement for mining activities located on all boundaries of the parcel. The mining rights have not been leased and are considered abandoned, and the Department of Interior's regulations should allow for a conservation easement on the property despite the severance of the mineral rights required by the 1938 Act.

This parcel also has a four-foot wide easement for utilities located on the northern edge of the property.

This parcel is in pristine condition. The parcel has been zoned residential by the city of Poway.

278-210-0400 (5 acre property)

This five-acre parcel was once owned by the federal government, the Bureau of Land Management. Under the Act of June 1, 1938, "an Act to provide for the purchase of public lands for home and other sites," the land was claimed by Chester Keirsey in 1957. Per the Act, the United States reserved all mineral deposits to itself and claimed a 50-foot easement for mining activities located on all boundaries of the parcel. The mining rights have not been leased and are considered abandoned, and the Department of Interior's regulations should allow for a conservation easement on the property despite the severance of the mineral rights required by the 1938 Act. The parcel has been zoned residential by the city of Poway.

278-210-3000 (2.67 acre property)

This 2.67-acre parcel used to be a five acre parcel before Highway 67 was expanded in the 1980s. The original 5-acre parcel was once owned by the federal government, the Bureau of Land Management. The land was claimed by Chester Keirsey in 1965. The mineral rights have not been severed from this parcel. This parcel deed contains the following language: "There is also reserved a right-of-way for a Federal Aid Highway under 23 U.S.C. 317." The deed was later changed after the expansion of Highway 67. 2.33 acres were removed from the parcel and were deeded to Caltrans as their right of way for Highway 67. The remaining 2.67 acres have been zoned residential by the city of Poway. Highway 67 is not a federal aid highway.

Currently, the eastern edge of this parcel and a large swath of the adjacent land is polluted with the remnants of the old highway's asphalt broken up across this land. Originally, a blue-line stream straddled the 2.67 acre parcel and the Caltrans right of way, but the water has been redirected downstream through a series of culverts. The City of Poway also maintains an unauthorized trail on this parcel. This area is a prime candidate for habitat restoration. (See Figures 12, 13, and 14.)

Exhibit 1
pg. 91



*Figure 12: APN: 278-210-3000. The blue-line stream is shown in its natural state before Highway 67 expansion.*



*Figure 13: APN: 278-210-3000. The blue-line stream was partially undergrounded by Caltrans in the 1980s.*

20

Exhibit 1
Pg 92



*Figure 14: APN: 278-210-3000. Topo map showing the blue-line stream on a 1947 map.*

278-210-2900 (3.63 acre property)

   This 3.63 acre parcel used to be a five-acre parcel before Highway 67 was expanded in the
1980s. This five-acre parcel was once owned by the federal government, the Bureau of Land
Management. Under the Act of June 1, 1938, "an Act to provide for the purchase of public lands
for home and other sites," the land was claimed by Raymond Morris in 1957. Per the Act, the
United States reserved all mineral deposits to itself and claimed a 50-foot easement for mining
activities located on all boundaries of the parcel. The mining rights have not been leased and are
considered abandoned, and the Department of Interior's regulations should allow for a
conservation easement on the property despite the severance of the mineral rights required by
the 1938 Act. In the 1980s, the parcel was subdivided, with a 1.37 acre parcel deeded to Caltrans
to expand their right-of-way for Highway 67.  The remaining 3.63 parcel has been zoned
residential by the city of Poway. It is in pristine condition and contains a manzanita forest with
several species of manzanita including Del Mar Manzanita. There is currently an unauthorized
cleared foot trail on the property maintained by the City of Poway.

Exhibit 1
    Pg 93

APPENDIX A

LIST OF PLANT AND WILDLIFE SPECIES

Biological surveys of the property was conducted by Brock A. Ortega on May 8, 2005 and Michelle L. Balk on May 18, June 21, and October 4, 2005. Biological surveys were also conducted by Kevin Kelly on September 14, 2017, September 30, 2017, October 11, 2017, and October 18, 2017. The following species have been documented inside the proposed Mt. Woodson-Rock Haven Springs Mitigation Bank:

**FERNS**

DRYOPTERIDACEAE – WOOD FERN FAMILY

    *Dryopteris arguta* – coastal wood fern

PTERIDACEAE – BRAKE FAMILY

    *Pentagramma triangularis* spp. *Triangularis* – California goldenback fern

**ANGIOSPERMS (DICOTS)**

ANACARDIACEAE – SUMAC FAMILY

    *Malosma laurina* – laurel sumac

    *Rhus ovata* – sugar bush

    *Toxicodendron diversilobum* – western poison oak

APIACEAE – CARROT FAMILY

    *Apiastrum angustifolium* – bur chervil

ASTERACEAE – SUNFLOWER FAMILY

    *Acourtia microcephala* – sacapellote

    *Artemisia californica* – California sagebrush

    *Artemisia palmeri* – Palmer's sagewort

    *Baccharis Vanessae* – Encinitas baccharis

    *Brickellia californica* – California brickellbush

    *Chaenactis artemisiifolia* – Artemisia pincushion

    *Conyza Canadensis* – horseweed



22

APPENDIX A (Continued)

*Eriophyllum confertiflorum* var. *confertiflorum* – long stem golden yarrow

*Filago gallica* – narrow leaf filago

*Gnaphalium caliornicum* – California everlasting

*Gnaphalium canescens var. beneolens* – white everlasting

*Gnaphalium palustre* – lowland cudweed

*Hazardia squarrosa ssp. Grindelioides* – saw-toothed goldenbush

*Helianthus gracilentus* – slender sunflower

BORAGINACEAE – BORAGE FAMILY

*Cryptantha micromeres* – minute-flower cryptantha

BRASSICACEAE – MUSTARD FAMILY
*Brassica nigra* – black mustard

CAPRIFOLIACEAE – HONEYSUCKLE FAMILY
*Lonicera subspicata var. denudata* – southern honeysuckle

CARYOPHYLLACAE – Pink Family

*Silene gallica* – common catchfly

CISTACEAE -  Rock Rose family

*Helianthemum scoparium* – peak rush rose

CONVOLVULACEAE – MORNING-GLORY FAMILY

*Calystegia macrostegia* – morning glory

Exhibit 1
Pg 95

APPENDIX A  (Continued)

CUCURBITACEAE – GOURD FAMILY

    *Marah macrocarpus* var. *macrocarpus* – manroot, wild-cucumber

ERICACEAE – HEATH FAMILY

    *Arctostaphylos glandulosa* ssp. *Crassifolia* – Del Mar Manzanita

    *Arctostaphylos glauca* – big berry manzanita

    Arctostaphylos glandulosa ssp. Cushingiana – Cushing Manzanita

    *Xylococcus bicolor* – mission manzanita

FABACEAE – OAK FAMILY

    *Quercus agrifolia* var. *agrifolia* – coast live oak

    *Quercus berberidifolia* – scrub oak

    *Quercus engelmannii* – Engelmann or mesa oak

    *Quercus acutidens*

    *Quercus dumosa*

GENTIANACEAE – GENTIAN FAMILY

    Centaurium venustum – canchalagua

HYDROPHYLLACEAE – WATERLEAF FAMILY

    *Eriodictyon crassifolium* var. *crassifolium* – thickleaf yerba santa

    *Eucrypta chrysanthemifolia* – common eucrypta

    *Phacelia cicutaria* – caterpillar phacelia

    *Phacelia parryi* – Parry's phacelia

Exhibit 1
Pg 96

APPENDIX A (Continued)

JUNCACEAE

*Juncus Mexicanus* – Rush

LAMIACEAE

*Monardella viminea* – Willowy Monardella

MALVACEAE – Mallow Family

*Malacothamnus fasciculatus* – chaparral bushmallow

ONAGRACEAE – EVENING PRIMOSE FAMILY

*Camissonia micrantha* – miniature suncup

PAEONIACEAE – PEONY FAMILY

*Paeonia californica* – California peony

PAPAVERACEAE – POPPY FAMILY

*Dicentra chrysantha* – golden eardrops

*Eschscholzia californica* – California poppy

PHRYMACEAE

*Mimulus cardinalis* – Scarlet Monkeyflower

POLEMONIACEAE – PHLOX FAMILY

*Allophyllum glutinosum* – blue false – gilia

*Navarretia atractyloides* – holly-leaf skunkweed

Exhibit 1
pg 97

APPENDIX A (Continued)

POLYGONACEAE – BUCKWHEAT FAMILY

>*Eriogonum fasciculatum* var. *foliolosum* – California buckwheat

>*Pterostegia drymarioides* – granny's hairnet

PORTULACACEAE – PURSLANE FAMILY

>*Calandrinia ciliate* – red maids

>*Claytonia perfoliata* var. *perfoliata* – miner's lettuce

RANUNCULACEAE -  CROWFOOT FAMILY

>*Clematis pauciflora* – ropevine

>*Delphinium* sp. – larkspur

RHAMNACEAE – BUCKTHORN FAMILY

>*Ceanothus crassifolius* – hoaryleaf Ceanothus

>*Ceanothus crassifolius* var. *crassifolius*

>*Ceanothus integerrimus* – deer brush

>*Ceanothus cyaneus* – San Diego Ceanothus

>*Ceanothus spinosus* – Greenbark Ceanothus

ROSACEAE – ROSE FAMILY

>*Adenostoma fasciculatum* – chamise

>*Heteromeles arbutifolia* – toyon, Christmas berry

>*Prunus ilicifolia* – islay, holly-leaf cherry

*Exhibit 1*
*pg 98*

APPENDIX A (Continued)

RUBIACEAE – MADDER FAMILY

> *Galium angustifolium* – narrow-leaved bedstraw
>
> *Galium nuttallii* ssp. *Nutallii* – San Diego bedstraw

SALICACEAE – WILLOW FAMILY

> *Salix lucida* ssp. *Lasiandra* – shinning willow

SCROPHULARIACEAE – FIGWORT FAMILY

> *Antirrhinum coulterianum* – Coulter's snapdragon
>
> *Antirrhinum nuttallianum* ssp. *Nuttallianum* – Nuttall's snapdragon
>
> *Cordylanthus* sp. – bird's beak
>
> *Keckiella cordifolia* – climbing bush penstemon
>
> *Linaria Canadensis* – blue toadflux
>
> *Mimulus aurantiacus* – coast monkey flower, bush monkey flower
>
> *Mimulus guttatus* – seep monkeyflower
>
> *Penstemon spectabilis* – showy penstemon
>
> *Scrophularia californica* var. *floribunda* – California figwort

SOLANACEAE – NIGHTSHADE FAMILY

> *Solanum parishii* – Parish's nightshade
>
> *Solanum xanti* – chaparral nightshade

Exhibit 1
pg. 99

27

APPENDIX A (Continued)

**ANGIOSPERMAE (MONOCOTYLEDONES)**

    LILIACEAE – LILY FAMILY
    *Calochortus weedii* var. *weedii* – Weed's mariposa lily

    *Dichelostemma capitatum* ssp. *Capitatum* – blue dicks

    *Yucca schidigera* – Mohave yucca

POACEAE – GRASS FAMILY

    *Bromus diandrus* – ripgut grass

    *Bromus hordeaceus* – soft chess

    *Bromus madritensis* spp. *Rubens* – foxtail chress

    *Melica imperfecta* – coast range melic

    *Muhlenbergia rigens* – deergrass

    *Nassella lepida* – foothill needlegrass

    *Nassella pulchra* – purple needlegrass

    *Vulpia myuros* var. *myuros* – rattail fescue

WILDLIFE SPECIES VERTEBRATES

**AMPHIBIANS**

PLETHODONTIDAE – LUNGLESS SALAMANDERS

    *Batrachoseps pacificus* – Pacific slender salamander

BUFONIDAE – TRUE TOADS

    *Bufo boreas* – western toad

Exhibit |
pg 100

APPENDIX A (Continued)

HYLIDAE – TREEFROGS

    *Hyla regilla* – Pacific treefrog


**REPTILES**

IGUANIDAE – IGUANID LIZARDS

    *Sceloporus occidentalis* – western fence lizard

    *Uta stansburiana* – side-blotched lizard


XANTUSIIDAE

    *Xantusia henshawi* – granite night lizard


SCINCIDAE – SKINKS

    *Eumeces skiltonianus* – western skink


COLUBRIDAE – COLUBRID SNAKES

    *Lampropeltis getulus – common kingsnake*

    *Pituophis melanoleucus* – gopher snake


VIPERIDAE – VIPERS

    *Crotalus viridis* – western rattlesnake


**BIRDS**


ANATIDAE – WATERFOWL

    *Anas platyrhynchos* – mallard

Exhibit 1
pg 101

29

APPENDIX A (Continued)

ACCIPITRIDAE – HAWKS

    *Accipiter striatus* – sharp-shinned hawk

    *Buteo jamaicensis* – red-tailed hawk

    *Buteo lineatus* – red-shouldered hawk

FALCONIDAE – FALCONS

    *Falco sparverius* – American kestrel

PHASIANIDAE – PHEASANTS AND QUAILS

    *Callipepla californica* – California quail

COLUMBIDAE – PIGEONS AND DOVES

    *Zenaida macroura* – mourning dove

CUCULIDAE – CUCKOOS AND ROADRUNNERS

    *Coccyzus americanus* – yellow-billed cuckoo

TROCHILIDAE _ HUMMINGBIRDS

    *Calypte anna* – Anna's hummingbird

    *Calypte costae* – Costa's hummingbird

PICIDAE – WOODPECKERS

    *Colaptes auratus* – northern flicker

    *Melanerpes formicivorus* – acorn woodpecker

    *Picoides nuttallii* – Nuttall's woodpecker

Exhibit 1
Pg 102

APPENDIX A (Continued)

TYRANNIDAE – TYRANT FLYCATCHERS

    *Sayornis nigricans* – black phoebe

    *Sayornis saya* – Say's phoebe

HIRUNDINIDAE – SWALLOWS

    *Petrochelidon pyrrhonota* – cliff swallow

    *Tachycineta thalassina* – violet-green swallow

CORVIDAE – JAYS AND CROWS

    *Aphelocoma californica* – western scrub-jay

    *Corvus brachyrhynchos* – American crow

    *Corvus corax* – common raven

PARIDAE – TITMICE

    *Baeolophus inornatus* – oak titmouse

AEGITHALIDAE – BUSHTITS

    *Psaltriparus minimus* – bushtit

TROGLODYTIDAE – WRENS

    *Salpinctes obsoletus* – rock wren

    *Thryomanes bewickii* – Bewick's wren

Exhibit 1
pg 103

APPENDIX A (Continued)

POLIOPTILIDAE– GNATCATCHERS

*Polioptila caerulea* – blue-gray gnatcatcher

*Polioptila californica* – California gnatcatcher

VIREONIDAE

*Vireo bellii* – Bell's vireo

TURDIDAE – THRUSHERS AND BABBLERS

*Sialia mexicana* – western bluebird

TIMALIIDAE – LAUGHINGTHRUSH AND WRENTIT

*Chamaea fasciata* – wrentit

MIMIDAE – THRASHERS

*Mimus polyglottos* – northern mockingbird

*Toxostoma redivivum* – California thrasher

PARULIDAE – WOOD WARBLERS

*Dendroica coronata* – yellow-rumped warbler

*Geothlypis trichas* – common yellowthroat

EMBERIZIDAE – BUNTINGS AND SPARROWS

*Amphispiza belli* – sage sparrow

*Melospiza melodia* – song sparrow

*Pipilo crissalis* – California towhee

*Pipilo maculatus* – spotted towhee

*Spizella atrogularis* – black-chinned sparrow

*Zonotrichia leucophrys* – white-crowned sparrow

Exhibit 1
pg 104

32

APPENDIX A (Continued)

FRINGILLIDAE – FINCHES

*Carpodacus mexicanus* – house finch

*Carduelis psaltria* – lesser goldfinch

ACCIPITRIDAE

Aquila chrysaetos – Golden eagle

**MAMMALS**

DIDELPHIDAE – NEW WORLD OPOSSUMS

*Didelphis virginiana* – Virginia opossum

LEPORIDAE – HARES AND RABBITS

*Sylvilagus bachmani* – brush rabbit

SCIURIDAE – SQUIRRELS

*Spermophilus beecheyi* – California ground squirrel

GEOMYIDAE – POCKET GOPHERS

*Thomomys bottae* – Botta's pocket gopher

MURIDAE – RATS AND MICE

*Neotoma lepida* – desert woodrat

Exhibit 1
pg 105

33

APPENDIX A (Continued)

CANIDAE – WOLVES AND FOXES

*Canis latrans* – coyote

PROCYONIDAE – RACCOONS AND RELATIVES

*Proncyon lotor* – common raccoon

FELIDAE – CATS

*Lynx rufus* – bobcat

*Puma concolor* – mountain lion

**INVERTEBRATES**

BUTTERFLIES AND MOTHS

PAPILIONIDAE – SWALLOWTAILS

*Papilio eurymedon* – pale swallowtail

RIODINIDAE – METALMARKS

*Apodemia mormo virgulti* – Behr's metalmark

NYMPHALIDAE – BRUSH-FOOTED BUTTERFLIES

*Junonia coenia* – buckeye

*Limenitis lorquini* – Lorquin's admiral

*Nymphalis antiopa* – mourning cloak

Exhibit 1
Pg 106

34



Exhibit 1
Pg 107

# EXHIBIT C

Exhibit 1
pg 108

 ## About Daley Ranch

This 3,058-acre property, previously frequented by Native Californians of the Kumeyaay and other local tribes, is heavily covered with a variety of threatened and endangered species. There are thousands of acres of Chaparral and Coastal Sage Scrub, several large stands of Coast Live Oak and Englemann Oak, wetlands and non-native grasslands. A number of rare and endangered species, such as the San Diego horned lizard live in this type of habitat.



Each of our 2,136* Conservation Credits equates to an acre of mitigation land. The existing approval of the state and federal Resource Agencies and the on-going land management responsibility of the City of Escondido make the Daley Ranch Conservation Bank a valuable source for mitigation requirements of both public and private development projects.

We would be happy to discuss with you the mitigation needs of your development project, and the applicability of the Daley Ranch Conservation Bank Credits to your particular mitigation requirements.

*Credits as of March 2018



CITY OF ESCONDIDO
201 N BROADWAY
ESCONDIDO, CA 92025





# DALEY RANCH
## Conservation Bank



...Providing Conservation Credits
to satisfy the environmental
mitigation requirements
of development projects
throughout all of western
San Diego County.

Exhibit 1
pg 109

## About the Daley Ranch Conservation Bank



The State of California Department of Fish & Game (CDFG) and the U.S. Fish & Wildlife Service (USFWS) have approved the Daley Ranch Conservation Bank's Credits for either in-kind or out-of-kind mitigation for public and private development projects within Western San Diego County. This Credit Area extends from the Pacific Ocean to the inland mountain ranges, from the Mexico border to Riverside County.

The eligibility of a development project for use of Daley Ranch Conservation Credits is determined by the Resource Agencies (CDFG & USFWS) and the local jurisdiction on a case by case basis during the environmental review process for each project. For development projects located within a Habitat Conservation Plan (HCP), the Plan's mitigation requirements will control the number and type of Credits required for mitigation; for projects not located within an HCP area, the Resource Agencies will determine the number and type of Credits required.

## About the Daley Ranch Conservation Credits



The City of Escondido owns and manages the Daley Ranch Conservation Bank. Within the Conservation Bank there are 2,842 Conservation Credits approved for use as mitigation of five categories of species and habitat. The categories of Conservation Credits, and their asking prices as of March 2018 are as follows:

| Credit Type | Credits Avail. | Cost per Credit |
|---|---|---|
| Chaparral and Coastal Sage Scrub | (1,828 Credits) | $76,000 |
| Coast Live Oak Woodland | (121 Credits) | $57,000 |
| Englemann Oak Woodland | (75 Credits) | $57,000 |
| *Water Dependent Habitat | (11 Credits) | $475,000 |
| *Non-Native Grasslands | (101 Credits) | $55,800 |

*Credit prices are all-inclusive, including all continuing management and restoration expenses. After your purchase of Conservation Credits required for your project, you will have no additional costs for on-going mitigation lands management.*

*\*Water dependent habitat and non-native grassland Credits are reserved for development projects within the City of Escondido.*





**For more information please call:**
**Darren Parker, Associate Planner**
City of Escondido
dparker@escondido.org
(760) 839-4553

Exhibit 1
pg 110

# Daley Ranch preserve also a valuable land bank worth millions



Daley Ranch in Escondido (Katherine Zimmer)



**J. Harry JonesContact Reporter**

Daley Ranch in the northern part of Escondido is a 3,058-acre habitat preserve that is popular with hikers, horseback riders and history buffs.

It also doubles as a land mitigation bank that could bring in more than $140 million to the city's general fund.

Recently, the Escondido City Council approved steep increases to the cost of the land credits it sells at the ranch after an analysis showed the city was charging far less than other banks in the region.

A land mitigation bank allows developers who destroy or alter sensitive natural areas with their projects to offset the damage by purchasing land credits elsewhere in the region. Escondido is the



Exhibit 1
Pg 111

only municipality that owns a land bank in the county. However, several others in the region that are owned by private enterprises have become available in the past decade.

In 1996, the city purchased the ranch for $21 million to thwart development plans.

"It happened to be one of those opportunities," said Jerry Harmon, who was mayor of Escondido at the time.

"The economy was such that developers were looking to unload properties that weren't going to make as much money as other properties were for them ...There were a lot of us in the community as a whole who felt that, wow, this is one of those rare opportunities that doesn't come along every day to purchase a large parcel of land."

The year after the purchase, state and federal Fish & Wildlife agencies approved the ranch as a conservation bank with 2,842 habitat credits, of which all but 200 were controlled by the city.

"There could be a tremendous amount of return to the city as a result of that mitigation bank," Harmon said.

On Jan. 24, the council agreed to raise the prices so that the credits would still be 10 percent cheaper than competing land banks but much higher than what the city has been charging.

For instance, the average regional cost for a Chaparral and Coastal Sage Scrub credit is $80,000. Escondido was charging only $15,000 but will now charge $72,000. Chaparral and Coastal Sage Scrub credits account for the vast majority of ones available at the ranch.

The city still has 2,137 credits for sale. Under the old pricing structure, that would bring in more than $33 million. Under the new pricing structure, sale of the same credits could bring in $143,466,900.

At the rate the credits have been sold the last two decades, however, it would likely take 50 years or more to sell all that are available.

"I think Daley Ranch is one of our biggest assets," Mayor Sam Abed said Friday. "We are very fortunate to have this acreage available to improve our environment."

In the past 20 years, the city has sold just over 500 credits (one credit equals one acre), which have brought in $4.7 million. A small portion of each credit sale ($500) goes toward maintaining the ranch, but most goes straight into the city's general fund.

Often, it's governmental agencies seeking credits, like Caltrans for highway widening projects, or cities needing to build on land in sensitive areas. For instance, Assistant City Manager Jay Petrek told the council, San Marcos and Vista have purchased Daley Ranch credits in the past.

Exhibit 1
pg 112

Of the 2,137 habitat credits available for sale, 1,828 are chaparral and sage. The city also has 121 credits of coast live oak woodland and 75 credits for Englemann Oak Woodland. Both types of those credits have been selling for $20,000 but will now sell for $54,000.

Daley Ranch also has 11 acres of highly valuable water-dependent habitat that could be sold for $450,000 a credit; however, that acreage is reserved for city municipal project mitigation. The same goes for 101 credits of non-native grasslands; however, the city may decide to offer some of those credits for sale in the future.

The council also changed a policy having to do with developers who have purchased credits but haven't followed through with projects. There have been examples in recent years of those developers then reselling the credits at much higher rates and reaping a big profit, Petrek said.

From now on, the council unanimously decided, if that happens, 75 percent of the profit made from such sales will go to the city.

Escondido will also require purchasers to pay within 90 days of agreeing to buy credits. In the past, there were instances where developers waited years to make payments until their projects were off the ground.



Sources: Mapzen; OpenStreetMap   **MICHELLE GILCHRIST** U-T

Exhibit 1
pg 113